John S. PEREIRA, as Trustee of Trace International Holdings, Inc. and Trace Foam Sub, Inc., Plaintiff,

v.

Marshall S. COGAN, Saul S. Sherman, Andrea Farace, Frederick Marcus, Robert H. Nelson, Philip Smith, Karl Winters, Tambra King, Defendants.

No. 00 CIV. 619(RWS).

United States District Court, S.D. New York.

May 8, 2003.

LeBoeuf, Lamb, Greene, & MacRae, L.L.P., by John P. Campo, John S. Kinzey, Theodore J. Fischkin, Thomas G. Rohback, of counsel, New York City, for Plaintiff.

Salomon Green & Ostrow, P.C., by Alec P. Ostrow, Nicholas F. Kajon, Walter Benzija, Jocelyn Keynes, of counsel, New York City, for Marshall S. Cogan.

Swidler, Berlin, Shereff, Friedman, by Guy Petrillo, Yun Lee, Robert Topp, of counsel, New York City, for Saul S. Sherman.

Piper Marbury Rudnick & Wolfe, LLP, by Robert A. Meister, Joshua Sohn, Michael S. Etra, of counsel, New York City,

for Robert H. Nelson, Philip Smith, and
Karl Winters.

*OPINION*

SWEET, District Judge.

## TABLE OF CONTENTS

The Issue.................................................................462

Prior Proceedings .......................................................463

Findings of Fact.........................................................465

Parties .................................................................465
 1. Trace International ...............................................465
 2. The Trustee .....................................................465
 3. Cogan ...........................................................465
 4. Farace ..........................................................466
 5. Marcus ..........................................................467
 6. Nelson...........................................................467
 7. Winters..........................................................468
 8. Smith ...........................................................468
 9. Saddlebrook Office Staff .........................................469

Trace and Its Investments ...............................................470

Trace Transactions and Financings .......................................470

Foamex Going Private Transaction ........................................470
 I. Count I: The Cogan Notes Totaling $14.3 Million ...........................471
 A. The Notes .......................................................471
 B. Cogan's Alleged Offsets ..........................................472
 1. Informal Severance Policy ....................................472
 a. Regular Practice .......................................472
 b. Reasonable Reliance ...................................472
 2. Deferred Compensation .......................................473
 3. Expenses.....................................................474
 II. Count II: Cogan's Excessive Compensation ..............................474
 A. Self–Dealing Versus Ratification of Cogan's Compensation from 1988 to 1994 .....................................................474
 1. The 1987 Agreement .........................................474
 2. Cogan Increases His Salary....................................475
 3. The Board's Ratification of Cogan's Past Compensation ...........476
 4. Cogan's Compensation After January 1, 1995....................478
 5. Board Inaction Regarding the Renewal..........................478
 B. The Experts' Analyses on Fair Compensation.......................479
 1. The Experts' Backgrounds ....................................479
 2. Neither Expert Chose Appropriate Comparator Groups ...........480
 a. Petersen's Group ......................................480
 b. Mines' Group .........................................481
 c. Trace Had Attributes of Both an Equity Fund and an Operating Company ....................................482
 3. Cogan's Compensation from Trace and Its Affiliates Will be Considered For Cogan's Liability ............................483
 C. Cogan's Efforts at Trace .........................................484
 D. Summary ........................................................485

 III. Count IV: Breach of Fiduciary Duty .....................................486
 A. The Alleged Breaches ............................................486

**460**

 1. The Repurchase of Trace Stocks From Dow ......................486
 a. Dow's Investment in 1992 and the Renegotiation in 1995.....486
 b. Cogan's Purchase of the Dow Stocks ........................486
 2. Dividends ................................................488
 3. Cogan's Compensation .........................................490
 4. The Cogan Loans and Notes ....................................490
 a. Cogan Borrows $10.25 Million From Trace...................490
 b. Non–Cogan Defendants' Knowledge .......................491
 i. The $1 Million Loan...................................492
 ii. The Other Loans ....................................492
 5. The Unauthorized Loans and Gifts.............................493
 a. Loans to Maureen Cogan ...................................493
 b. Hank Glantz .......................................494
 c. Loan to George Lowrance .................................494
 d. Loan and Bonus to Helen Lento ............................494
 e. Loans to Robert Nelson ...................................494
 f. Loan to Sinkfeld ........................................495
 g. Loans to Tambra King ....................................495
 6. Cogan's Birthday Party at MOMA .............................495
 7. Cogan's Daughter's Job .......................................497
 a. Golfino's Work ..........................................497
 b. Defendants' Knowledge of Her Job ........................497
 B. Kagan's Testimony on Proper Corporate Governance and Trace's
 Practices..................................................498
 1. Kagan's Testimony ..........................................498
 2. Trace's Practices ...........................................499

IV. Trace was Insolvent or in the Vicinity of Insolvency Since 1995 Except for
 the Last Quarter of 1996 ..........................................500
 A. The Experts and Their Reports ....................................501
 B. The Balance Sheet Test ..........................................502
 1. Valuation of Foamex .......................................502
 2. Valuation of UAG ..........................................505
 a. Pre–IPO Valuation ......................................505
 b. Post–IPO Valuation ......................................506
 3. Valuation of CHF ..........................................506
 4. Completing the Balance Sheet Test ............................507
 5. Bank of Nova Scotia ("BNS") Asset Appreciation Liability .........508
 6. Adjustments to Trace's Other Assets and Liabilities...............508
 7. Balance Sheets Results......................................509
 C. Blake's Cash Flow and Capital Adequacy Test ......................509
 D. Lenhart's Second Test ..........................................511
 E. Summary ......................................................512

V. Count V: Illegal Dividends and Share Redemption ...........................512

VI. Collateral Offsets ....................................................512
 A. Marcus .......................................................512
 B. Smith ........................................................512

VII. Mitigation by the Trustee .............................................513

CONCLUSIONS OF LAW ......................................................514

 I. Jurisdiction and Venue ...............................................514

 II. Powers of the Trustee ................................................514

 III. Count I: The Cogan Notes .............................................514

| | | A. | Additional Interest, Fees and Charges .............................514 |
|--|--|----|----|

A. Additional Interest, Fees and Charges .............................514
B. Cogan's Claimed Offsets .........................................515
 1. Severance Pay ...............................................515
 2. Deferred Compensation ......................................516
 3. Reimbursement ..............................................517
C. Summary .......................................................517

IV. Count II: Cogan's Excess Compensation.................................517
 A. The Burden Will Remain with Cogan in the Absence of any
 Independent Board Action ......................................517
 B. Cogan Is Liable for Excess Compensation..........................518
 C. Summary .......................................................519

V. Count IV: Breach of Fiduciary Duty ...................................519
 A. A Fiduciary Duty to Creditors Exists for the Period from 1995 to
 1999 When Trace Was Insolvent ................................519
 B. Fiduciary Duties Owed to Trace .................................521
 C. Whether the Officer–Defendants may be Held Liable for the
 Alleged Breaches ..............................................522
 1. Dow Re–Purchase ...........................................522
 a. Smith ...................................................522
 b. Winters ................................................522
 2. Dividends .................................................523
 a. Smith ...................................................523
 b. Winters ................................................523
 3. Cogan compensation ........................................523
 a. Smith ...................................................523
 b. Winters ................................................523
 4. Cogan loans ...............................................523
 a. Smith
 b. Winters ................................................523
 5. Other loans ...............................................524
 6. MOMA Party ...............................................524
 7. Golfinos ..................................................524
 D. "Abstention" Not a Defense Where No Actions Taken ...............525
 E. Standard of Review ............................................526
 1. Board Actions..............................................526
 a. Standard of Review .....................................526
 b. The Director–Defendants are Obliged to Prove the
 Entire Fairness of the Transactions as They Breached
 Fiduciary Duties ......................................527
 i. Duty of Loyalty .....................................527
 ii. Duty of Due Care....................................529
 2. Board Inaction ............................................530
 3. The Defendants are not Protected by Section 102(b)(7) ...........533
 F. The Challenged Transactions ....................................534
 1. The Dow/Series A Preferred Transaction .......................534
 2. Dividends .................................................535
 3. Cogan Compensation and Employment Agreement Renewal .......535
 4. Loans to Cogan and Insiders.................................536
 a. Cogan loans ...........................................537
 b. Loans to Insiders.......................................537
 i. Glantz....................................................538
 ii. The Other Loans ....................................538
 5. Cogan's Birthday Party at MOMO ...........................538
 6. Golfinos ..................................................539
 G. Summary .......................................................539

VI. Count V: Dividends and Dow Re–Purchase ............................539

A. The Dividends ...............................................539
 1. Most of the Dividends were Illegal..............................539
 2. Defendants' Collateral Estoppel Argument Fails.................540
 3. The Dow Re-purchase.......................................541
B. Summary ................................................544

VII. Damages Are Available Even Though the non-Cogan Defendants Do not
 Possess Any Particular Funds Belonging to Trace...........................544

VIII. Judgement Reduction Arguments .......................................546
 A. The Properly Asserted Offsets .....................................546
 B. Marcus's Proposed Thirteenth Affirmative Defense ..................547
 C. Sherman Settlement.........................................548
 D. Mitigation.......................................................548
 E. Farace's 1998–99 Liability........................................549

IX. Prejudgment Interest ..............................................550

CONCLUSION .....................................................550

Plaintiff John S. Pereira, as Chapter 7 Trustee (the "Trustee") of Trace International Holdings, Inc. ("Trace International") and Trace Foam Sub Inc. ("Trace Foam") (collectively "Trace") initiated this action against the controlling shareholder of Trace, Marshall S. Cogan ("Cogan") and seven other former Trace directors and/or officers: Saul S. Sherman ("Sherman"); Andrea Farace ("Farace"); Frederick Marcus ("Marcus"); Robert H. Nelson ("Nelson"); Philip Smith ("Smith"); Karl Winters ("Winters"); and Tambra King ("King").[1] The Trustee alleges that Cogan is in default of promissory notes to Trace in the amount of approximately $13.4 million, that Cogan engaged in self-dealing in breach of his fiduciary duty in receiving excess compensation in excess of $23 million, and that all of the defendants are in breach of their fiduciary duty of due care stemming from their failure to carry out their duties in the best interests of Trace and their subordination of those duties to the personal interests of Cogan. Finally, the Trustee also alleges that the Director–Defendants (i.e., Cogan, Farace, Marcus and Nelson) illegally approved the payment of dividends and the redemption of Trace shares when Trace's capital was impaired. After a trial before the Court and upon all the prior proceedings and the findings and conclusions set forth below, judgment will be granted in favor of the Trustee, in part, as set forth below.

*The Issue*

This action presents novel issues of corporate governance under Delaware law. Trace was a privately held corporation that was dominated by its controlling shareholder and founder, Cogan. Its board of directors and officers were content to let Cogan run the show; by and large they claim in their defense that they did not benefit from, and were not aware of, Cogan's self-dealing. Two primary issues are presented.

First, can a controlling shareholder and founder of a privately held corporation be held liable for, colloquially speaking, taking money out of one pocket and putting it into another? Cogan was a widely respected figure in the investment community. He was in large part the reason why

---

1. The case has since been dismissed as to King and settled between the Trustee and Sherman.

Trace was able to attract lenders and investors. Without Cogan, Trace would not have performed as well as it did; it would not even, likely, be an entity. However, Cogan's acts of self-dealing were not without effect to others, as evidenced by the current bankruptcy and because Trace was the holding company of two public companies. Once Cogan created the cookie jar—and obtained outside support for it—he could not without impunity take from it.

The second and more difficult question posed by this lawsuit is what role the officers and directors should play when confronted by, or at least peripherally aware of, the possibility that a controlling shareholder (who also happens to be their boss) is acting in his own best interests instead of those of the corporation. Given the lack of public accountability present in a closely held private corporation, it is arguable that such officers and directors owe a greater duty to the corporation and its shareholders to keep a sharp eye on the controlling shareholder. At the very least, they must uphold the same standard of care as required of officers and directors of public companies or private companies that are not so dominated by a founder/controlling shareholder. They cannot turn a blind eye when the controlling shareholder goes awry, nor can they simply assume that all's right with the corporation without any exercise of diligence to ensure that that is the case.

As discussed later, it is found as a matter of fact that Trace was insolvent or in the vicinity of insolvency during most of the period from 1995 to 1999, when Trace finally filed for bankruptcy. Trace's insolvency means that Cogan and the other director and officer defendants were no longer just liable to Trace and its shareholders, but also to Trace's creditors. In addition, the insolvency rendered certain transactions illegal, such as a redemption

and the declaring of dividends. It may therefore be further concluded that, in determining the breadth of duties in the situation as described above, officers and directors must at the very least be sure that the actions of the controlling shareholder (and their inattention thereto) do not run the privately held corporation into the ground.

### Prior Proceedings

On July 21, 1999, Trace filed for protection under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York. On August 6, 1999, the Office of the United States Trustee appointed an official unsecured Creditors' Committee. See 11 U.S.C. § 1101(a) and (b). On October 18, 1999, the Creditors' Committee, with permission of the Bankruptcy Court, initiated an adversary proceeding by filing a complaint asserting certain causes of action belonging to Trace against Cogan, the Directors and other parties. On January 18, 2000, the Directors moved to dismiss the Complaint. On January 24, 2000, the Bankruptcy Court converted Trace's Chapter 11 case to a Chapter 7 case. On January 25, 2000, the Trustee was appointed. Shortly thereafter, the parties agreed to extend the time for the Trustee to respond to the pending motion to dismiss and, subsequently, that the Trustee would respond by filing an amended complaint.

On January 28, 2000, the Directors filed a motion to withdraw the bankruptcy reference of the adversary proceeding from the Bankruptcy Court, pursuant to 28 U.S.C. § 157(d). On May 15, 2000, the Trustee filed an amended complaint, and on July 31, 2000, the Trustee filed the Second Amended Complaint. The motion to withdraw the bankruptcy reference was granted, pursuant to a stipulation by the parties, on August 28, 2000.

464

In *Pereira v. Cogan*, 2001 WL 243537, 2001 U.S. Dist. LEXIS 2461 (S.D.N.Y. March 8, 2001) (*"Pereira I"*), the Defendants' motion to dismiss the Trustee's Second Amended Complaint on the grounds that, *inter alia*, Counts II, IV, V and VI failed to state a claim was denied. A few of these issues dealt with have resurfaced to be disposed of hereafter.

In *Pereira v. Cogan*, 267 B.R. 500 (S.D.N.Y.2001) (*"Pereira II"*), the Trustee moved for partial summary judgment under Rule 56 of the Federal Rules of Civil Procedure, seeking to hold Cogan liable for the Cogan notes in the aggregate principal of $14 million. The Trustee also moved to dismiss Cogan's two affirmative defenses asserting unrelated offset claims against the notes. Cogan contended entitlement to a $4.7 million offset, based on compensation allegedly due to him under his 1987 Employment Agreement with Trace (the "1987 Agreement"), as renewed in 1997. In addition, he alleged a $12 million offset for severance, retirement and death benefits, under a 1985 Defined Benefit Deferred Compensation and Salary Continuation Agreement (the "1985 Agreement"). The Court granted the Trustee summary judgment with respect to the Cogan notes and voided the renewal of the 1987 Agreement as an unlawful self-dealing transaction and dismissed Cogan's two alleged offset claims.

In *Pereira v. Cogan*, 275 B.R. 472 (S.D.N.Y.2002) (*"Pereira III"*), the Trustee filed a motion under Fed.R.Civ.P. 54(b) for entry of partial final judgment against Cogan on Count I. The Trustee also sought a stay of judgment under Fed.R.Civ.P. 62(h) on condition that Cogan pay the judgment amount into Court, pending the outcome of the action, or pay suitable bond. The Court granted the motion and, on May 14, 2002, entered partial final judgment of $19.5 million (representing the principal and interest on the Cogan notes) under Rule 54(b) and stayed the judgment pursuant to Rule 62(h). To date, Cogan has made no payment into court. Cogan admits to being insolvent. *Id.* at 474, 475.

In *Pereira v. Cogan*, 200 F.Supp.2d 367 (S.D.N.Y.2002) (*"Pereira IV"*), the Trustee moved for partial summary judgment against Cogan seeking to dismiss $14.7 million of alleged offsets in the form of additional compensation or excess benefits claims. The Court dismissed the offsets except for Cogan's $3.6 million severance pay claim, which is addressed herein.

As a result of *Pereira II* through *IV*, the remaining issues under Count I are whether (1) the Trustee is entitled to recover for collection costs (including counsel fees) and late charges under the terms of the Cogan notes and (2) whether Cogan can sustain any of the three remaining alleged offsets: (a) a $3.6 million severance offset under Trace's alleged informal severance policy; (b) a $1.1 million offset for deferred compensation in 1999 on a *quantum meruit* basis; and (c) an offset of $41,265.28 for unreimbursed advances made to Trace.

As a result of *Pereira II*, the invalidity of the 1997 renewal of the 1987 Agreement has already been decided, but the issue in Count II remains whether Cogan received excessive compensation in the total amount of $23,763,206 for the period from July 21, 1993 to December 31, 1999.

The Trustee has withdrawn his fraudulent conveyance claim under Count III seeking avoidance of the 1997 renewal of Cogan's 1987 Agreement and recovery of excess compensation. He also withdrew his claim under Count VI seeking to pierce the corporate veil of Trace and hold Cogan personally liable for Trace's legitimate obligations.

Cogan withdrew with prejudice his demand for a jury trial.

A non-jury trial was held from November 12, 2002, to November 26, 2002. Both sides called a number of witnesses and presented numerous exhibits. Post-trial briefing and argument was completed on April 7, 2003.

### Findings of Fact

The following constitute the findings of fact of this Court and are based upon the trial, approximately 2,000 exhibits, and the proposed findings of facts from the Trustee, from the Officer- and Director–Defendants other than Cogan (collectively "the non-Cogan Defendants") and from Cogan.

### Parties

#### 1. Trace International

Trace International is a Delaware corporation and at all times relevant to this proceeding maintained its headquarters at 375 Park Avenue, New York, New York. Trace International, a privately held corporation, was formerly known by the names General Felt Industries from 1971 to 1987; Knoll International Holdings from 1987 to 1990; and '21' International Inc. from 1990 to 1995. As discussed above, Trace International and Trace Foam filed a petition under Chapter 11 of the Bankruptcy Code on July 21, 1999. The case was converted to proceedings under Chapter 7 on January 24, 2000.

Trace International's financial books and records, including its general ledger, were prepared and maintained in Trace International's Saddlebrook, New Jersey office (the "Saddlebrook Office"). Trace's Saddlebrook Office staff were responsible for Trace's account and bills payable, payroll, cash management, check issuance, bank accounts, bank reconciliations, bank wire transfers, disbursements and receipts. The Saddlebrook staff created financial statements and analyses and effectuated the movements and disbursements of Trace funds. The Saddlebrook Office staff is described in greater detail below.

#### 2. The Trustee

The Trustee was appointed Chapter 7 trustee on January 25, 2000. The Trustee brings this lawsuit by and on behalf of Trace's bankruptcy estate and for the benefit of its creditors. It appears unlikely that Trace's creditors will be paid in full even if the Trustee recovers all of the damages sought in this action.

#### 3. Cogan

Cogan was the majority common stockholder of Trace [2]; Chief Executive Officer ("CEO") of Trace; and Chairman of Trace's Board of Directors (the "Board") from 1984 to 1999. Through these positions, Cogan controlled the management and operations of Trace. Cogan, a graduate of Harvard Business School, was a senior partner at Cogan, Berlind, Weill & Levitt ("CBWL"), prior to joining Trace.

In 1974, Cogan and Steven Swid formed Trace. From 1974 until 1999, Cogan's duties were to buy companies, to fund and invest in those companies, to manage Trace in a responsible way, to govern the company in a way that could attract qualified personnel, and to put controls and policies in play that would allow Cogan to build a company. During that period of time, Cogan assisted Trace and its subsidiaries in raising more than $11 billion of capital. Cogan also was required to fulfill certain operational activities for Trace's subsidiaries, including pricing decisions, customer and supplier relations and personnel decisions.

Cogan received salary and bonuses from Trace as well as from certain Trace affiliates, *i.e.*, Foamex International, Inc.

---

**2.** He owned more than 50 percent of Trace's stock.

("Foamex"), United Auto Group, Inc. ("UAG") and Crown Home Furnishings, Industries, Inc. ("CHF"). As discussed in greater detail below, Cogan received total compensation from Trace and its affiliates of almost $42.1 million from 1993 to 1999. Cogan set the compensation for himself, as well as for the other Defendants.

### 4. *Farace*

Farace was a director and officer of Trace. He was the managing director of investment banking at Lehman Brothers before joining Trace and holds a masters of business administration. Farace was a member of the Board from December 15, 1993 to December 29, 1997. During that period, Farace was Trace's Executive Vice President and then President,[3] from December 15, 1994 to December 29, 1997. Around April 1997, Farace was named CEO of Foamex. His employment functions at Trace ended around June 1997 when he assumed the Foamex position, and he resigned from Trace in December 1997. Farace ceased employment at Foamex in 1999.

Farace served as a transaction specialist at Trace and was sometimes referred to as Trace's in-house investment banker. In that capacity, he participated in the negotiation of numerous transactions on behalf of Trace and its portfolio investment companies, including acquisitions and dispositions, initial public offerings and financings and refinancings. A number of these transactions are described, *infra*. Farace also worked on special projects such as the recruitment of Frank Foley ("Foley") to lead CHF in mid–1997, and the negotiation of Foley's employment agreement.

As a Trace officer, Farace did not sign or approve checks while employed by Trace. He never authorized the transfer of money from Trace to the account of any Trace employee or director, nor did he ever prepare or oversee the preparation of financial statement. Farace did not regularly interact with the Saddlebrook Office or with Trace's outside auditor.

As a Trace director, Farace regularly kept himself apprised of the financial condition of the company by reviewing the Trace audited financial statements, daily cash reports, non-GAAP balance sheets, and through daily discussions with the principal senior executives at Trace. The final annual audited financial statements read by Farace were the 1996 annual statements, which were issued on May 14, 1997. The 1997 annual statements were published after Farace resigned from Trace.

Farace also reviewed all unanimous written consents[4] distributed to him for signature and attended and made presentations at Board meetings in 1995.

Farace's compensation was about $435,000 in 1995, and approximately $1 million in 1996 and 1997. Of Farace's salary in 1997, Trace only paid approximately $240,000, the remainder coming from Foamex.

---

**3.** Farace's duties did not change with the title.

**4.** The Trace by-laws explicitly define an "act of the Board" to include a unanimous written consent. Trace By–Laws, § 2.8. The Delaware General Corporations Law permits such unanimous written consents. Del.Code Ann., tit. 8, § 141(f) ("Unless otherwise restricted by the certificate of incorporation or bylaws, any action required or permitted to be taken at any meeting of the board of directors or of any committee thereof may be taken without a meeting if all members of the board or committee, as the case may be, consent thereto in writing, or by electronic transmission and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the board, or committee.")

## 5. *Marcus*

Marcus was a director and officer of Trace. Marcus was director of institutional sales and a member of the investment policy committee at Carter, Berlind & Weill (a predecessor of CBWL) and then an institutional salesman and a member of the equity investment policy committee at Drexel, Burnham, Lambert before joining Trace. Marcus was a member of the Board from 1975 until March 15, 1999, and he served on the Trace Compensation Committee in 1997 and 1998. Marcus was also an officer of Trace from 1984 through March 1997. He was Vice Chairman of the Board and Trace's Senior Managing Director. Marcus ran the '21' Club as part of his operating responsibilities at Trace.

Marcus was the key Trace executive dedicated to investor relations on behalf of Trace and, in particular, its portfolio companies that were taken public. He was responsible for securing approximately 25% of the orders for the initial public offering ("IPO") shares of Foamex in 1993. Afterward, he continued to serve as Trace's representative to institutional investors with respect to Foamex. Concerning the IPO of UAG in 1996, Marcus likewise assisted in the marketing of the offering to investors and in maintaining relationships and communications with institutional investors before and after the IPO.

In 1996, Marcus worked with Cogan in the establishment of the Trace Global Hedge Fund and brought a major investor into the fund. He was also responsible for launching a Trace restaurant venture in 1994 called Stick to Your Ribs, which operated from approximately 1995 through 1996, when it was destroyed by fire at year-end.

In his duties as an officer, Marcus never supervised the treasury, accounting or bookkeeping operations of Trace, and no one performing such functions reported to Marcus. Nor did he prepare or oversee the preparation of financial statements while at Trace. He did not interact regularly with the Saddlebrook Office or Trace's outside auditor, and he did not sign or approve checks while at Trace.

In his role as a director, Marcus kept himself apprised of the financial condition of the company by reviewing the Trace audited financial statements, daily cash reports, non-GAAP balance sheets and through discussions with the principal senior executives at Trace. He also reviewed the unanimous written consents distributed to him for signature and attended and made presentations at Board meetings in 1995.

Marcus personally invested in Trace by purchasing shares of common stock in 1984 and subsequently in 1991. The cost of these two investments was approximately $850,000.

Marcus' annual compensation was approximately $758,000 in 1994 through 1996. In 1997, his salary was $650,000. Marcus did not receive any compensation from the portfolio companies during this period. Marcus has been in retirement since 1998.

## 6. *Nelson*

Nelson was a director and officer of Trace. A certified public accountant, Nelson was a former auditor at Coopers & Lybrand ("C & L"), Trace's outside auditor, and holds a bachelors degree in business administration. Nelson was the Chief Financial Officer ("CFO") at Trace from February 1987 to 1999, and in 1995 he became Chief Operating Officer ("COO") and Senior Vice President. As CFO, Nelson was ultimately responsible for Trace's financial books and records, including those audited by C & L, and overseeing Trace's annual tax returns and cash man-

agement functions. Nelson was also very involved in Trace's acquisitions and financings. Nelson's office was located in Trace's New York headquarters, and he rarely visited the Saddlebrook Office, where the individuals responsible for creating and maintaining Trace's financial records worked.

In 1996, Nelson dedicated the majority of his efforts to Trace's affiliate, UAG, which went public that year. Although he worked mainly on UAG matters, he retained his CFO title at Trace. Nelson was a member of the Board from June 23, 1994 until January 24, 2000. Nelson became a member of the Compensation Committee on February 16, 1995. Nelson also worked for other Trace affiliates, including CHF and Foamex, each of which he served as a vice president.

Nelson's initial annual compensation was $160,000, but it ultimately peaked at $1.2 million. After working for Trace for one year, Nelson received a $350,000 bonus. During the relevant years, Nelson earned from as much as $872,108 in 1996 as a result of a $600,000 bonus related to the UAG public offering to as little as $58,497 in 1998.

### 7. Winters

Winters was an officer of Trace. A certified public accountant and former auditor at C & L, Winters holds a masters in business administration. Winters was an employee of Trace from September 1993 to December 1999, and on June 23, 1994 he was elected as Vice President of Trace. In 1995, Winters, who reported to Nelson, assumed most of the CFO duties from Nelson, but was not named CFO. Winters' job at Trace was to provide Trace and its operating companies with technical support for accounting issues.

Winters did not calculate Trace's surplus. He did not have a bookkeeping role at Trace, but rather served as a technical consultant with regard to accounting issues. He also provided support to Trace's investment issues regarding Foamex, including an IPO undertaking and began to liaison with Trace lenders and investors. He assisted lenders with due diligence issues including reviewing documents, forecasts, balance sheets, income statements and legal situations to guide them in determining whether to invest in Trace.

Winters had limited involvement in Trace's personnel issues. He had no knowledge of who set Cogan's compensation and no authority to set any Trace employee's compensation. Winters' role in the compensation process was to input into a computer spreadsheet salary and bonus information about personnel other than Cogan and his daughter, who did not appear on that sheet. Winters did not deal with balance sheet issues, GAAP profit and loss statements and GAAP statement of cash flows. Nor did he have the authority to, and in fact never did, approve Trace loans.

Winters' starting compensation was $120,000 from Trace alone. His compensation from Trace and its subsidiaries peaked at $450,000. Trace paid Winters' salary only through the end of 1994. After that time, Winters' salary was paid by Trace subsidiaries, and from Trace he solely received occasional bonuses and the use of a company car.

### 8. Smith

Smith was an officer of Trace. A former partner in the law firm of Akin Gump Strauss Hauer & Feld ("Akin Gump"), Smith was General Counsel of Trace from January 1988 to December 21, 1999. Smith was also Vice President and Secretary.

In the role of corporate secretary, Smith maintained the corporate minute books and, when requested by the chairman, sent out notices of board meetings. He took the minutes of Board meetings and drafted unanimous consents. He was assisted in these matters by King, who eventually replaced Smith as Trace's corporate secretary.

Smith often hired and supervised outside counsel for Trace, including Akin Gump; Willkie Farr & Gallagher ("Willkie Farr"); and the Delaware corporate law firm Richards, Layton & Finger ("Richards Layton"). The three law firms provided advice and drafted memoranda, resolutions and unanimous consents for Trace.

From 1995 to 1998, Trace subsidiaries paid Smith's salary, and his sole compensation from Trace was the use of a company car and an occasional bonus. · In 1999, his total compensation from Trace was $60,000.

### 9. *Saddlebrook Office Staff*

The individuals in the Saddlebrook Office responsible for creating and maintaining Trace's financial records were all long-time Trace employees: Don Betson ("Betson"), Ronald Mamary ("Mamary") and Lever Thompson ("Thompson"). These individuals are not parties to this action.

Betson was Trace's vice president and controller. He supervised the Saddlebrook Office prior to his 1996 departure.

Mamary was Trace's assistant controller under Betson and, after Betson left, Mamary assumed supervisory control of the Saddlebrook Office and was promoted to controller.

Thompson was a twenty-year employee in the Trace accounting department in the Saddlebrook Office. His duties extended to cash management, payroll, reconciling bank accounts and effectuating wire transfers. He also created summaries of Trace's cash and investments.

Mamary, and Betson before him, created financial statements and analysis of Trace's books and records from his computer, on which he maintained Trace's general ledger, in the Saddlebrook Office. Only Mamary and Betson had access to this computer. Trace's New York office employees did not have access to the Saddlebrook computer system.

Mamary regularly generated statements of cash flows backup. Trace's lenders, such as Bank of Nova Scotia ("BNS"), were familiar with these financial documents. Mamary also had the ability to access Trace's bank accounts to effect wire transfers from those accounts.

Betson, Mamary and Thompson all had the ability to contact Trace's outside payroll manager, ADP, and add people to Trace's payroll.

Betson, Mamary and Thompson distributed financial reports out of the Saddlebrook Office.[5]

The Saddlebrook Office staff cut Trace's checks using a mechanical engraved imprint known as a check-stamping machine. The engraved imprint bore Winters' and Mamary's signatures. Either Mamary or Betson operated the check-stamping machine. Nelson, Smith and Winters did not use this machine, and there is no evidence that they ever manually wrote a Trace check. Their approval was not required for such issuance, either.

The Saddlebrook Office staff ordered Trace's wire transfers. In that office, Ma-

---

**5.** As noted above, there is no evidence that Nelson, Smith or Winters prepared those reports.

mary, Betson and Thompson had the ability to direct the wiring of Trace funds from Trace's bank accounts.

### Trace and Its Investments

Trace was primarily a holding company that had three principal investments. It held approximately 44 to 46% of Foamex, which was a public company through the relevant time period. It also held an interest in UAG, first as a private company where Trace owned about 39% and then as a public company after UAG's IPO in October 1996, from which point on Trace owned approximately 22 to 24%. Trace also owned CHF, a private company, from February of 1995 to the end of the period analyzed. Trace's holdings in these entities constitute between 90 and 95% of its assets.

It is also not disputed that Trace had no operations and therefore had no operating expenses. Trace's only expenses were salaries, fringes, office rent, professional fees, administrative salaries and interest. These general and administrative expenses were approximately $13 million per year, or $1.1 million per month. Trace did not have sufficient income to cover these general and administrative expenses.

According to Trace's own financial records, it had negative operating cash deficits ranging from $15.1 million in the year 1995 up to $44.5 million for the year 1998, for a total operating deficit of approximately $103 million for the period.

As a result of the fact that Trace had minimal or no cash flow from its operations, its only means of funding its cash flow deficits was by borrowing against its

primary assets, Foamex and UAG. The value of Trace's holdings in Foamex and UAG fluctuated significantly.[6]

### Trace Transactions and Financings

During the relevant period, Trace engaged in a number of transactions and financings, none of which are particularly germane to the determination of liability in the instant case. These transactions are, however, described in greater detail in Appendix A.

### Foamex Going Private Transaction

In the summer of 1997, Cogan, Farace, Nelson, Smith and Winters discussed Trace's status and future opportunities concerning its ownership interest in Foamex. Winters advised that Trace sell its interest in Foamex because (1) market conditions were ripe for such a transaction and (2) it had the opportunity to purchase Crain, a competitor, to increase its appeal to potential Foamex suitors. Trace thereafter purchased Crain and retained JP Morgan to find a strategic partner to acquire Foamex.

In January 1998, Cogan decided that Trace should purchase the publicly held shares of Foamex instead of selling the company. In January and February of 1998, Winters met with several investment banks and commercial lenders to determine the feasibility of taking Foamex private.

Foamex's independent directors hired Beacon Group Capital Services ("Beacon"), an advisory firm that counseled companies on going-private transactions, to advise as to the fairness of Trace's offer to purchase Foamex's outstanding public shares.[7]

---

**6.** For instance, in some months the value of Foamex fluctuated by as much as 70% and UAG after its IPO fluctuated as much as 40% in a single quarter. Between March 1996 and January 1997, Foamex fluctuated from a

low of approximately $7 per share to a high of approximately $21 per share.

**7.** In drafting this fairness opinion, Beacon examined Foamex's annual and quarterly reports, proxy statements and various commu-

Trace made an offer of $17 per share, and Beacon advised that it would not be fair to the Foamex shareholders. As a result, Trace raised its offer to $18.75 per share, a price that Beacon deemed fair. Beacon informed Trace's board of its opinion and soon thereafter delivered the opinion in writing, which the Foamex Board of Directors accepted. At the time Beacon rendered its fairness opinion, Foamex stock was trading below $18.75 per share.

On August 18, 1998, following Trace's public offer to purchase the Foamex shares and the execution as of June 25, 1998, of an Agreement and Plan of Merger in connection with the Trace offer, Donaldson Lufkin & Jenrette ("DLJ") and BNS together issued a commitment letter to provide $510 million and $340 million, respectively, or a total of $850 million, of revolving credit and term loan facilities upon consummation of the contemplated merger. The commitment letter also provided that DLJ and BNS would undertake to use reasonable commercial efforts to form a syndicate of lenders to participate in the credit facilities.

Trace was unable to consummate the $18.75 per share buyout proposal and, on October 16, 1998, withdrew its offer.[8] Al-

though Trace later submitted another offer to purchase all of the outstanding shares of common stock of Foamex not then owned by Trace or its subsidiaries (this time at $12.00 per share), Trace was unable to consummate this buyout proposal either.

## I. COUNT I: THE COGAN NOTES TOTALING $14.3 MILLION

### A. The Notes

Paragraph 6(A) of each of the eight promissory notes at issue requires that if Cogan is late in making payment of any installment of principal or interest, he is liable for a one-time charge of 2% of the overdue amount. The Court has already determined that Cogan failed to pay all past due principal sums, as well as interest installments due December 31, 1998 and December 31, 1999. *Pereira II*, 267 B.R. at 504. Cogan does not dispute the amount of the Trustee's previous calculation of $356,493.96 in late charges.

Paragraph 6(E) of the all the notes requires that, if Cogan is in default and has been required to pay immediately in full, the Note Holder (now, the Trustee) has the right to recover all costs and expenses for enforcing such note, including "reason-

---

nications to shareholders. Beacon also looked at non-public internal financial data regarding Foamex as a whole and its various businesses, including Foamex's 1997 purchase of Crain. It further scrutinized the proposed financing for the public share purchase, as well as Foamex's historical stock trading prices and activity. Beacon then compared Foamex to similarly situated companies to determine a fair purchase price.

8. The Defendants point to "adverse market conditions." On August 17, 1998, Russia devalued the ruble and defaulted on its sovereign debts (the "Russian Default"). In September 1998, Long–Term Capital Management collapsed, and the Federal Reserve Board organized a bail-out by commercial banks and securities firms. The Russian Default, coupled with the failure of Long–Term

Capital Management, precipitated a severe worldwide financial crisis, led to fears of systemic risk in the credit markets and caused unforeseeable turmoil in the financial markets (the "1998 Financial Crisis"). The 1998 Financial Crisis caused investors to sell corporate bonds and other investments and flee to the perceived safety of debt instruments issued by the United States Treasury Department. While the adverse market conditions were certainly a part of Trace's failure, the 1998 Financial Crisis was not the only precipitating cause of the failure of the Foamex going-private transaction. Neither the 1998 Financial Crisis nor the failure of the Foamex going-private transaction were entirely responsible for the eventual collapse of Trace.

able attorney's fees." It was earlier held that Cogan had defaulted on the outstanding Cogan notes and payment in full was required. *Pereira II,* 267 B.R. at 504; *Pereira III,* 275 B.R. at 476.

### B. *Cogan's Alleged Offsets*

Cogan asserts that he is entitled to offsets for (1) an informal severance policy providing $3.6 million; (2) deferred compensation of $1.1 million; and (3) expenses of $41,265.28. Each is addressed in turn.

#### 1. *Informal Severance Policy*

Trace did not have a written severance policy for senior executives. Cogan, however, claims a $3.6 million offset under an alleged informal severance policy. The Court has ruled that, in order for Cogan to succeed on an informal severance policy claim, he must show both that Trace had a regular practice of making severance payments and that he relied on this practice in accepting or continuing his employment. *Pereira IV,* 200 F.Supp.2d at 378–79.

##### a. *Regular Practice*

Cogan testified that Trace had a regular unwritten practice concerning senior executive severance. After having observed the demeanor of Cogan while he testified at length about this and other issues, it should be noted that, while a commanding and impressive witness, his assurance did not establish credibility in this instance nor in others which follow.

Here, for instance, Cogan's testimony was merely conclusory and unsupported by the evidence, including testimony by other defendants. Cogan's sole example of the alleged regular practice concerned Farace. Farace, however, testified that it "is absolutely not accurate" that he ever received Trace severance and that he instead received from Foamex "two years of severance, pursuant to an employment agreement." Farace and Winters make no

claims for severance. Nelson, Smith and Marcus all have claimed severance under written deferred compensation agreements rather than under an informal practice.

Cogan earlier claimed that through Nelson's testimony he would show that Trace had a severance policy for its senior executives that was not reduced to writing. At trial, Nelson testified that, "Trace didn't have any specific severance policy with respect to executives other than if somebody had an employment contract."

Further, Cogan testified that Trace's informal policy mirrored the written policy of Foamex. At his deposition, however, Cogan stipulated that the Foamex written policy did not apply to executives.

No regular practice of making severance payments other than by agreement was established by the evidence.

##### b. *Reasonable Reliance*

The 1987 Agreement, which was voided in 1997, provided for at least five years' severance. Further, it specifies the "intention" of the parties that "this Agreement shall supersede and be in place of any and all prior agreements or understandings between them." 1987 Agreement, § 27. Section 22 states "[n]o agreements or. representations, oral or otherwise, express or. implied" regarding the same subject matter were made if they were not expressed in the Agreement.

At the summary judgment stage, the Court drew the following inference in Cogan's favor given the above provisions: "Presumably, Cogan relied on the unwritten policy in that he was assured that even if his written contract was voided for some reason, he might still receive the usual severance package of one year's salary." *Pereira IV,* 200 F.Supp.2d at 379. At trial, when Cogan was asked whether the alleged informal policy was "sort of a back-

stop in case your contract was declared void," Cogan answered, "No."

Cogan's position at Trace gave him no reason to fear being fired. He was the CEO, Board Chairman and the majority shareholder. Cogan also had a ten-year contract with Trace. Further, there is no evidence that Cogan was subjected to any meaningful oversight by the Board.

The evidence failed to establish reliance by Cogan, and indeed the policy did not in fact exist.

### 2. *Deferred Compensation*

Cogan claims that in 1999 he voluntarily deferred a portion of his $3.6 million annual salary, and that he is now entitled to a $1.1 million offset under the equitable doctrine of *quantum meruit.*

Cogan deferred payment in order to conserve cash in light of Trace's financial difficulties. In 1999, Trace was still experiencing the adverse effects of the failure of the Foamex going private transaction, and Cogan was working to enhance the value of Trace's assets. In particular, Cogan negotiated the infusion of approximately $83 million in UAG by companies controlled by Roger Penske. Cogan was also working on a restructuring of the debt of BNS and a number of transactions to enhance the value of Foamex, including negotiations to combine operations with a Canadian company called Woodbridge Foam. Neither came to fruition.

Cogan did not serve as a full-time Trace employee in 1999. In January 1999, Cogan signed a two-year Foamex Employment Agreement with Foamex requiring him to be based at the Foamex headquarters in Linwood, Pennsylvania. Thus, he could not have worked full-time in 1999 at Trace's headquarters located in New York. In 1999, Cogan's annual salary under the Foamex agreement was $850,000.

In addition, Cogan covenanted away his 1999 Trace compensation. Cogan signed a Unanimous Written Consent of the Board, dated as of August 14, 1998, which approved the issuance of Series U Preferred Stock and an associated Certificate of Designation. In the certificate, Trace agreed that if the Series U Preferred Stock were not redeemed by December 31, 1998, Cogan would not receive any compensation unless and until the price of UAG reached $50 per share.[9] Trace later failed to redeem the shares, and UAG traded at only the $5 to $13 range in 1999. Since the two prerequisites did not occur, Cogan was not entitled to any compensation from Trace in 1999.

Finally, 1999 was the year in which Cogan led Trace into bankruptcy from which it never emerged. Cogan also that year defaulted on his substantial borrowings from Trace, further injuring the company. No factual basis for a quantum meruit claim has been established.

---

**9.** On August 14, 1998, Trace issued the Series U Preferred shares to CIBC, pursuant to a Unanimous Written Consent, in exchange for $10 million.

Under the terms of the Certificate of Designation of the Series U Preferred Shares, Trace agreed to mandatory redemption of the shares by December 31, 1998. If no redemption occurred by this date, Trace covenanted against making certain payments. Trace was prohibited from paying any salary, bonus or compensation to any "Restricted Sharehold-

er" before a "Restricted Payment Covenant Termination Event." "Restricted Payment Covenant Termination Event" meant the first day that UAG's common stock traded at $50 or more. "Restricted Shareholders" included those who owned 10% or more of Trace's common stock. Cogan, who owned far more than 10% of Trace's common stock, therefore could not received compensation from Trace until UAG's common stock price reached $50 or more.

### 3. *Expenses*

Cogan offered no support other than brief and conclusory testimony for his offset claim of $41,265.28 in un-reimbursed advances made to Trace.[10]

## II. *COUNT II: COGAN'S EXCESSIVE COMPENSATION*

In Count II of the Complaint, the Trustee alleges that Cogan received excess compensation from Trace as a result of Cogan's self-dealing, and seeks to recover such excess amount of compensation from Cogan for the benefit of Trace's estate.

### A. *Self-Dealing Versus Ratification of Cogan's Compensation from 1988 to 1994* [11]

The Trustee contends that Cogan set his own compensation levels, without the approval of an independent board of directors, and therefore Cogan bears the burden of proving that his compensation was "entirely fair" to Trace. Cogan, but not the other Defendants, contends that the other Defendants played a role in determining the amount of his compensation. All Defendants contend that in 1996 the Compensation Committee of the Board ratified Cogan's compensation retroactively for the period 1988 through 1994.

Based on the findings set forth below, Cogan's compensation was neither approved nor effectively ratified by an independent board or compensation committee, and accordingly Cogan bears the burden of proving, under the doctrine of self-dealing, that the level of the compensation was entirely fair to Trace for the entire period covered by the Trustee's damage claim. In any case, as the following facts demonstrate the compensation was excessive regardless of where the burden lies.

### 1. *The 1987 Agreement*

On August 5, 1987, Cogan and an alleged Trace predecessor entered into an agreement providing for Cogan's employment as Chairman and CEO for a 10–year "Initial Term" through August 4, 1997 (the "1987 Agreement"). The 1987 Agreement provided that Cogan was to receive compensation of $2.4 million per year,[12] and that Cogan's compensation could be increased only if the Board authorized the increase. It also provided for four additional 10–year "Renewal Terms" spanning the period from August 4, 1997 to August 4, 2037. Under the 1987 Agreement, each of these Renewal Terms would occur automatically unless the Trace Board, by a three-quarters vote of its entire membership, affirmatively declined to review the Agreement or Cogan himself elected not to renew the Agreement.

The terms and conditions of the 1987 Agreement were drafted by Akin Gump and overseen by independent Merrill

---

10. Cogan refers to his testimony and to Trace's Posted Transaction List for the periods January 1999 to July 1999. Presumably the latter document is meant to support the finding that Cogan was never reimbursed. Cogan does not refer to any particular section or page of the 222–page document that supports his testimony that he paid the claimed expenses.

11. Although the ratification involved salaries received in, pertinently, 1993 and 1994, at a time when Trace was not insolvent, the ratification vote took place in 1996. Thus, at the

time of the vote in or around June 18, 1996, as discussed below, the Board owed fiduciary duties both to Trace and to its creditors, even though it owed those duties only to Trace in 1993 and 1994 when Cogan received the excess compensation at issue here.

12. In the years subsequent to 1987, Cogan received annual compensation from Trace substantially in excess of $2.4 million, but there is no evidence that the Board took any contemporaneous action authorizing those increases.

Lynch investment bankers and other independent investors. At the time, Trace was planning to raise approximately $125 million through the issuance of common stock to the public and to raise another $350 million through the issuance of public debt. Merrill Lynch was the lead underwriter with respect to the offering of common stock and Drexel Burnham Lambert was the leader underwriter with respect to the public debt offering. To better assure the success of these two public offerings, the underwriters insisted that Cogan be committed to a long-term employment agreement.

Trace's independent directors,[13] who constituted a majority of Trace's Board of Directors at the time, ratified the 1987 Agreement, guided by advice of counsel and after Feld made a presentation concerning it.

By unanimous written consent dated April 1, 1989, the Executive Committee of the Board approved and adopted 1989 salary increases and 1988 bonuses for certain Trace employees, including an award of a 1988 bonus to Cogan in the amount of $5.25 million. The members of the Executive Committee at that time were Sherman, Marcus and Cogan.

### 2. Cogan Increases His Salary

In 1991, Cogan unilaterally increased his base salary under the 1987 Agreement to $3.6 million annually.[14] There is no ev-

idence that the Trace Board took any contemporaneous action to approve this increase. Cogan claims that the Board ratified it the next year, at an annual meeting held on July 21, 1992. There, the Board ratified "all past acts and decisions, including, without limitation, all purchases, sales, borrowings, leases, contracts, contributions, compensations, proceedings, elections and appointments, by the officers of [Trace], in the name of and on behalf of Trace since the last election of officers at the regular meeting of [Trace's] Board of Directors." The Board members in attendance at that meeting were Cogan, Feld, Hershon, Lawrence C. Horowitz, Marcus and Shapiro. There is no evidence regarding any discussions of Cogan's compensation, nor any evidence that the Board members were aware of Cogan's compensation.

The minutes of the June 24, 1994 annual meeting of the Board recorded that:

> Various members of the Board commented on Mr. Cogan's strong leadership and the outstanding contributions made by him since his founding the Company. His performance was thought to compare favorably with the performance of the heads of many investment banking firms, merchant banks and leveraged buy-out companies as well as other entrepreneurs. Mr. Nelson

---

**13.** The outside directors included: Sidney P. Kriser, an independent investor; Dr. Stuart D. Hershon, an orthopedic surgeon for the New York Yankees; Alan D. Feld, Esq. ("Feld"), a senior executive partner at the law firm of Akin Gump; Charles Lubin, the founder of Sara Lee Bakeries; Sherman, an experienced businessman and then Chairman of Allied Products Corporation; and Stephen Weinroth, an investment banker at Drexel, Burnham, Lambert.

**14.** Cogan's testimony, uniformly contradicted by others, that Nelson, Smith and Winters

had "informal" input into determining Cogan's compensation is not credible.

Smith's only role in the Trace compensation process was when Cogan or Nelson consulted him regarding compensation of his secretary and King. He neither reviewed nor made suggestions to the Trace employees' annual compensation.

Winters also did not participate in deciding Cogan's compensation or in deciding whether Cogan should receive a bonus in a given year. He does not recall even knowing about any bonus paid to Cogan.

then reviewed Mr. Cogan's compensation from 1991 through 1994.

The directors in attendance at that meeting were Cogan, Feld, Marcus and Sherman, of whom only Cogan and Marcus were then officers of Trace.

### 3. The Board's Ratification of Cogan's Past Compensation

The Board explicitly attempted to retroactively ratify compensation for years 1988 through 1994.

Sometime after January 10, 1996 and prior to June 18, 1996, a unanimous written consent dated as of January 3, 1996, was signed by the two members of the Compensation Committee, Nelson and Sherman.[15] It recommended that the Board ratify Cogan's compensation for the period from 1988 through 1994, inclusive, and contained the following findings[16]:

Mr. Cogan's performance as Chairman and Chief Executive Officer was reviewed favorably and was considered to have been vital to the success of the Company, and ... the various subsidiaries ... for which Mr. Cogan rendered services from 1988 through 1994;

a review of Mr. Cogan's compensation relative to the Company's performance over time demonstrated that his compensation increased and decreased commensurate with the Company's revenue and earnings growth ... and in proportion to that of the other officers and executives; and

Cogan's compensation [as Chairman and CEO in the forms of salary and bonus from 1988 through 1994 were deemed] was comparable to or below that of similarly situated executives at investments banks, ·commercial banks, closely held investment companies, leveraged buyout firms, and medium sized diversified holding companies.

That consent was circulated to the Board sometime after June 18, 1996, along with a unanimous written consent dated as of January 4, 1996 (the day after the Compensation Committee's recommendation was effectively dated). The unanimous written consent adopted the recommendation of the Compensation Committee and restated the findings above. It was signed by Sherman, Cogan, Farace, Nelson and Marcus.

The decision to ratify Cogan's compensation was the result of advice from an

15. The Trustee has implied that Sherman's appointment to the Compensation Committee so shortly preceded the decision to ratify Cogan's compensation that the Committee could not possibly have considered the matter. Sherman was appointed by unanimous written consent, sent out for review on January 10, 1996, but dated effective January 2, 1996, the day before the effective date of the Compensation Committee's recommendation that Cogan's compensation be ratified. At the time, Sherman was the only one of the five Board members not on Trace's payroll. The Committee's recommendation, however, was sent out approximately five months later, in June 1996. The time frame alone therefore, does not suggest a lack of diligence. That lack of diligence is revealed, however, by the fact that there is no evidence that the Committee ever met, ever hired consultants to investigate

the proper amount of compensation, or ever took any other appropriate steps to determine whether their findings were accurate.

16. The Defendants contend that the Compensation Committee's findings were based on the collective knowledge of the two members, Sherman and Nelson, of what comparable executives earned. Nelson also purportedly examined various business periodicals, including Forbes and Business Week, to compare Cogan's compensation to the top hundred salaries of similarly situated executives. They found that Cogan's salary was similar to investment banking executives such as Andy Levison and Andy Heyer, who made approximately $3 to $4 million annually. No evidence was presented to support this testimony, however.

outside counsel to Trace, Melvyn R. Leventhal ("Leventhal"), who recommended to the Board in writing that it review and approve the Compensation Committee's resolution in which the Committee considered the reasonableness of Cogan's compensation between 1988 and 1994 inclusive.[17] That advice was received sometime between January 10, 1996 and June 18, 1996. There is no indication why Leventhal advised that the previously received compensation be ratified.

The evidence does not establish that the ratification by the Board was a well-informed decision of a truly independent board.[18] First, there is no agreement on what level of compensation the Compensation Committee or the Board believed they were ratifying. The resolution adopting the ratification contains no recitation of the amounts of compensation being ratified for any of the years at issue. While Farace testified that, at the time of the ratification of Cogan's compensation for 1988 through 1994, the Board was presented with a schedule reflecting the figures year by year, no such table has been presented into evidence. In addition, the directors have provided contradictory testimony as to their belief of what level of compensation they were ratifying: Marcus testified that he thought the Board was ratifying the base amount of $2.4 million under the 1987 Agreement. Farace thought he was ratifying the amount stated in the minutes, which contain no amount. Cogan, who

appeared to assume the validity of the unilateral increase in his base salary to $3.6 million in 1991, testified that he thought the only things being "ratified" were his bonus payments for the years in question.

The fact that none of the participants in the ratification process can agree on exactly what they were ratifying, and the lack of any illuminating information in the board resolutions, are reasons to find the ratification ineffectual.

Further, the evidence at trial demonstrated that neither the Compensation Committee nor the Board followed procedures that would lead to an informed decision as to whether Cogan's compensation for the seven-year period was reasonable. The evidence demonstrates that the Committee did not in fact conduct any real investigation into the reasonableness of Cogan's compensation. It is undisputed that the Committee retained no compensation consultant or other professional to assist it. Nor does it appear that the Committee consulted any salary surveys or other analyses. While the Committee's findings purport to find that Cogan's compensation was comparable to that of "similarly situated executives," none of the witnesses at trial knew who the similarly situated executives were, where they worked, or how much they made. It thus appears that the only support for this assertion was, at best, the anecdotal information that the Committee and other Board members had from business acquaintances

---

17. The suggestion had also been made by Shapiro, an attorney and the outside-director member of the Compensation Committee in 1995. There is no evidence that the Committee took any action in 1995 with regard to Cogan's compensation. After Shapiro retired from the Board in 1995, Sherman took his place on the two-member Compensation Committee as outside director. Sherman remained on the committee until he resigned in 1999.

18. The following discussion focuses on the explicit ratification of Cogan's salary. The same logic applies, with greater force, to the general ratification in 1992 as there is no evidence that the Board had any specific information about Cogan's compensation or even any idea that their vote was necessary to ratify his unilateral raise.

and, in the case of Nelson, information he recalled from reading articles in business periodicals such as *Business Week*. Nelson reported this information to Sherman, who relied on him for information when he ratified Cogan's compensation.

Cogan also failed in his burden to demonstrate that the Committee or the Board was "independent" in connection with the purported ratification of his compensation. Sherman, the only member of the Board not on Trace's payroll, was a long-time business associate and personal friend of Cogan, with whom he had other overlapping business interests. Nelson, the only other member of the Committee, was Trace's CFO and was dependent on Cogan both for his employment and the amount of his compensation, as were Farace and Marcus, the other Board members who approved the Committee's ratification of Cogan's compensation. There is no evidence that any member of the Committee or the Board negotiated with Cogan over the amount of his compensation, much less did so at arm's length.

### 4. Cogan's Compensation After January 1, 1995

There is no evidence that the Committee or the Board took any action to set, review or approve Cogan's compensation for any period subsequent to January 1, 1995.[19] The Board held its last meeting in September 1995, and the Committee never held a meeting.

Because Cogan did not elect not to renew the 1987 Agreement and because the Board did not address the propriety thereof, it was automatically renewed on August 4, 1997, for another 10–year term through August 4, 2007. That renewal was declared void, and thus Cogan was not entitled to the $2.4 million salary under the 1987 Agreement after it expired in 1997. *Pereira II*, 267 B.R. at 509–11.[20]

### 5. Board Inaction Regarding the Renewal

All of the defendants were aware or should have been aware that the 1987 Agreement was up for renewal in August 1997.[21]

The evidence at trial confirmed the finding in *Pereira II* that there was no Board approval of the 1997 renewal. There is not any Board resolution or other Board minutes on this subject in the Trace minute book or elsewhere. The custodians of

---

**19.** The "renewal" of the Agreement by Board inaction is discussed in greater detail in Part III.

**20.** It has previously been held that the 1997 renewal of the 1987 Agreement was an unlawful self-dealing transaction. The renewed Agreement (1) precluded the Board from exercising their statutory duties to supervise and evaluate the CEO; (2) contained unfair termination penalties; (3) perpetuated a continuing renewal process at odds with Delaware law; and (4) came into force without the requisite "fair process" (or any process for that matter) by the Trace Board. *Pereira II*, 267 B.R. at 509–11.

**21.** Farace and Marcus admittedly knew that the 1987 Agreement was up for renewal in

August of 1997, and they also understood that the Board had an obligation to supervise and evaluate the CEO. Moreover, Marcus was a member of the Compensation Committee in 1997, and the 1987 Agreement was within the purview of that committee.

Nelson had actual prior knowledge that the 1987 Agreement was up for renewal in August of 1997, as evidenced by his affidavit dated May 23, 2001, in opposition to the Trustee's prior summary judgment motion.

Smith and Winters should have been aware of that fact as it was included in Trace's 1995 year-end audited financial statements, which both received and with which they should have been familiar. In addition, Smith was familiar with the inception of the 1987 Agreement and its existence during the same time frame that it was up for renewal.

the minute book, King and Smith, attested to its completeness. Furthermore, Farace testified credibly that the Board did not consider whether or not to renew the Agreement. In addition, Cogan and Nelson acknowledged, in affidavits admitted against those parties, that the Agreement was "automatically" renewed in 1997.

Nor is there any evidence even of any discussions regarding whether the Board should consider the renewal. Farace and Marcus claim that they took no action with regard to the renewal because they relied on their assessment of Cogan's performance and qualifications, their knowledge of what other similarly situated executives were earning, Trace's audited financial statements, Trace's financial records, information supplied by other officers in Trace's Saddlebrook office and daily stock quotes for Foamex. There is no record of any such consideration in the corporate minutes.

The Defendants presented no evidence that a hypothetical wholly independent Board would have approved the 1997 renewal of the 1987 Agreement. The fact that the 1987 Agreement was originally approved by the Trace Board in 1987[22] does not cure the failure of any (independent or other) Board approval in 1997 or the absence of hypothetical independent board approval evidence.

As a result, Cogan's compensation for all relevant times subsequent to January 1, 1995 is found to have been determined by Cogan alone, without supervision or control by the Committee or the Board. Accordingly, it is concluded that Cogan bears the burden of proving that his compensation for the relevant time period was "en-

tirely fair" to Trace. The parties offered evidence of the reasonableness of Cogan's compensation through their expert witnesses.

## B. The Experts' Analyses on Fair Compensation

The Trustee contends that Cogan received in excess of $23 million in excess compensation. The Defendants argue that, even including the unauthorized loans received by Cogan that are discussed in Counts I and IV, Cogan was not overpaid. The resolution of the parties' conflicting positions regarding whether Cogan received excess compensation rests primarily on the assessment of the expert reports and testimony offered by the two sides. The Trustee relied on the expert reports and testimony of Kenneth Petersen ("Petersen"), who was a consultant with KPMG at the time his expert report was prepared and has more than twenty years' experience as a compensation consultant. The Defendants offered the expert reports and testimony of Herbert T. Mines ("Mines"), who is currently chairman of his own business, Herbert Mines Associates ("Associates"), an executive search firm that is hired by the board of a company or its CEO to find an executive they wish to recruit from the outside.

### 1. The Experts' Backgrounds

KPMG hired Petersen in early 2000 to re-establish its compensation consulting business, which KPMG had previous sold to Mercer. Over the course of his career, Petersen has advised hundreds of corporate boards of directors, compensation committees and corporate officers on issues of executive compensation and bene-

---

**22.** It has been previously held that Cogan's claim "runs afoul of a director's continuing duty to make currently informed decisions . . ., and a properly functioning, independent board could not assume that whatever hap- pened a decade ago was still in the corporation's best interest." *Pereira II,* 267 B.R. at 511. The Defendants have presented no evidence that undermines this ruling.

fits. He has also testified as an expert witness in numerous bankruptcy cases on behalf of both debtors and creditors.

Mines has a bachelor's degree in economics and a master's degree in industrial and labor relations. In his career, Mines has recruited approximately one thousand executives, of which approximately 300 have been the senior most executives of a company. Associates recruits an average of 100 executives per year. Mines is a member of the Association of Executive Search Consultants.

Mines was originally contacted by counsel for Cogan in early 2001 and asked whether he could support Cogan's Employment Agreement. Mines advised the Defendants that he could not support the agreement because of the length of its term and the automatic renewal provision. About six months later, Mines was again contacted by counsel for Cogan and asked to consider evaluating the reasonableness of Cogan's compensation for the period 1993 through 1998, and he agreed to do so.

### 2. Neither Expert Chose Appropriate Comparators

During his testimony, Petersen described a process of analysis called "benchmarking," which is a generally accepted method used by compensation consultants and experts to determine reasonable compensation levels for corporate executives. In a "benchmarking" study, the consultant gathers information about the salaries of other executives in a "comparator" group selected by the consultant. The information is generally obtained from publicly available sources such as proxy statements filed with the Securities and Exchange Commission. It is important for the benchmarking study that the members of the comparator group be comparable to the executive position being evaluated. That means that the comparator group should be composed of executives perform-

ing similar tasks at companies in similar industries and of similar size and revenue as the company whose executive position is being benchmarked.

Both experts utilized this methodology. Neither chose an appropriate comparator group, perhaps in part because Trace utilized a hybrid form, combining qualities of the two groups that each chose.

#### a. Petersen's Group

Petersen assembled a group of fifteen comparator companies for which relevant compensation data was available for the years 1993 through 1999. All of these companies were in businesses which Petersen considered, based on the Bureau of Census Standard Industrial Codes ("SIC"), to be in industries comparable to one or more of Trace's operating affiliates. These comparables included, for example, companies in various chemical industries that Petersen considered comparable to Foamex; companies in the auto parts and auto dealership industries that were comparable to UAG; and companies in the home furnishing industry that were comparable to CHF. In selecting these companies, Petersen also attempted to find companies that were all roughly comparable in size, based on revenue in 1999, to Trace and its consolidated affiliates. The fifteen companies' 1999 revenues ranged, in rounded numbers, from $767.9 million to $3.779 billion, with the average revenue of the group at $1.902 billion and the median revenue at $1.63 billion. These figures compare to Trace's 1999 revenue of $1.357 billion.

Using the proxy statements filed with the SEC by the comparator group companies, Petersen determined the total annual cash compensation (salary plus bonus) for the chief executive officers of the comparator companies for the years 1995 through

1999.[23] Petersen calculated that the relevant amount for determining Cogan's reasonable "target" compensation was the compensation paid to an executive at the 75th percentile of this group. Petersen chose this amount based on an authoritative study, *ECS 2001/2002 Industry Report in Top Management Compensation*, showing that only 28.6% of companies "target" top management total cash compensation at or above their market's 60th percentile. Petersen's choice of the 75th percentile is reasonable based on this reasoning. Moreover, Mines used the same 75th percentile figure when comparing executives' salaries to Cogan's.

Petersen's study concludes that Cogan's reasonable compensation for each of the years is as follows:

| | |
|---|---|
| 1999 | 1,322,000 |
| 1998 | 1,388,000 |
| 1997 | 1,188,000 |
| 1996 | 1,163,000 |
| 1995 | 1,074,000 |
| 1994 | 1,074,000 |
| 1993 | 1,074,000 |
| **TOTAL** | **$8,283,000** |

The defendants object to these findings on several grounds. First, they argue that Mines' comparator groups are more appropriate and therefore these figures are flawed. While correct, the argument is unavailing due to the conclusion below that Mines' comparator group is also inappropriate. Second, Mines criticizes Petersen's analysis on the grounds that Petersen considered only the cash compensation (salary and bonuses) and did not take into account the non-cash compensation (*i.e.*, stock options and restricted stock) that the comparator group received. In light of the finding that Petersen's figures are not appropriate, and the means by which the Court determines the reasonable compensation due Cogan, there is no need to address this second point.

### b. *Mines' Comparator Group*

Mines determined that it was inappropriate to compare Cogan to the heads of operating companies (as Petersen did) and instead compared Cogan with the heads of venture capital firms or with individuals who would receive a finder's fee[24] as a result of significant transactions.

Mines looked to how heads of venture capital firms were paid, calculating for each year the salary based on the base salary, plus bonus and long-term incentive in the 75th percentile. Aggregate compensation paid during the five-year period

---

23. For the years 1993 and 1994 most of the companies in the comparator group did not electronically file their proxy statements with the SEC, so Petersen assumed that compensation levels for those years were the same as for 1995. Petersen testified that this assumption was beneficial from Cogan's standpoint because compensation levels were rising between 1993 and 1994, and the actual compensation figures for 1993 and 1994 were in all probability lower than the 1995 data Petersen used as his point of comparison.

24. Typically, finder's fees are paid pursuant to the Lehman formula that pays 5% of the first $1 million of the transaction, 4% of the second $1 million; 3% of the third $1 million; 2% of the fourth $1 million; and 1% thereafter.

Mines determined that Cogan successfully directed at least seventy transactions from 1987 to 1999, with a value of more than $5.5 billion. From this, Mines concluded that an appropriate finder's fee for the person who conceived these transactions would be approximately $55 million. This analysis is flawed, however, and hereby rejected. First, Cogan, as a corporate executive of a participant in the transactions, was not entitled to compensation of this sort from Trace and likely could not ethically accept such a fee from the other parties to the transaction. In addition, while Mines asserts that Cogan would be entitled to a finder's fee in all of the transactions he led, there is no analysis of individual transactions to support the conclusion that all of the transactions would merit such a fee.

from 1996 through 2000 was $45,375,000. The average annual compensation was $9,075,000, and Mines used this level of compensation for a six-year period, resulting in a total compensation for the six-year period of $54,450,000. Mines was not able to get information as to compensation of managing partners at equity firms prior to 1996, but determined that there would not have been significant variation in the terms of his analysis.

Between 1987 and 1999, Cogan received approximately $54 million from Trace, including loans the Board did not authorize,[25] and therefore Mines concluded that Cogan's compensation was reasonable under either test.

Based on the above analysis, Mines concluded that Cogan's compensation in the years 1993 through 1998 was reasonable because Cogan was in essence running a venture capital firm, and the compensation he could have derived had he been paid as an entrepreneur running a venture capital firm was within the range of what he actually earned.

The Trustee argued that Petersen's comparator group was more appropriate, and also took issue with a number of other choices Mines made in reaching his figures. For instance, Mines relied on a compensation study prepared by another firm, Mercer, that did not contain sufficient information to allow him to identify and separately evaluate compensation at the subset of the companies in the Mercer study that could be regarded, by any measure, as comparable in size to Trace. Indeed, Mines did not even know the identity of the companies included in the survey, companies that included private investment powerhouses. Further, Mines only purchased a few "relevant" pages of the

Mercer report rather than the entire document, and he did not update his report when he received earlier portions of Mercer reports. It is true that this methodology, in addition to the fact that Mines was only able to obtain compensation figures from 1996 to 2001, rather than 1993 to 1999, likely resulted in inflated numbers. Such inflation is dealt with in the findings below that neither expert is correct, but that an average of the two is the most appropriate means of determining a reasonable compensation.

Mines' suggestion that Cogan's role at Trace was similar to that of a manager at a private equity fund is rejected, however. Trace was not structured or operated like private equity fund, which typically manages investments made by the public or a number of passive investors.

### c. Trace Had Attributes of Both an Equity Fund and an Operating Company

Neither expert was able to credibly argue that his findings were correct because Trace was not so easily compartmentalized into either Petersen's operating company comparator group nor Mines' equity fund paradigm. Instead, Trace had attributes of both. For instance, Cogan in many ways acted like a venture capitalist: he participated in efforts to increase the value of Trace and its affiliates and was involved in financings, mergers and acquisitions. While heads of operating companies do get involved in some of these issues, they have large staffs (and frequently separate departments), which do all the work with respect to these kinds of activities. Frequently these staffs report to the Chief Financial Officer, rather than the CEO. It is only when the preliminary work has

---

**25.** Mines, who testified that the use of loans rather than bonuses is not an unusual form of compensation, included Cogan's base salary, bonuses and the $13.4 million in unauthorized loans in computing his annual compensation.

been done that the CEO of an operating company is brought in.

On the other hand, however, Cogan and his colleagues were active in managing the day-to-day business affairs of Trace and its affiliates,[26] just as with an operating company. In addition, the structure of Cogan's compensation at Trace in the form of salary and bonus more closely resembles that of a corporate CEO rather than managers at private equity firms who, as Mines recognized, receive the largest portion of their compensation in the form of "carried" equity interests.

Because neither party presented evidence regarding an appropriate comparator group, the findings of both Petersen and Mines with regard to what constitutes reasonable compensation are rejected. Instead, the following figures, based on the average of Petersen's year-by-year figures with Mines' average compensation of $9,075,000, are adopted:

| | |
|---|---|
| 1999: | $ 5,198,500 |
| 1998: | 5,231,500 |
| 1997: | 5,131,500 |
| 1996: | 5,119,000 |
| 1995: | 5,074,500 |
| 1994: | 5,074,500 |
| 1993: | 5,074,500 |

### 3. Cogan's Compensation from Trace and Its Affiliates Will Be Considered for Cogan's Liability

The Trustee contends that in considering the reasonableness of Cogan's compensation, it is appropriate to consider the total amount Cogan received from both Trace and its affiliates, while Cogan contends that the relevant amount is only the amount paid to Cogan directly from Trace itself.

The compensation of the CEO of a corporate holding company should include compensation for the services the CEO provides to the corporation's subsidiaries. Cogan's Employment Agreement with Trace provided that the compensation for his services "may be allocated among and paid by any combination of [Trace] and its subsidiaries and/or divisions ...," and that his duties as Trace CEO could be delegated to executives of Trace's "divisions or subsidiaries." In addition, when Cogan and the other Board members purported to approve retroactively Cogan's Trace compensation from 1988–94, they cited, inter alia, Cogan's services to "the various subsidiaries of the Company."

Cogan's testimony at trial attempted to differentiate between the "strategic" investment-management services he provided at the Trace level and the "operational" management services he provided at the affiliate level. This testimony is rejected on credibility grounds. The evidence presented at trial indicates that Cogan and his colleagues in fact viewed running the day-to-day operations of the affiliates as part of their job at Trace, and placed little significance on which of the entities were covering their paychecks in what amount. The officers of Trace typically held the same or comparable offices at the affiliate level, so there was no clear delineation between their functions at the various entities.[27]

---

26. Cogan himself characterized his "operational" activities for the subsidiaries including pricing decisions, customer relations, personnel decisions, used car lot operations and supplier relations as services he provided to Trace. Similarly, other Trace executives held comparable positions with the subsidiaries and spent a considerable amount of time providing management services at the operating level.

27. Farace was involved in the operations of Foamex and became its CEO while he still served as president and director of Trace. Marcus was "in charge of operations" of Trace's restaurant business. Nelson was Executive Vice President for operations of UAG and dealt with operational issues on the individual dealership level. Smith served as officer and General Counsel and Secretary of Foamex and UAG. Winters was Executive

Employees were routinely reassigned from the Trace payroll to the affiliates' payrolls, and vice versa, without any apparent change in job functions or responsibilities. There was no correlation between the time an individual spent working on the affairs of Trace or its affiliates and the percentage of the individual's total compensation that was paid by Trace or the affiliate in question.

It is also appropriate to look to the total amount of Cogan's compensation when considering its reasonableness because both experts relied on comparability studies of other full-time executives. If, as Cogan suggests, he was working part-time for the other affiliates, and being compensated by the affiliates for that portion of time, it follows that the amount of compensation he received directly from Trace should have been adjusted to reflect the less-than-full time commitment of his efforts to Trace itself. For all of these reasons, in determining Cogan's liability, the appropriate figure is the total compensation received from Trace and its affiliates.

It is therefore concluded that Cogan's liability for excess compensation will be determined based upon the following figures:

| Year | Reasonable Compensation | Compensation From Trace and Affiliates |
|------|-------------------------|----------------------------------------|
| 1999 | 5,198,500 | 2,805,469 |
| 1998 | 5,231,500 | 6,500,965 |
| 1997 | 5,131,500 | 5,652,546 |
| 1996 | 5,119,000 | 4,755,680 |
| 1995 | 5,074,500 | 4,746,855 |
| 1994 | 5,074,500 | 8,356,366 |
| 1993 | 5,074,500 | 9,279,000 |
| **TOTAL** | **25,755,000** | **42,096,881** |

Vice President and CFO of UAG and was involved in the day-to-day operations of Foa-

It should be noted, however, that the same does not hold true for the non-Cogan Defendants. These defendants have been sued in their capacities as Trace directors and officers. As such, the duties they owed (and which the Trustee claims they breached) were to Trace. No evidence has been presented to support a finding that, by permitting subsidiaries to excessively compensate Cogan, the directors and officers were in breach of their fiduciary duties to Trace. As a result, the appropriate figure for the Director-and Officer–Defendants is the amount of compensation Cogan received from Trace alone.

The potential liability for the non-Cogan Defendants under Count IV will be based upon the following figures:

| Year | Reasonable Compensation | Compensation From Trace |
|------|-------------------------|-------------------------|
| 1999 | 5,198,500 | 897,413 |
| 1998 | 5,231,500 | 3,785,017 |
| 1997 | 5,131,500 | 3,783,228 |
| 1996 | 5,119,000 | 3,753,872 |
| 1995 | 5,074,500 | 3,788,520 |
| 1994 | 5,074,500 | 7,606,366 |
| 1993 | 5,074,500 | 8,826,249 |
| **TOTAL** | **25,755,000** | **32,440,665** |

### C. *Cogan's Efforts at Trace*

Cogan testified at length about various deals that he spearheaded and that purportedly resulted in millions of dollars in profits for Trace. For instance, Cogan testified that (1) a $2 million investment in GFI in 1974 resulted in a $89 million sale in 1989; (2) an initial investment of $250,000 in Knoll in 1977 led to an eventual sale in 1991 for $104 million; (3) a $5 million investment in Color Tile in the 1980's led to a sale for approximately $75 million; (4) a $10 million profit on a $10 million investment in Sotheby's; (5) Trace sold Sheller Globe for $187 million in 1987

mex.

after a $14 million investment from Trace and $65 million from Lehman Brothers in 1985; and (6)Trace sold the '21' Club in 1995 for $22.8 million after an initial investment of $5 million in 1984. He now would have the Court make findings of fact that his efforts resulted in these huge profits.

In the absence of any further evidence to support the claimed returns-on-investments listed above, the Court cannot find that the exact figures as claimed by Cogan were those actually realized by Trace. it is unclear from Cogan's testimony what other costs were incurred by Trace in preparing the various investments for sale, whether by heavily investing in them or even the pro rata expense of Trace's operational costs that may be attributed to the investments. For instance, as discussed in Appendix A, the sale of the '21' Club netted Trace a profit of approximately $6.4 million. Yet from Cogan's testimony, it would appear as though the sale resulted in a profit of more than double that amount. As a result, the most that can be found is that Cogan was instrumental in pursuing and shaping investments that apparently resulted in large returns-on-investment for Trace. However, these deals, while commendable, do not alter the factual finding above that Cogan's compensation was excessive. Such efforts were taken into consideration in the determination that Petersen's comparator group was inappropriate, however.

Similarly, the Defendants tout the fact that from 1995 to 1998, the key lenders to Trace such as BNS[28] and Republic Bank, knew the approximate level of Cogan's annual compensation and did not object to it. Further, they note that Cogan's compensation, even when combined with that of other Trace employees, did not violate the $12 million ceiling BNS had established on total Trace compensation. The fact that lenders did not object to Cogan's compensation does not establish that it was not excessive.

### D. *Summary*

The damage calculation, as set forth below, establishes that the Trustee is entitled to recover almost $7 million in excess compensation from Cogan:

| Date | Actual Compensation | Reasonable Compensation | Excess Compensation |
|------|---------------------|-------------------------|---------------------|
| 7/21/93–12/30/93 [29] | $4,142,762 | $2,266,145 | $1,876,617 |
| 1994 | 8,356,366 | 5,074,500 | 3,281,866 |
| 1995 | 4,746,855 | 5,074,500 | N/A |
| 1996 | 4,755,680 | 5,119,000 | N/A |
| 1997 | 5,652,546 | 5,131,500 | 521,046 |
| 1998 | 6,500,965 | 5,231,500 | 1,269,465 |
| 1999 | 2,805,469 | 5,198,500 | N/A |
| **Total** | | | **$6,948,994** |

28. The fact that BNS, in connection with the July 1996 credit agreement, also requested that Trace obtain a $20 million key man insurance policy with respect to Cogan because BNS considered Cogan as an instrumental individual in the operation and management of Trace and its operating companies also does not alter the findings above.

29. Represents proration of Cogan's total compensation from Trace and its affiliates in 1993 and proration of the reasonable compensation for 1993 found above to reflect that the damage period starts on July 21, 1993.

486

## III. *Count IV: Breach of Fiduciary Duty*

### A. *The Alleged Breaches*

The alleged breaches revolve around (1) the repurchase from Dow Chemical Company ("Dow") of Trace stocks (the "Dow repurchase"); (2) declared and undeclared dividends; (3) Cogan's compensation; (4) loans to Cogan; (5) loans to insiders of Trace and its subsidiaries; (6) Cogan's birthday party at MOMA; and (7) Cogan's daughter's job at Trace. Each will be detailed separately. It is undisputed that the Board only took action with regard to the 1996 ratification of Cogan's past compensation and certain of the dividends.

#### 1. *The Repurchase of Trace Stocks from Dow*

##### a. *Dow's Investment in 1992 and the Renegotiation in 1995*

In 1992, Dow, a critical supplier to Foamex since 1982, agreed to fund the purchase of Trace preferred stock. Dow lent $20 million to a DLJ subsidiary, BSI, and the loan was made, bearing interest at an annual rate of 7%, or $1.4 million, payable quarterly. As part of the same transaction, Trace sold 1,000 shares of Trace Series A Preferred Stock ("Series A Preferred") to BSI for $20 million, which BSI pledged to Dow as security for its $20 million debt. The Series A Preferred accrued dividends, which were payable quarterly "out of any funds legally available" at the annual rate of $1,400 per share.

The annual dividend rate remained in effect for five years, until the Dow/BSI loan matured. Thereafter, the annual per share dividend rate increased to $20,000, multiplied by the three-month United States Treasury Bill rate plus 6%. Because Trace had the option of continuing to pay interest, the Series A Preferred was a perpetual instrument. If Trace exercised its right to redeem the Series A Preferred, the per-share price would be $20,000 (aggregate $20 million) plus accrued but unpaid dividends.

As part of the same transaction, Trace loaned $10 million to Dow in the form of a purchase of a $10 million Dow note. The Dow note accrued interest at a rate keyed to the rate of 3–month commercial paper. In turn, Trace guaranteed up to $10 million of BSI's debt to Dow and pledged the Dow note as collateral for said guarantee.

In 1995, Dow, Trace and BSI entered into a Master Recapitalization Agreement, under which (1) Dow paid Trace the $10 million balance on the Dow note; (2) Trace paid BSI $10 million in consideration for BSI's consent, *inter alia*, to halve the annual dividend rate from $1,400 to $700 per share multiplied by the three-month Treasury bill rate plus 6%; (3) BSI paid Dow the $10 million received from Trace to repay part of the outstanding balance on the Dow/BSI loan; and (4) the Trace guarantee terminated. These terms had the effect of reducing Trace's Series A Preferred annual dividend obligation and redemption price by 50%, with a corresponding reduction in interest obligation and outstanding balance owed to Dow, and a repayment of $10 million of Dow's investment.

##### b. *Cogan's Purchase of the Dow Stocks*

Reacting to a demand of Dow in 1997,[30] Cogan and Smith drafted, and Cogan executed, a letter to Dow dated October 9,

**30.** The demand occurred after, on May 6, 1997, Winters sent a letter to Dow informing Dow of Trace's intention to pay an increased dividend rate on the Dow Shares rather than redeem the shares at that time. That rate, as set forth above, was 6% plus the rate being paid on 90–day Treasury bills. Although Trace was within its contractual rights to so

1997, in which they committed Trace to redeem or to cause the purchase of Dow's investment in Trace over a three-year period commencing with a $3 million installment by May 1998. The letter was written and delivered without the knowledge of Farace or Marcus. A letter dated April 9, 1998, in which Dow discussed the obligation, was copied to Smith and Winters after its receipt, according to a handwritten note on the letter.

Pursuant to its 1997 agreement to purchase the Dow stock or cause it to be purchased, Trace had only two options. Richards Layton had advised Smith that Trace could not redeem the Dow stock without also paying dividend arrearages on Trace's *pari passu* convertible preferred stock,[31] which were in excess of $2 million.[32] Therefore, that option would require Trace to use $5 million in cash. The second option was the one taken by Trace. To circumvent the legal impediments to Trace's redeeming the Dow Shares directly, Smith devised a plan to disguise the redemption as a purchase by Cogan. Thus, Smith, Cogan, Nelson and Winters agreed that Trace would lend $3 million to Cogan, who then used these Trace funds to purchase the Dow Shares. Cogan then pledged the Dow Shares to Trace.

The Board was not notified of, or requested to consider, the loan or the Dow transaction.

Prior to May 1, 1998, the $3 million loan was made to Cogan, and Cogan issued to Trace a promissory note in the amount of $3.722 million, the terms of which were set by Cogan's personal attorney and accountant, Michael Schwartzbard ("Schwartzbard"). Ultimately, Maurice Lefkort, a partner at Wilkie Farr, prepared the Note and the attached stock pledge agreement and stock certificate.

On May 4, 1998, Cogan informed Dow that Trace "today redeemed $3 million of Trace's Series A preferred stock. Trace has honored its commitment to redeem this portion of the Preferred ...." At his deposition, Cogan admitted that Trace, through M.S. Cogan, redeemed $3 million of Trace's Series A Preferred stock.

Farace believed that Trace had redeemed the Dow Shares. Cogan, Nelson or Winters told Farace, as President of Foamex,[33] that Trace had redeemed the Dow Shares. Farace was not a member of the Board at the time of the redemption. The Trustee does not assert the Farace was liable for the loan, but does claim that Farace was responsible for the October 1997 commitment to Dow, despite Farace's recusal from the issue.

Marcus knew the Dow Shares had been redeemed, and he believed that Trace had redeemed them.[34] Marcus believed that

request, Dow apparently preferred Trace to buy back the stocks instead.

31. The restriction on Trace's redemption was in the certificate of designation of its Class A Preferred Stock, issued pursuant to Del. Gen. Corp. L. § 151(g).

32. As discussed, *infra,* Trace also could not legally redeem the Dow Shares unless Trace had sufficient surplus to redeem the Dow Shares and pay the dividend arrearages on its Convertible Preferred Shares.

33. In the spring of 1997, Farace discussed with Cogan and either Nelson or Winters his intention to handle Trace matters at arms length to the extent those matters related to Foamex. Because Foamex had a strong interest in its commercial relationship with Dow, Farace communicated to Trace that he would not participate in Trace decisions in which Trace and Foamex had potentially varying interests, such as with respect to the Dow investment in Trace.

34. Cogan informed Marcus that Cogan was considering borrowing money from Trace to

Dow's request for a stock repurchase should be accommodated due to the important relationship Dow had with Foamex. As of May 1998, he also believed based upon his own approximation of Trace's assets and obligations that Trace had a surplus.

There is no record in Trace's Corporate Minutes concerning the redemption of the Dow Shares. According to Nelson, "Trace didn't have adequate surplus" to redeem the Dow Shares.

## 2. *Dividends*

On July 29, 1993, Richards Layton prepared a twenty-page memorandum advising the Trace Board of the legal standards under Delaware law for determining when a corporation may declare dividends (the "Dividend Memorandum"). According to its Executive Summary:

As a general matter, directors of a Delaware corporation may make a dividend only out of the corporation's "surplus." A corporation (by resolution of its board of directors) may in certain circumstances transfer amounts previously designated as "capital" to "surplus" to the extent such "capital" including amounts in excess of the aggregate par value of issued shares of capital stock of the corporation and so long as the fair market value of the assets of the corporation remaining after the reduction in capital is sufficient to pay the corporation's debts. A court will defer to the board's decision to transfer such capital and declare and pay a dividend from surplus so long as the board determines that the

dividend or the transfer of such capital would not cause the value of the corporation's debts to exceed the value of its assets as determined via techniques or methods that are generally accepted within the financial community. In making this determination, a board of directors is entitled to rely on the books of the corporation and the statements and reports of its officers as well as on opinions by experts whom the board has selected with reasonable care. Furthermore, the board must consider contingent and other liabilities in its analysis as to the ability to declare and pay a dividend or to transfer capital to surplus.

Dividend Memorandum, at 1–2. The memorandum was distributed to all of the members of the Trace Board. Cogan, Nelson, Farace and Marcus were all familiar with the Dividend Memorandum.

Smith, in his role as general counsel, explained the Delaware dividend declaration standards to Nelson.

While Nelson claims to have followed a standard procedure each time Trace considered paying dividends, there is no corroborating evidence of any such process.[35] There is no evidence of any calculations, nor that Nelson showed this calculations to other Directors or discussed his methodology with them. There were no practices or procedures in place to ensure that Nelson understood how to calculate whether Trace had sufficient surplus to pay a dividend.

repurchase the Dow shares, and Smith informed Marcus that a negotiation with Dow was in progress.

35. Nelson claims that he followed the Dividend Memorandum and obtained a financial statement that was prepared by the Saddlebrook office and that showed the assets and liabilities of Trace on a fair market value

basis, upon which he based calculations as to whether Trace had a surplus. After which time he claims to have informed each of the Directors and advised whether paying a dividend would be a sound use of Trace cash. The Directors claim they relied on Nelson's report of a surplus.

When the directors decided that Trace should pay a dividend, Nelson so informed King, so that she could prepare and circulate a unanimous written consent. Richards Layton had prepared the initial form of the unanimous written consent and each time a dividend was declared, King modified and updated the form with information relevant to each subsequent dividend and sent it to the Board members for their signatures. Once she received back all the signed written consents, she informed Betson or Mamary, and they had Thompson prepare and send the dividend checks.

During the relevant time period, Trace paid dividends aggregating $5,122,989, as follows:

| Date Paid | Amount | Stock |
| --- | --- | --- |
| 02/95 | $350,000 | Series A Preferred ("Series A") |
| 05/95 | $350,000 | Series A |
| 08/95 | $175,000 | Series A |
| 02/96 | $175,000 | Series A |
| 05/96 | $175,000 | Series A |
| 08/96 | $175,000 | Series A |
| 11/96 | $175,000 | Series A |
| 12/96 | $638,166 | Convertible Preferred ("Convertible") |
| 02/97 | $175,000 | Series A |
| 05/97 | $175,000 | Series A |
| 07/97 | $638,166 | Convertible |
| 08/97 | $191,100 [36] | Series A |
| 11/97 | $176,225 [37] | Series A |
| 12/97 | $638,166 | Convertible |
| 02/98 | $278,000 | Series A |
| 06/98 | $638,166 | Convertible |

The Board ratified by unanimous written consent just eight of the above dividends, those being distributed in February 1995, May 1995, August 1995, November 1996, December 1996, May 1997, July 1997 and December 1997.[38] There is no evidence

that the Board approved or ratified any of the other distributions.

The unanimous written consents approving the payment of dividends recite that Trace has sufficient surplus to pay dividends.

Further, while the Defendants contend that there is no evidence of any distribution in February and May 1996, Nelson testified that the distributions to Dow were regularly given. His testimony was also supported by cancelled checks and correspondence with preferred stockholders. The Defendants' contention that Trace somehow forgot to give contractually required distributions to one of the major suppliers to one of its subsidiaries—and that Dow had no reaction to this failure—is insupportable. Given Nelson's testimony, the Defendants would have to present some evidence that the distributions were not in fact given in those two periods; they have failed to present any such evidence.

In late 1998, Nelson determined, applying the test in the Dividend Memorandum, that Trace did not have sufficient capital surplus to declare a dividend. After this determination, Smith requested that Willkie Farr review the surplus computation to ensure its accuracy.

The Trustee does not contend that Farace is liable for any dividends paid in 1998.

In May 1999, the Delaware Court of Chancery in a case entitled *Barbuto v. Trace Int'l Holdings, Inc.*, ordered Trace

---

**36.** While the Trustee argues in his findings of fact that a higher dividend was paid in August 1997, the Trustee's interrogatory answers, JX–JD, admit that those payments were only $191,100.

**37.** While the Trustee argues in his findings of fact that a higher dividend was paid in November 1997, the Trustee's interrogatory answers, JX–JD, admit that those payments were only $176,225.

**38.** On September 12, 1995, the Board by unanimous written consent ratified the dividends paid in 1995. On November 1, 1996, the Board by unanimous written consent ratified the dividends paid in November and December 1996. On June 25, 1997, the Board by unanimous written consent ratified the dividends paid in May and July 1997. On December 30, 1997, the Board by unanimous written consent ratified the dividends paid in December 1997.

to pay dividend arrangements on its Convertible stock that accrued on June 30, 1995; December 31, 1995; and June 30, 1996. Anthony G. Barbuto, as trustee for Lambert Brussels Financial Corporation, had moved for partial summary judgment against Trace International and its directors seeking the payment of dividends accrued, but not yet paid, on June 30, 1995, December 31, 1995, and June 30, 1996, at the rate of $839.94 per share. Those dividends were never paid. Moreover, a final judgment was never entered in the case.

### 3. *Cogan's Compensation*

As discussed in Part II, *supra,* from 1993 to 1999, Cogan received excess compensation of $6,948,994 from both Trace and its subsidiaries. Also as discussed above, the non-Cogan defendants will not be liable for that entire amount, but only the amount of excess compensation Cogan received from Trace. Based on the findings above, the non-Cogan Defendants may be liable for $4,207,303 in excess compensation:

| Date | Actual Compensation | Reasonable Compensation | Excess Compensation |
|---|---|---|---|
| 7/21/93– 12/30/93 [39] | $3,941,582 | $2,266,145 | 1,675,437 |
| 1994 | 8,356,366 | 5,074,500 | 2,531,866 |
| 1995 | 3,788,520 | 5,074,500 | N/A |
| 1996 | 3,753,872 | 5,119,000 | N/A |
| 1997 | 3,783,228 | 5,131,500 | N/A |
| 1998 | 3,785,017 | 5,231,500 | N/A |
| 1999 | 897,413 | 5,198,500 | N/A |
| **Total** | | | **$4,207,303** |

It has been concluded that there was no legitimate ratification of the increase in Cogan's salary and no action taken with regard to the 1997 renewal of the 1987 Agreement. The facts surrounding these issues are stated in greater detail above.

### 4. *The Cogan Loans and Notes*

#### a. *Cogan Borrows $10.25 Million from Trace*

Although Cogan testified that he did not remember the process through which he received advances, documents show that loans were effectuated by bank wire transfers from the Saddlebrook Office to Cogan's personal accounts. Some of the records of the wire transfers note by whom they were ordered, and the names so recorded are Betson, Trace's Controller; Thompson, Trace's Treasurer; or Helen Lento ("Lento"), Cogan's secretary. As for the others, the evidence is that Mamary and Betson, as well as Thompson, were the persons who could have ordered wire transfers from Trace's accounts. There is no evidence that any non-Cogan defendant ordered or caused any of these loans to be made. The wire transfers were as follows:

| Date | Amount | Effectuated By |
|---|---|---|
| 3/31/95 | $500,000 | Betson |
| 3/31/95 | $250,000 | Not Identified ("N/I") |
| 10/24/95 | $200,000 | N/I |
| 05/16/96 | $1 million | N/I |
| 01/09/97 | $1.5 million | N/I |
| 03/03/97 | $500,000 | Thompson |
| 03/12/97 | $250,000 | Thompson |

---

39. Represents proration of Cogan's total compensation from Trace and proration of the reasonable compensation found above to reflect that the damage period starts on July 21, 1993.

| Date | Amount | |
|---|---|---|
| 04/04/97 | $198,000 | N/I |
| 04/16/97 | $600,000 | N/I |
| 04/21/97 | $400,000 | Thompson |
| 06/23/97 | $539,000 | N/I |
| 07/01/97 | $100,000 | N/I |
| 08/12/97 | $300,000 | N/I |
| 08/21/97 | $112,900 | N/I |
| 09/15/97 | $300,000 | N/I |
| 10/22/97 | $200,000 | N/I |
| 12/29/97 | $600,000 | N/I |
| 02/02/98 | $100,000 | N/I |
| 02/02/98 | $100,000 | N/I |
| 03/06/98 | $200,000 | N/I |
| 05/01/98 | $3 million | N/I |
| 05/05/98 | $400,000 | N/I |
| 05/11/98 | $300,000 | N/I |
| 06/11/98 | $100,000 | Lento |
| 07/09/98 | $200,000 | N/I |
| 09/01/98 | $250,000 | N/I |
| 11/02/98 | $ 75,525 | N/I |

Trace's general ledger shows that Cogan's loans totaled $13,411,712.52, and there is no evidence that Trace loaned Cogan more than the amount shown in the general ledger. Two of the loans listed above are dealt with separately: (1) the $3 million loan in May 1998 for the Dow repurchase, as discussed above, and (2) the $161,000 loan to Maureen Cogan, Cogan's wife. As a result, the discussion of Cogan's loans will focus on the remaining $10.25 million in loans.

Cogan requested that Schwartzbard draft promissory notes (the "Notes") to evidence these borrowings. Schwartzbard drafted the notes without any input from Trace's officers or directors. Except for the May 1998 loan for the Dow re-purchase, which is dealt with separately, above, there is no evidence that any non-Cogan defendant had any role in determining the terms of the Notes. Cogan's testimony that Nelson, Smith or Winters were involved in setting the terms of the Notes is not credible because of Cogan's conflict-

ing testimony on that issue and because there is no evidence of any communication with Nelson, Smith or Winters about the Notes.

The Notes carry a 9% annual interest rate and provide Trace with no collateral security. These terms were disadvantageous to Trace since Trace had to borrow the funds that it lent to Cogan from BNS at interest rates as high as 23% coupled with significant restrictions on Trace's principal assets.

There is no record of any discussion or approval of the Cogan loans by the Board in Trace's Corporate Minute Books, or in any proposed or adopted unanimous written consent. Trace's Corporate Secretary credibly testified that if the Board had discussed or approved the Cogan loans, the minutes of the meeting or written approval would appear in Trace's Corporate Minute Books, and there was no such record presented at trial.

There were no practices or procedures in place for the review of loans to Cogan and at no time did any of the directors suggest putting any such procedures into place. No one at Trace performed a credit check on Cogan to ensure he could repay the loans that he was receiving, nor did the Board discuss whether the loans should be secured or unsecured.

### b. Non–Cogan Defendants' Knowledge

By May 1998, all non-Cogan defendants who remained as officers and directors were aware of the loans, as they were disclosed at that time on the 1997 Financial Statements.[40]

**40.** Trace's outside auditor, Coopers & Lybrand ("C & L"), required Trace for the first time in its 1997 Financial Statements to disclose the loans from Trace to Cogan as related-party transactions. James Kelley, the C & L audit partner for Trace from 1994 through 1998, interviewed Schwartzbard regarding

Cogan's personal assets and contractual obligations to Trace and satisfied himself that the Cogan loan amounts were collectible.

The 1997 Financial Statements were released in May 1998. Other than the 1997 Financial Statements and, as discussed later, the daily cash report, no other Trace memo-

The parties have presented conflicting evidence with regard to whether certain non-Cogan defendants were aware of the loans prior to that time. Some of the non-Cogan defendants were actually consulted on an early loan for approximately $1 million.[41] There is evidence that at least some of the defendants were, or should have been, aware of the other loans as well, albeit after the fact.

### i. *The $1 million loan*

Schwartzbard told Nelson in 1995 that Cogan had taken a $950,000 loan from Trace. Nelson then informed Farace, Marcus and Sherman of this loan. He did not ask for their approval of the loan. None of the Director–Defendants objected to the loan or suggested that the Board institute procedures to bring loans to Cogan to the Board's attention.

At the time Nelson told him, Farace believed Cogan to be a wealthy man. Farace requested that Nelson keep him informed of any further loan activity of material amounts, and afterward expected that any additional loan advance to Cogan would be brought to his attention. Nelson did not bring any such loans to his attention.

Marcus testified that Nelson had only informed him the Cogan might be seeking a "possible loan."[42] At the time, Marcus believed Cogan to be a wealthy man based on Cogan's real estate and fine arts holdings and believed it well within Cogan's means to borrow $1 million. Marcus also discussed the loan with Sherman, who indicated that he did not see a problem with a loan of that size. Subsequent to Marcus's conversation with Nelson in 1995 concerning the possible loan to Cogan, Nelson never again mentioned to Marcus any loan or proposed loan by Trace to Cogan.

### ii. *The Other Loans*

Nelson admittedly knew of the other loans, and Farace, Marcus and Winters will similarly be charged with such knowledge. Smith, who was aware of loans to other insiders as early as 1996, will also be charged with knowledge of the loans.

Although Cogan did not consult with him about the loans, Nelson learned of the advances to Cogan shortly after they occurred, initially from Schwartzbard and then as a result of the daily cash reports.

Farace, Marcus and Winters received and reviewed the same daily cash reports. Although no daily cash report that memorializes any of the loans to Cogan has been introduced into evidence, Nelson's admission that he knew of the loans through the daily cash reports is sufficient to support a factual finding that Farace, Marcus and

randa or documents reflected the Cogan loans or other related-party transactions involving Cogan family members or Trace insiders. A glaring gap in memoranda written by Cogan could explain this absence, however. Cogan produced approximately seventeen boxes of documents to the Trustee in this action, including memoranda authored by Cogan on virtually every business day from late 1993 through 1999, with the exception of the period between July 1, 1995 and August 12, 1996. Cogan's production included no memoranda authored during this period. Cogan he has offered no explanation as to why he produced no memoranda written during the period.

**41.** Other defendants were involved both in the $3 million loan in May 1998 to purchase some of Dow's holdings of Trace's stock, as discussed above, and in the $161,000 loan to Maureen Cogan, as discussed below.

**42.** Marcus claims that he was not aware that Cogan had actually received the "possible loan" until he received the 1997 Financial Statements. This contention is belied by the fact that the loan appeared in the daily cash reports, which Marcus received. In any case, even if he were only told of a possible loan, he took no actions with regard to determining whether such a loan could or should be given.

Winters should have similarly been put on notice by the daily cash reports.

In addition to receiving the daily cash reports that noted the loans, Winters' knowledge of the loans is evidenced by his discussion of the presentation of these loans with Trace's auditors in the mid-1990's. The discussion concerned whether the loans should be booked as assets or a reduction of equity. Winters did not discuss the loans to Cogan with any of the members of the Trace Board.

It is uncontested that Farace is not liable for the 1998 loans to Cogan totaling $1,663,712.52.

### 5. *The Unauthorized Loans and Gifts*

In addition to the loans to Cogan and the unauthorized compensation paid to Cogan's daughter, Cogan caused Trace to make unauthorized loans to his wife and other employees of Trace and companies affiliated with Trace.[43] All checks and disbursements of funds, including the loan disbursement to Cogan, were processed by Trace's Saddlebrook office. The total value of these transactions is $1,717,000 after deducting amounts recovered by the Trustee from the loan recipients in separate adversary proceedings.

All of the loans and bonuses discussed below were paid by Trace without the approval of the Board. The record is devoid of any minutes of the Board or written consents of the Board reflecting that the pleaded loans were put forward for the Board's consideration and determination. None of the loans were disclosed in the annual audited financial statements of Trace from 1994 to 1997.

Cogan admits that the Board had a duty to supervise transactions between Trace and its officers and directors. However,

Cogan produced no evidence that he or the other directors were fulfilling that duty. Smith never informed the Board that it had a responsibility to approve loans to employees by Trace; he did not believe it had such a responsibility.

Marcus, as Vice Chairman of the Board and Senior Managing Director of Trace, did not know the process for authorizing loans to employees or even if there was such a process. In fact, there was no process or procedure in place at Trace to determine whether any given loan to an employee was appropriate.

Winters did not recommend that procedures be put into place to monitor and approve or disapprove of loans to Trace employees.

#### a. *Loans to Maureen Cogan*

In 1996, Cogan unilaterally directed Nelson to have Cogan's wife, Maureen Cogan, receive $1,000 per week. Over time, these payments aggregated $161,000, and were reflected in the Notes that Schwartzbard prepared for Cogan's signature. Cogan agrees that payments that were made to his wife "were loans made to me that were double counted by Ron Mamary." The loans were not presented to, discussed by or approved by the Trace Board.

Nelson believed that an additional loan to Cogan of approximately $50,000 per year was not material and so instructed the Saddlebrook staff.

No defendant other than Cogan and Nelson had any role in making or implementing these advances to Maureen Cogan. Other than the knowledge imputed to those who received the daily cash reports that would reflect the $161,000 promissory note to Cogan, no defendants other

---

**43.** The Trustee has stipulated that two loans—those to Peter Cohen and Frank Foley—are not at issue.

than Cogan and Nelson were aware of these loans.

### b. *Hank Glantz*

In 1996, Hank Glantz ("Glantz") was an executive of Trace's affiliate UAG. Glantz had achieved the performance milestones set forth in his compensation agreement with UAG and was therefore entitled to receive a $850,000 bonus. To help UAG, which was feeling a financial pinch, fulfill its obligation to Glantz, Cogan had Trace pay UAG $500,000 to Glantz on UAG's behalf with the understanding that UAG would reimburse Trace the $500,000 and would pay Glantz the remaining $350,000 he was due under his compensation agreement. UAG's chief financial officer, Davidson, and UAG's president, DiFeo, agreed with the structure of the transaction. The transaction should have been recorded on Trace's books as a $500,000 receivable from UAG, not as a loan to Glantz. No one ever told Glantz the money was a loan.

UAG did not repay the $500,000 receivable, but instead set off that amount against funds Trace owed UAG. Nelson and Smith knew about the loan. No other non-Cogan defendants were aware of the loan.

In a separate adversary proceeding, the Trustee sued both UAG and Glantz to recover the $500,000 loan. Because Trace owed UAG well in excess of $500,000, UAG reduced its claim against Trace by $500,000 and the Trustee dismissed it from the suit. Glantz then settled the action against him for $160,000, subject to the approval of the Bankruptcy Court.

### c. *Loan to George Lowrance*

In 1996, George Lowrance, the executive vice president and general counsel of Trace's affiliate. UAG, received a $43,000 loan from Trace to assist him when separating from his wife. Nelson caused the Trace loan to Lowrance. In 1998, when Lowrance left UAG, Cogan forgave the $43,000 loan.

No defendant other than Nelson or Cogan was aware of or had any role in the decision to lend the money to Lowrance.

The Trustee has separately sued Lowrance on the loan in Bankruptcy Court. The parties settled for a payment by Lowrance of $30,000, and thus $13,000 remains at issue.

### d. *Loan and Bonus to Helen Lento*

Helen Lento ("Lento") was Cogan's administrative secretary. In 1991, she received a $300,000 loan from Trace. There is no allegation that this loan was not authorized properly. It was made to induce Lento to continue working for Trace after she indicated that she had been contemplating retirement and to facilitate her purchase of a residence.

In 1997, Cogan caused Trace to forgive the 1991 loan in the form of a $558,000 bonus, consisting of the forgiveness of her $300,000 loan and the income taxes on such forgiveness.

This transaction was implemented by Nelson, Winters and Smith. Schwartzbard calculated the amount needed to accomplish the loan forgiveness with no tax effect on Lento. He discussed this calculation with Winters. Nelson notified Ronald Mamary of the event for bookkeeping purposes. No other non-Cogan defendants were involved.

### e. *Loans to Robert Nelson*

In 1995, Nelson received a $300,000 loan from Trace. In 1998, he received an additional $300,000 loan from Trace.

Cogan authorized the loans to Nelson. Schwartzbard acted for Trace in structuring the loans, the interest rate, maturity and other terms including a mortgage on Nelson's home, and Nelson executed the

Notes for the loans. Nelson did not authorize the loans to himself.

Marcus and Farace were aware of the loan to Nelson. Marcus was aware before the fact, as Cogan told him about the possibility of a loan to Nelson. Marcus believed that the loan would be appropriate because Nelson was a very key member of Trace and UAG. Marcus did not discuss the loan to Nelson with any of the Board Members and did not suggest that the Board put procedures in place to monitor loans to employees. Farace was aware of the loan after the fact, as Nelson once told Farace that he had received a loan from Cogan. Farace believed the loan came from Cogan, however, rather than from Trace.

Smith was not aware of the actual loans given to Nelson.

A memorandum from Cogan to Winters dated July 30, 1998, authorized Winters to lend $300,000 to Nelson "to be used as he sees best and to be repaid as he sees best over the balance of this century." Cogan stated the money could come from "any one of our entities" and he asked that the loan be made by August 10, 1998. In another memorandum dated August 21, 1997, Cogan instructed Winters to provide a $500,000 interest-free loan to Nelson. There is no evidence that a loan of that amount was ever given to Nelson. Winters did not take any actions to seek Board approval or put any procedures in place to deal with loans to insiders.

In a pending Bankruptcy Court action, the Bankruptcy Court is currently adjudicating the amount of Nelson's off-sets to the loans.

#### f. *Loan to Sinkfeld*

Richard Sinkfeld ("Sinkfeld") previously worked as an attorney at the Atlanta law firm of Rogers & Hardin. UAG hired Sinkfeld as its general counsel, but he was never an employee, officer or director of Trace. To induce Sinkfeld to leave his firm in Atlanta, Trace lent Sinkfeld $100,000 to move to New York City.

Only Cogan and Smith had contemporaneous knowledge of the loan to Sinkfeld.

The Trustee sued Sinkfeld in a separate adversary proceeding to recover the $100,000 loan. That action was settled for $85,000.

#### g. *Loans to Tambra King* [44]

Trace did not make a loan to King. King, who was secretary and vice president of Trace in 1998 and 1999, testified that she was afforded no loan by Trace and that the $50,000 referred to in the Complaint was a bonus for work in 1998, paid in 1999. Smith, as King's supervisor, had recommended to Nelson and Cogan than King be paid a bonus for her work at Trace. Smith was told that Trace was paying King a $50,000 bonus for her work in 1998. When Smith and Winters delivered the check, they both thanked King for her work during 1998 and told her that the $50,000 was her 1998 bonus. King never asked for a loan from Trace and no one ever told her the $50,000 was a loan. King did not treat the $50,000 as a loan; she paid income taxes on it.

#### 6. *Cogan's Birthday Party at MOMA*

Trace paid $1,069,586 for a birthday party for Cogan at the Metropolitan Museum of Modern Art ("MOMA") to celebrate Cogan's 60th birthday (the "Birthday Party"). The party included the screening of a film entitled "The Life of Marshall Cogan,"

---

44. The Trustee did not include facts concerning this loan in his Proposed Findings of Fact. It may be assumed from this elision that the Trustee is no longer arguing that the $50,000 is a loan, as supported by King's testimony.

which was produced at a cost of $108,000 in company funds.[45]

It was Cogan's idea to throw the party for himself at the MOMA, conceiving of the party as an opportunity to "put every one of the investment bankers, lawyers, bankers, auditors, competitors, and public who would buy cars, and people who would continue buying products from [Trace] into a room to create an aura about what we had accomplished so it would be easier to raise money."

The primary business purpose of the party was evidenced by the large number of business persons at the party who had done business, or been associated, with Trace; the majority of attendees (accompanied by guests in most instances) had a Trace business relationship.[46] Hundreds of financial industry and business persons were invited. As Nelson put it, "Marshall Cogan's birthday was the excuse, not the reason to have the party." Approximately fifteen persons in attendance were related to Cogan.

Cogan alone approved of the payment of more than $1 million for the Birthday Party. There was no discussion among Trace's board members concerning whether Trace funds should be used to pay for the Birthday Party and film, and the

Board did not vote on whether Trace should pay for the Birthday Party. The expense was not disclosed in the 1997 annual audited financial statements.

Of the non-Cogan defendants, only Nelson and Marcus knew, prior to the Birthday Party, that it might be paid for, at least in part, with Trace funds. Cogan solicited Nelson's opinion about whether Trace could pay for the party, and Nelson said he believed Trace could pay for part of the cost. Nelson did not find out that Trace had footed the entire bill until Trace filed for bankruptcy. A month or so before the Birthday Party, Marcus overheard a conversation as to whether the Birthday Party could be deducted as a business expense.[47]

Sherman testified that he thought that Cogan was paying for the Birthday Party and that it was improper to expend corporate funds for this event. Similarly, Farace testified that he received a "personal" invitation to the party from Cogan and/or Cogan's wife, Maureen; that he thought that Cogan was paying for the party, with the film being a gift from Maureen; and that the use of corporate funds was improper.

All the Defendants knew the nature of the event as they were all present at the party.

---

**45.** Marcus and Farace contend that the quality of the video shown at the party was such that no reasonable person would estimate such a significant cost.

**46.** The party took place not long after the UAG went public in the fall of 1996 and around the time that UAG raised $200 million in public debt. Business persons involved in the UAG financing attended the party. The party also took place around the time that Foamex was engaged in a refinancing of its debt. Business persons involving in the Foamex refinancing attended the party.

**47.** Marcus admitted that he was surprised to learn that the Birthday Party cost $1 million. Based on his experience in running the '21'

Club, he believed the party should have cost approximately $250 to $300 per person. Given that from 200 to 300 persons were invited to and attended the party, Marcus believed the total expense would be less than $100,000. There is no evidence that anyone reported to Marcus that the event cost substantially more than he had estimated.

Lavish corporate events were not uncommon, however. Knoll Furniture, which was a Trace subsidiary, threw a party where Knoll sponsored an Andy Warhol exhibit and black-tie dinner for approximately $900,000. UAG attended itself held corporate entertainment events that cost $400,000 to $500,000 each.

### 7. *Cogan's Daughter's Job*

Cogan requested in 1995 that Marcus add his daughter, Stephanie Golfinos ("Golfinos"), to the payroll at the '21' Club, and Marcus refused. Nevertheless, Cogan acted unilaterally [48] to hire her as a consultant and arranged for Trace to pay her a salary of his own determination. While there is no direct evidence as to how Cogan implemented his decision, he must have so instructed Thompson, Trace's Treasurer, who was in charge of adding new employees to the payroll. Golfinos received approximately $460,000 from Trace between 1995 and 1999 in annual compensation as follows: $19,384.64 (in 1995); $105,026.12 (in 1996); $123,355.62 (in 1997); $196,432.89 (in 1998); and $15,769.26 (in 1999). Golfinos also received from Cogan a Lexus owned or leased by Trace.[49] She only used the car for personal, not Trace business, use.

#### a. *Golfinos' Work*

Prior to being put on the payroll, Golfinos was allegedly involved in the development of the '21' Club Cookbook (the "Cookbook") during July of 1992 through July of 1995. The Cookbook was finalized in mid–1995 and published later that year. Trace did not earn revenue from the Cookbook because it was published in 1995 and Trace sold the '21' Club in 1995. After Trace sold the '21' Club, Trace had no interest in selling the Cookbook and did not monitor the number of copies sold.

After being put on the payroll, Golfinos had, at most, minimal involvement in Trace's other restaurant ventures and after mid–1997 performed no services for Trace. The only work that Golfinos allegedly did for the '21' Club or Trace's other restaurant venture, Stick to Your Ribs, was to attend approximately six meetings and make menu and interior design suggestions. Any work Golfinos did on behalf of Stick to Your Ribs ended at the end of 1996 when the restaurant burned down. Golfinos then allegedly did some work between October of 1996 and June of 1997 on developing a new restaurant venture that never opened.

According to Golfinos, she performed no services for Trace as a consultant and a memo that Cogan's secretary sent out stating that Golfinos would be working as a consultant from home in 1997 was incorrect. Golfinos received W–2s, which are created for employees and not consultants.

Although Golfinos received raises from Trace, her performance was never reviewed.

#### b. *Defendants' Knowledge of Her Job*

The Trace Board was not informed of Cogan's decision to hire Golfinos. Cogan did not present a proposal to the Board asking for Golfinos to be paid by Trace.

None of the non-Cogan defendants were aware of Golfinos' position. The record is barren of any memorandum or other writing addressed or copied to any of the non-Cogan defendants but Winters describing or mentioning in any manner that Golfinos was receiving money regularly from Trace from 1995 to 1998. Moreover, Winters credibly claims that he did not see two memoranda sent to him, instructing him to raise Golfinos' salary. Winters was not involved in setting compensation and had given standing instructions to his secretary to send memoranda and letters erroneously sent to him to the proper person.

---

48. Cogan on more than one occasion acted independently to hire Trace personnel.

49. Golfinos, who had no idea that Trace owned the car, first learned that the Lexus was owned by Trace in 1999, when she had to return it because of Trace's bankruptcy.

Similarly, Marcus, who knew of Golfinos' efforts with the '21' Club and Stick To Your Ribs as he oversaw those operations, knew that Golfinos was not on the payroll for either entity and believed that Golfinos participated in the Stick To Your Ribs venture as an unpaid volunteer. Marcus' belief is credible, particularly given his flat denial when Cogan asked that Golfinos be put on the '21' Club payroll.

The Trustee points out that Trace had less than forty employees and Golfinos' compensation was represented in her W–2s and memos from Cogan and his secretaries. However, Golfinos' name did not appear in the Trace telephone directory, and she did not have an office at Trace. She was not even listed on the schedule of Trace employees used in determining annual salary adjustments, nor were the payments to her separately noted on the daily cash reports. As a result, the defendants will not be charged with the knowledge of her employment by Trace in the absence of some other indication that they were aware. The Trustee has not established any such evidence.

The Trustee does not contend that Farace is liable for any amounts paid by Trace to Golfinos in 1998 and 1999, or for the automobile use she was afforded by Trace in 1998 and 1999.

### B. Kagan's Testimony on Proper Corporate Governance and Trace's Practices

#### 1. Kagan's Testimony

At trial, the Trustee presented expert evidence on corporate governance from Irving Kagan ("Kagan"), who has more than 30 years' experience in this field as an in-house counsel (for Hertz and GAF), special corporate counsel, board member, educator and author. His experience includes both public and private corporations. Kagan's conclusions are credible, and his testimony confirms the Court's pre-trial determination that his expertise provides a "reliable foundation for his opinions on good corporate governance practices." *Pereira v. Cogan,* 281 B.R. 194, 200 (S.D.N.Y.2002).

Kagan explained that good corporate governance practices do not vary whether the entity is public or private. Cogan at trial and Sherman at his deposition testified to like effect.

As Kagan explained, the Board's central function is to direct the management of the company.[50] A Board must establish practices and procedures that will enable it to discharge its responsibilities effectively and set the proper ethical tone. Such practices and procedures should include, *inter alia,* reporting and monitoring systems, codes of conduct and compliance policies. Based on his analysis, Kagan concluded that the Trace Board did not have practices and procedures to monitor and oversee the management of the corporation. He opined that the lack of such procedures resulted in the ratification of Cogan's compensation without sufficient information and the renewal of Cogan's 1987 employment agreement without any action by the Board. In addition, there were no practices or procedures for reviewing the propriety of granting loans or other personal expenditures. Nor did Trace have compliance policies or a compliance officer.

---

**50.** Cogan, Farace, Marcus, Nelson and Smith similarly admitted that directors have the duty to be advised as to the financial condition and business of the corporation, to attend meetings of the Board, to review the corporation's financial statements, to make inquiries, to supervise transactions between the corporation and its officers, to supervise and evaluate the CEO and to review major transactions such as payments of dividends.

Kagan also opined that there should be a system of regularly scheduled meetings, with a focused agenda, and preceded by an informative "board package." The Board's ensuing deliberations at meetings should be adequately documented in the corporate minutes. Informal, off-the-record meetings are an inadequate substitute as they lack discipline and lack accountability. In lieu of action at a board meeting, a board may lawfully employ a unanimous written consent, which has the same binding effect as action at a Board meeting.

Kagan also stated that a board should establish effective Audit and Compensation Committees, or itself exercise those functions if it chooses not to have such committees. However, Delaware law did not require during the relevant time that a privately held corporation such as Trace have an audit committee or a compensation committee. The audit function includes accounting matters in addition to serving as a "watchdog" to protect the corporation and its constituents from improper internal acts. These functions cannot be performed properly by remaining passive. Kagan opined that a compensation committee is charged with protecting the corporation's resources and evaluating the performance of management. A compensation committee should conduct a review of management at least annually, and it should seek objective advice, such as by retaining outside compensation experts.

Kagan stated that the role of General Counsel is to advise the board as to its statutory obligations and provide guidance and recommend measures necessary to meet those obligations.

### 2. *Trace's Practices*

The last Trace Board meeting at which a quorum was recorded in writing and minutes taken and produced took place in September 1995.[51] Board actions after September 1995 were memorialized in unanimous written consents prepared by or at the direction of in-house counsel Smith or under Smith's supervision. Otherwise, there was only purported "off-the-cuff" informal discussions between the officers and directors.[52] Neither Trace's Articles of Incorporation nor its bylaws required the Board to meet on an annual basis, and Delaware law did not require during the relevant period that a specific number of Board meetings be held.

From time to time, Trace retained outside counsel, *inter alia*, to prepare unanimous written consents for the Board. The firms consulted included Akin Gump, Willkie Farr, and Richards Layton. Also from time to time, unanimous written consents distributed to Board members would attach legal memoranda prepared by the outside counsel concerning an issue presented to the Board.

Although financial officers should establish procedures for reporting to a board on a regular basis, and the board itself should

51. Cogan testified that the Trace Board held meetings in his Southampton home throughout the 1990's and as late as 1997. King, who was responsible for documenting such meetings, contradicted Cogan. The corporate minutes show the last Southampton Board meeting occurred in 1991, not 1997. Further, Cogan's 1997 invitation to his Southampton home says nothing about a board meeting. As a result, Cogan's testimony that a Board meeting was held in 1997 is rejected as it is unsupported and contradicted.

52. During the period in which each served as director, Cogan (through 2000), Marcus (through March 1999), Farace (through 1997) and Nelson (through 2000) all maintained offices at Trace's New York office and thus discussed business matters in person on a daily basis. Through his resignation in June 1999, Sherman was also in regular telephone communication with Board members concerning business matters. There is no record of what, if anything, transpired during these discussions in the corporate minutes.

instruct those officers to provide the necessary reports, there were no procedures for getting financial information to the Trace Board. Winters undertook no responsibility to deal with the Board, although he reported to a Board member, Nelson.

Smith, as General Counsel, was supposed to advise the Board as to its obligations and responsibilities. Smith admits never giving the Board advice on the duties of corporate officers. He never discussed with the Board its duty to manage the corporation, the need to establish compliance and monitoring programs or an audit committee, the obligation to make decisions on redemption of the corporation's securities, the obligation to supervise and evaluate Cogan as CEO and to inform themselves as to transactions between Cogan and Trace. Smith did not believe that the directors had the legal duty to determine if loans should or should not be made to Cogan or other insiders, and he admittedly never read the Delaware statute that made such duty a Board responsibility.

Trace's Executive Committee did not meet between 1994 and 1999.

Trace did not have an audit committee. While Trace was not alone among privately held companies incorporated in Delaware in its choice not to have an audit committee,[53] there is no evidence that the Trace Board took over the "watchdog" role that the audit committee would normally hold as it should have done in the absence of such committee. The evidence in the record did not demonstrate any lack of awareness on the part of the Board concerning the accounting functions, however, i.e., the purchase, management and sale of Trace's portfolio companies. In addition, Trace's principal portfolio companies during the relevant periods, UAG and Foamex, were public corporations that each had an audit committee.

Trace did not have a compensation committee until February 1995.[54] The compensation committee, once created, did not convene in person and record minutes during the relevant period. The only written memorialization of action taken by the Committee is contained in a unanimous written consent discussed above concerning the retroactive ratification of Cogan's compensation. The Compensation Committee never considered the compensation paid to Trace's other employees. The named members of the Compensation Committee were Ralph J. Shapiro, Esq. ("Shapiro") and Nelson in 1995; Nelson and Sherman in 1996; and Marcus and Sherman in 1997 and 1998.

While the Defendants point out that there is no evidence that any lender complained about Trace's corporate governance practices, such evidence is insufficient to overcome the conclusion that Trace's corporate governance practices were sadly deficient.

## IV. *Trace was Insolvent or in the Vicinity of Insolvency Since 1995 Except for the Last Quarter of 1996*

Relevant both to Counts IV and V is the issue of the solvency of Trace. With regard to Count IV, the Trustee contends

---

**53.** For instance, Zurich Center Group, for which King currently serves as Secretary, has approximately 100 subsidiaries, many of which are Delaware corporations. None of those corporations has a compensation committee. Another Delaware corporation, Arinda Health Corp., which employed King prior to her Trace employment, also did not have an audit committee.

**54.** The two companies discussed above that did not have audit committees, Zurich Center Group and Arinda Health Corp., also did not have compensation committees.

that Trace was insolvent or in the vicinity of insolvency for the entire period from 1995 through the filing of Trace's bankruptcy in 1999. As a result, the Trustee contends that the fiduciary duty that the directors owed to Trace and its shareholders expanded and was owing to the creditors as well from 1995. The Defendants contend that Trace did not become insolvent or enter the zone of insolvency until sometime in the third or fourth quarter of 1998. With regard to Count V, the Trustee contends that Trace could not legally pay dividends and redeem shares because Trace was insolvent or had insufficient surplus.

The resolution of the parties' conflicting positions regarding the timing of Trace's insolvency rests primarily on the assessment of the expert reports and testimony offered by the two sides. The Trustee relied on the expert reports and testimony of Thomas Blake ("Blake"), a partner at Ernst & Young, L.L.P. Blake testified that Trace was insolvent during the entire period 1995–98. The Defendants offered the expert reports and testimony of two different partners from BDO Seidman, L.L.P. ("BDO"), William Lenhart ("Lenhart") and Charles Stryker ("Stryker"). Lenhart, relying on valuations provided him by Stryker, testified that Trace was not insolvent until the third or fourth quarter of 1998.

While there are differences in the opinions reached by Blake and Lenhart/Stryker, the basic methodologies used are similar in a number of significant respects. Both Blake and Lenhart agreed that more than one test was necessary to determine solvency and they agreed that one of those tests should be the Balance Sheet Test. In

preparing their respective Balance Sheet Test, each expert started with Trace's own internal financial statements and adjusted the values of both assets and liabilities to market. Blake prepared his own valuations of Trace's most significant assets (Foamex, UAG and CHF), while Lenhart relied on the valuations prepared by Stryker. The differences in the valuations are described below.

The experts also each utilized a second test to determine the solvency of Trace. They differed in their choice of tests, however. Blake applied a Cash Flow and Capital Adequacy Test, in which he analyzed Trace's cash flow and capital adequacy looking not only at Trace's ability to pay its current maturing obligations as they came due, but also the ability to meet cash and capital requirements in the future, including those required to repay the additional borrowings that were being incurred to fund Trace's cash flow deficits. Lenhart applied a more short-sighted version, where he looked to whether Trace paid, as opposed to defaulted upon, its current obligations, relying on the fact that Trace was able to continue to borrow to pay its obligations. As discussed *infra*, the Cash Flow and Capital Adequacy test is the appropriate second test to be applied to determine solvency as a matter of law.[55]

### A. *The Experts and Their Reports*

Blake has been a partner at Ernst & Young for twenty-two years and an accountant since 1968. Blake is a Certified Public Accountant with a Bachelor's Degree in Economics and a Master's Degree in Business Administration. Blake is a member of, *inter alia*, The American Society for Appraisers, The American Institute

---

**55.** Blake testified that in the twenty plus years that he has been doing valuations and solvency analyses, he has never prepared a report that did not use both methodologies for determining solvency. Further, this is the only solvency report Lenhart has ever prepared that does not include a cash flow and capital adequacy analysis.

of Certified Public Accountants and the Massachusetts State Society of Public Accountants.

Lenhart and Stryker are both partners at BDO. Lenhart has been a partner in BDO's insolvency group for approximately twelve years and Stryker has been a partner in BDO's evaluation and appraisal group for about four years. Lenhart relied on the valuations provided to him by Stryker.

Stryker has a Bachelor's Degree in Economics and a MBA in Finance/Investments. He is a member, *inter alia*, of the Association for Investment Management and Research, the New York Society of Security Analysts, and the Association for Investment Management and Research. Previously, Stryker served as a member of the Valuation Advisory Committee of the Employee Stock Ownership Plans Association of America and of the AICPA Management Consulting Team.

Lenhart is a Certified Public Accountant with a Bachelor of Science in accounting. Lenhart is a certified turnaround professional, as designated by the Turnaround Management Association and a certified fraud examiner as designated by the Association of Certified Fraud Examiners. Lenhart is also a member, *inter alia*, of the American Institute of Certified Public Accountants, the American Bankruptcy Institute. Lenhart is a board member of the Association of Insolvency and Restructuring Advisors.

The experts were retained to prepare financial analyses of Trace and to render reports regarding their opinions as to Trace's solvency for the period 1993 through Trace's bankruptcy filing in 1999.

### B. *The Balance Sheet Test*

The balance sheet test of insolvency is determined by examining whether the fair value of liabilities exceeds the fair value of assets. In order to prepare their balance sheet analyses, both Blake and Lenhart (through Stryker) first valued Trace's investments in Foamex, UAG and CHF. The experts agreed that there are three accepted methodologies for determining the fair market value of assets: (1) the market approach; (2) the income approach (also known as the discounted cash flow approach); and (3) the cost approach. The major differences between the experts are described below.

### 1. *Valuation of Foamex*

As noted above, Trace owned directly or indirectly between 44 and 46% of the shares of common stock outstanding of Foamex. Because Foamex is a public company, both experts used the public stock price for Foamex as a starting point for their valuations. It was determined that the public stock price for Foamex was an efficient market for determining the value of Foamex's stock and that there was sufficient trading volume so that the public stock price would be representative of the value at which buyers and sellers in an open market would trade that stock.

Thus, both experts began by multiplying the number of shares that Trace owned in Foamex by the public stock prices on certain Valuation Dates. Stryker looked to prices for each of the following periods: June 30, 1993; December 31, 1993; December 31, 1994; December 31, 1995; December 31, 1996; March 31, 1997; June 30, 1997; September 30, 1997; December 31, 1997; March 31, 1998; September 30, 1998; and December 31, 1998. Blake looked to these dates as well as times when the stock was valued at its lowest prices, as discussed later.

After obtaining these figures, the experts again differ in their methods. Blake discounted the figures by what Blake testified was an appropriate "blockage dis-

count" to take into account the size of Trace's block of Foamex's stock and other impediments to sale. A "blockage discount" accounts for the negative effect on the price of attempting to sell a large block of single stock. The negative effect of a blockage discount can be thought of in two ways: (1) a large number of shares limits the number of potential purchasers, or (2) a shares put on the market increases the supply of shares relative to the demand for shares which tends to lower the price at which purchasers will be willing to buy the shares. Blake's own analysis resulted in a blockage discount of 26 to 28%. However, he instead utilized a lower blockage discount of 15%, which was more favorable to Trace, as that was the discount used in a valuation performed by Trace's external auditors, C & L, in 1996.

By contrast, after obtaining the figure based on price per share, Stryker added in all but two of the Valuation periods,[56] a premium reflecting the control position represented by Trace's ownership of a large block of Foamex shares. The "control premium" represents the benefits associated with a control position, including the ability to make decisions that increase cash flow of the controlled or controlling person, declare dividends, raise capital through borrowing or the issuance of shares in the public or private markets, hire and fire management, determine the strategic direction of a company, make investments, liquidate or dispose of assets, and others.

To determine the magnitude of the control premium to apply in each period in which he applied a control premium to the value of the Foamex shares, Stryker considered a database of merger and acquisition transactions and offers maintained by MergerStat, a source regularly relied upon by valuation professionals, that reflected marketplace purchases of or offers to purchase control of companies categorized in the same three-digit Standard Industrial Classification Code as Foamex is categorized, between 1990 and 1999. Stryker observed 33 purchases or offers to purchase in the appropriate database. Based on market prices for the target companies' respective common stocks thirty days before the announced offer, the average offer was at a premium to market of 52%, and the median premium was 39%. Of the 32 mergers, only 22 actually closed, and all of them involved the sale of 100% of the target company's stock. Stryker did no analysis to determine why a control premium was being offered in the listed transactions and did not look at any information about the transactions except from the single page generated by MergerStat.[57]

Blake testified, and further findings of fact set forth in the following paragraphs confirm, that Trace could not have ob-

**56.** In those two periods, the first and second quarters of 1998, a public offer by Trace at a premium to the market was outstanding for all of the shares of common stock of Foamex then outstanding and not already owned by Trace. Stryker concluded that a premium for control was reflected in the NASDAQ trading prices of Foamex's common stock in these two periods as a result. Accordingly, he calculated the value of the asset solely by calculating the number of shares held by Trace by the then-market price of a single share trade publicly at the close of the relevant trading day.

**57.** For his rebuttal report, Stryker performed a second MergerStat analysis to find transactions involving the sale of 40–50% blocks of stock. MergerStat contained ten such transactions for the period between 1993 and 1998, but none of these transactions were in Foamex's SIC code and only eight closed. Stryker did not look at any information concerning the transactions beyond what was listed on the single-page report and he did nothing to determine why a control premium was being offered in the listed transactions.

tained a control premium for its block of Foamex stock. Blake testified that a purchaser would only be interested in acquiring Trace's 44 to 46% block of Foamex stock at a premium if the purchaser were able to make a change to Foamex to increase its cash flow. Blake credibly testified that due to Foamex's cost structure, inability to raise sales prices and historic financial performance, a potential purchaser would not expect to be able to increase the cash flows from Foamex, and that Trace did not enjoy a lot of benefits that a control owner would normally enjoy. In this case, there were significant loan covenant restrictions regarding compensation and dividends, as well as a provision providing an automatic default if there was a change in Foamex's principal shareholder. The ability to exercise the prerogatives of control through Trace's 44 to 46% block was severely restricted by Foamex's debt structure and its financial performance.

In support of this finding, Michael Glassman, an investment banker for Beacon, who rendered investment banking advice to a special committee of Foamex board in connection with the Foamex going-private transaction, testified that a purchaser of Trace's share of Foamex would not pay a control premium.

In further support of this finding, Stryker agreed with Blake that ability to increase cash flows is primarily determinative in whether a control premium should be applied. However, Stryker never identified what a potential purchaser of Trace's block of Foamex stock could do to increase cash flow. Furthermore, Stryker never researched or identified any specific improvements that a buyer could make in Foamex's cash flow. Nor has Stryker identified any synergies or redundancies that a potential purchaser would use or reduce to increase cash flow. Stryker also ignored the change of control provisions in Foamex's private and public debt covenants.

In short, Stryker inadequately supported his conclusion that Trace's block of Foamex stock could be sold at a premium. Furthermore, Stryker's reliance on the MergerStat reports is incomplete and without adequate support. As a result, it is inappropriate to apply a control premium for Trace's interest in Foamex. Instead, the application of a 15% discount is reasonable, and Blake's application of that discount is both credible and reliable for the valuation of Trace's holdings in Foamex.

The one remaining issue is whether the Court should adopt Blake's calculations derived from the low-points as opposed to his calculations derived from the quarter end points. The rebuttal testimony of Lenhart in opposition to Blake's "low-point" analysis is persuasive and credible, and therefore Blake's calculations using this method will not be adopted. Lenhart, who has never in his career preparing and/or evaluating approximately 200 solvency analyses prepared nor seen prepared a solvency analysis using the "low point" formulation suggested by Blake, stated that the low-point analysis "results in an 'apples and oranges' comparison of incomplete data at different points in time." Report at 2. For instance, the "low point" for the fourth quarter of 1997 occurred on December 4, 1997. Blake then values the Foamex stock as of that date, yet compares it to liabilities recorded as of the end of the fourth quarter of 1997, at which time Trace owed an additional $26 million in liabilities than it did on December 4, 1997. It is more consistent to compare the value of the assets as of the same date as the liabilities are valued. As a result, the use of the quarter end points is more consistent and reliable than the use of the low points, and

therefore finds the following valuations for Trace's block of Foamex stock:

| | |
|---|---|
| March 1995: | $ 76.7 million |
| June 1995: | $ 70.1 million |
| September 1995: | $ 99.5 million |
| December 1995: | $ 70.7 million |
| March 1996: | $ 91.1 million |
| June 1996: | $117.5 million |
| September 1996: | $155.8 million |
| December 1996: | $158.4 million |
| March 1997: | $150.1 million |
| June 1997: | $126.1 million |
| September 1997: | $136.9 million |
| December 1997: | $106.1 million |
| March 1998: | $171.3 million |
| June 1998: | $170.1 million |
| September 1998: | $142 million |
| December 1998: | $120.7 million |

### 2. *Valuation of UAG*

Prior to October 1996, UAG was a privately owned company, and Trace owned directly or indirectly approximately 39% of the shares of UAG. After UAG's IPO in October 1996, Trace owned directly or indirectly approximately 20% of the outstanding common stock of UAG. Both experts used different approaches for the pre-IPO valuation and the post-IPO valuation.

#### a. *Pre–IPO Valuation*

Blake based his valuation on a June 1996 valuation performed by Coopers & Lybrand, who used both the market approach and the income approach. In its valuation C & L applied a 45% minority interest and illiquidity discount to Trace's interest in UAG and valued that interest at $14 million.

Blake determined that the 45% discount was too high, so he used a 15% minority and illiquidity discount instead. This change was favorable to Trace as the marketability of Trace's UAG shares was not assured and a significant portion of UAG's

value in the C & L valuation came from the value of dealerships that were not acquired by UAG until after January 1995.

Using the 15% discount as opposed to C & L's 45% discount, Blake's pre-IPO valuation of UAG was increased to the value of $23 million. Blake used this valuation for the entire period from January 1995 through September 1996. He did not increase the valuation of UAG in the third quarter of 1996 in anticipation of its IPO because public offerings are not assured and can be postponed or cancelled altogether.[58] This is further supported by the fact that Trace itself did not internally adjust its valuation of UAG in anticipation of the pending IPO.

Stryker utilized a market approach to the valuation of UAG, looking to the "Big Three" automobile manufacturers—Ford, Chrysler and General Motors—as comparable companies because there were no publicly traded automobile mega-dealers at the valuation dates. Stryker examined equity value multiples applied in the marketplace to revenue figures for the manufacturers and then adjusted the multiples downward to reflect the different business characteristics of automobile manufacturers and retailers. He further lowered the value of Trace's holding by a 35% blockage discount, as that term is discussed above. This valuation methodology is unreliable and not credible as the "Big Three" automobile manufacturers are so different in kind from UAG that even Stryker's downward adjustments are insufficient to ensure an accurate valuation. Given the lack of an analogous company against which to compare UAG, it was more appropriate to

---

**58.** The Defendants point out that a jump from $23 million in September 1996 to $77.3 million in December 1996 after the IPO is incredible and casts doubt on the accuracy of Blake's findings. The reasons that Blake cited for not increasing the valuation of UAG immediately prior to the IPO are credible and reliable, and therefore the lower figure of $23 million is accepted despite the leap in value on the next valuation date.

rely on the valuation performed by Trace's own auditors, Coopers & Lybrand.

As a result, a valuation of $23 million will be applied for the periods from March 1995 until September 1996.

### b. Post–IPO Valuation

Similar to their methodology of valuing the Foamex stock, both experts first multiplied the number of UAG shares held by Trace by the market price of the stock at various valuation dates. Both experts then applied a blockage discount, albeit of different values. Blake testified that a 15% blockage discount for Trace's shares in UAG is appropriate for the following reasons: (1) UAG was not able to generate any cash, dividends or other returns to Trace and therefore the holding essentially increased the liquidity requirements that Trace already had; (2) there were rule 144 restrictions on Trace's sale of its stock in UAG after the IPO; (3) there was an underwriter's lockup arrangement whereby there was a restriction on selling the stock; and (4) C & L used a 15% blockage discount in its valuation of Trace's holdings in Foamex. Relying on similar factual underpinnings, Stryker suggested that a 10% blockage discount be applied.

For the post-IPO valuations of UAG, the 15% blockage discount utilized by Blake is reasonable and should be applied. In addition, it is found that quarter-end points should be used instead of the low-point analysis by Blake for the reasons stated above. Therefore, it is found that UAG had the following valuations post-IPO:

| | |
|---|---|
| December 1996: | $ 77.3 million |
| March 1997: | $ 58.1 million |
| June 1997: | $ 59.5 million |
| September 1997: | $ 91.5 million |
| December 1997: | $ 61.9 million |
| March 1998: | $ 45.4 million |
| June 1998: | $ 74.7 million |
| September 1998: | $ 48.5 million |
| December 1998: | $ 31.4 million |

### 3. Valuation of CHF

Trace owned from 95 to 100% of CHF, a private company, during the relevant period. It acquired CHF in February 1995 for an initial investment of $20 million. Because CHF was losing money, Trace ultimately put another $18 million into it for a total investment of $38 million. In addition, Trace guaranteed a $22 million loan that BNS made to CHF.

For the period beginning with the first quarter of 1995 through the second quarter of 1997, CHF experienced declining cumulative annual sales of 6.7%. CHF's earnings before interest and taxes margin declined over this period from a high of 8.4% revenues in the first quarter of 1995 to a low of 0.7% revenues in the second quarter of 1997.

Because there was no public market for CHF shares, Blake performed his own valuations for CHF, in which he considered the income, the market, and the cost approaches. Blake opined, and it is found, that the market approach is inappropriate given CHF's low profitability and sales growth compared to potentially similar public companies in the home furnishing business, as a result of which Blake would need to make too many adjustments to use the guidelines companies to value CHF.

Blake then performed an income approach valuation of CHF, beginning with management's internal projections as of April 1997. These projections had been reviewed by C & L, who determined they were overly optimistic as management had missed its revenue projections by approximately 20% for both 1995 and 1996. Based upon management's history of not meeting its projections, and CHF's continued decline in revenue growth and essential margins, Blake did not use management's April 1997 projections in determining CHF's value. Instead, Blake performed his income (discounted

cash flow) analysis based on CHF's historical performance and the median rates for the guidelines companies for the period 1994 through June 30, 1997. Blake made certain appropriate key assumptions with respect to the projections, many of which were favorable to CHF in light of its past poor performance.

Aside from December 31, 1995, when Trace's interest in CHF had a positive indicated value of $5.5 million, Blake found negative indicated values for CHF for the periods December 31, 1996, March 31, 1997 and June 30, 1997, ranging between negative $42.3 million and negative $30.2 million. Because Trace had guaranteed CHF's obligations to BNS up to $22 million, Blake applied a cap of $22 million to the negative values for the periods ending December 31, 1996, March 31, 1997 and June 30, 1997, and valued CHF at a negative $22 million for each of the three periods. These valuation methods and their calculations are correct.

In Stryker's valuation of CHF, he utilized the market approach, beginning with a selection of comparable companies in the same or substantially the same industry. Stryker then examined five marketplace valuation multiples for these comparable companies at various valuation dates. The multiples examined: (1) total invested capital-to-revenues on a latest twelve month and 3–year average basis; (2) total invested capital-to-EBITDA on a latest twelve-month and 3–year average basis; (3) total invested capital-to-earnings before interest and taxes ("EBIT") on a latest twelve-month and 3–year average basis; (4) price-to-earnings ratios on a latest twelve month and 3–year average basis; and (5) market-to-book ratios. Stryker took the median value for the five multiples and adjusted them. Although CHF was an extremely poor performer, Stryker ascribes positive equity value to CHF, applying control premiums and ignoring his own valuation methods where those methods result in a negative value for CHF.

Blake opined correctly that Stryker's valuation of CHF inappropriately fails to consider accepted valuation methodology that is dependent upon income or cash flow. When the purpose of a valuation is to assess solvency, omission of valuation factors that address the ability to earn income and the ability to generate cash flow render an opinion of value speculative for that purpose.

Accordingly, the expert opinion of Blake concerning CHF and the following values of CHF at each of the valuation dates is adopted by the Court:

| | |
|---|---|
| March 1995: | $20 million |
| June 1995: | $15 million |
| September 1995: | $10 million |
| December 1995: | $ 5.5 million |
| March 1996: | $ 5 million |
| June 1996: | 0 |
| September 1996: | ($10 million) |
| December 1996: | ($22 million) |
| March 1997: | ($22 million) |
| June 1997: | ($22 million) |
| September 1997: | ($22 million) |
| December 1997: | ($22 million) |
| March 1998: | ($22 million) |
| June 1998: | ($22 million) |
| September 1998: | ($22 million) |
| December 1998: | ($22 million) |

**4. Completing the Balance Sheet Test**

The experts followed basically the same steps to prepare their fair market value balance sheets for Trace. Blake started with Trace's own non-GAAP monthly balance sheets and analyzed the assets and liabilities on a monthly basis for the period between 1995 and 1998. He then performed an enterprise valuation of Foamex, UAG and CHF as set forth above to satisfy himself as to the value of Trace's holdings in those assets at various points in time. He then adjusted the value of Trace's assets and liabilities to fair market value. Blake's fair market value balance sheet therefore reflected the fair market

value of Trace's underlying assets and all of its associated liabilities.

Lenhart did not start with Trace's non-GAAP monthly financial statements, but rather relied upon Trace's non-GAAP quarter-end and year-end GAAP financial statements. Lenhart also relied on the valuations of Foamex, UAG and CHF performed by Stryker. There is no evidence that Trace's quarter-end non-GAAP balance sheet information is any more reliable than Trace's month-end non-GAAP balance sheet information. Every third month-end period coincides with a quarter-end period. Blake's use of Trace's internal month-end non-GAAP balance sheets as a starting point for determining Trace's assets and liabilities and Lenhart's use of Trace's internal quarter-end non-GAAP balance sheet information are both credible and reliable.

To test whether Trace was solvent or insolvent on the Balance Sheet Test, both experts compared the value of Trace's assets as against its liabilities. If assets exceeded liabilities, Trace had positive shareholder equity and was solvent. If Trace's liabilities exceeded its assets, it was insolvent.

Blake performed his analysis based on the market value of Trace's shareholders' equity for each quarter ending period from March 1995 through December 1998, as well as for each quarter's "low point," as described above. The more reliable and consistent test is to look to the end of each quarter period rather than to focus on a low-point within each quarter.

### 5. Bank of Nova Scotia ("BNS") Asset Appreciation Liability

In preparing their balance sheets, Blake and Lenhart/Stryker calculated a deduction from the fair market value of the Foamex and UAG shares for the "asset appreciation liability" that would be owed to BNS when Trace's investment assets were sold. As part of the terms of Trace's July 1996 credit agreement with BNS, Trace owed BNS 25% of the increase in value over specified base amounts, on a portfolio basis, for assets that were sold, transferred or otherwise disposed of by Trace. The assets subject to the agreement were the Foamex shares, the UAG shares and the common stock of CHF. The base value for Foamex was $11.875 per share and the base value for UAG was $15 per share. The base value for CHF was $20 million in total.

As a result of the asset appreciation liability owed to BNS, even if Trace's assets appreciated in value and additional borrowing capacity became available, that capacity was reduced by the 25 to 28% asset appreciation liability owed to BNS. Thus, even if Trace's assets appreciated, Trace's ability to borrow against those assets was not appreciating at the same rate.

### 6. Adjustments to Trace's Other Assets and Liabilities

To complete their balance sheet tests, the experts had to adjust Trace's other assets and liabilities to their fair market value.

Starting with Trace's own internal combined non-GAAP balance sheets, Blake adjusted the other assets and liabilities as follows:

*Deferred Financing:* Trace capitalized approximately $2.5 million of certain up-front fees and charges paid primarily to BNS in connection with Trace's loan agreements. These costs are amortized over the cost of financings and treated as an asset for book value purposes. These costs, however, have no fair market value and thus were adjusted to zero.

*Long Term Debt—Recticel Foam Corporation and Societe Generale Bank Loans:* These loans were issued at origi-

nal issued discounts and the amortization of those discounts is not at market rates. Therefore, the carrying or book value of the loans does not reflect their fair market value. Thus, they were adjusted to reflect their fair market values. *The Dow Stock:* Blake treated the Dow stock as a cash obligation from Trace to Dow from the inception of the transaction. The parties intended to have the Dow Shares redeemed, based on Dow's relation to Foamex as a primary supplier, Trace's acknowledgment that Dow expected redemption, the provisions for a sharp increase in the dividend rate if the stock was not redeemed, and the testimony of Cogan and others as to the relationship.

The amount of these adjustments and their timing by Blake are reliable and accurate.

Blake adjusted other liabilities and assets on the balance sheet, including a put obligation to John Rallis, the artwork that Trace had pledged as collateral for a loan to Danziger Gallery, and loans to officers, which in Blake's opinion had a fair market value of zero. The amounts of these additional adjustments and their timing by Blake are reliable and accurate.

Lenhart disagreed with Blake as to the timing of the adjustments, but not necessarily their amounts. For example, Lenhart does not adjust the Dow Shares until sometime in the fourth quarter of 1998. Lenhart acknowledges, however, that the parties' intent is the key issue regarding the treatment of the Dow Shares. Despite this acknowledgment, Lenhart ignores all of the clear evidence that is indicative of Trace's intent from the inception to cause the Dow Shares to be redeemed and its intent to satisfy Dow, as a major supplier of Foamex, with respect to this obligation.

Having observed the demeanor of the witnesses, the testimony of Blake is more credible than the testimony of Lenhart

with respect to these issues, and the adjustments to the valuations and their timing as set forth in the Blake report and Blake's testimony are more credible and more reliable.

### 7. *Balance Sheets Results*

Having read the experts' reports, having heard their testimony and having observed their demeanor, Blake's reports and testimony on the valuations and the Balance Sheet Test, as measured at the end of the quarter (rather than at low points) are more credible and are therefore adopted:

| | |
|---|---|
| March 1995: | $ 42 million |
| June 1995: | $ 22.3 million |
| September 1995: | $ 33.4 million |
| December 1995: | ($ 4.7 million) |
| March 1996: | $ 8.3 million |
| June 1996: | $ 19.8 million |
| September 1996: | $ 26.1 million |
| December 1996: | $ 51.4 million |
| March 1997: | $ 24 million |
| June 1997: | ($ 10.9 million) |
| September 1997: | ($ 5.1 million) |
| December 1997: | ($ 77.8 million) |
| March 1998: | ($ 44.1 million) |
| June 1998: | ($ 46 million) |
| September 1998: | ($106.8 million) |
| December 1998: | ($180.6 million) |

The fair market value balance sheet is negative as of the quarter ending December 1995 and negative for all quarters for the period June 1997 through December 1998. Thus, Trace was insolvent on a balance sheet basis in the quarter ending December 1995 and for the period June 1997 through December 1998.

### C. *Blake's Cash Flow and Capital Adequacy Test*

The second insolvency test applied by Blake—and which was not applied by Lenhart—is the Cash Flow and Capital Adequacy Test. To determine the sufficiency of Trace's cash flow and capital adequacy, Blake created a model to assess whether Trace had a reasonable basis to project that it would have adequate capital to pay

its projected cash obligations and to fund its reasonable business requirements for capital with a reasonable cushion to cover the variability of cash receipts, cash realization on asset sales and cash needs. He performed the test for each quarter from 1995 through 1998, utilizing a one-year as well as three-year time horizon for evaluating the cash flow and capital adequacy of Trace. The three-year horizon is appropriate for evaluation of the cash flow and capital adequacy of a holding company such as Trace.

Trace did not have any cash flow from its own operations and instead depended entirely on cash flow that would come from its investments in Foamex, UAG and CHF. Blake testified, and Lenhart and Stryker agreed, that Trace had minimal cash flow that could be expected from Foamex. Foamex paid a management fee of approximately $1.75 million through 1997 and that was increased to approximately $3 million a year from mid–1997 forward. Foamex also loaned Trace some money in 1993, the interest on which was paid in kind. Finally, Foamex did not pay dividends to Trace, and Foamex's public filings with the Securities Exchange Commission indicated that it was unlikely to pay dividends at any time in the future. As a result, from a solvency perspective, Trace could not rely on Foamex for any cash flow but the management fees.

As to UAG, Trace could not expect any cash flow at all, as there were no management fees or dividends being paid. Additionally, the 10K filings for UAG indicated that UAG planned to reinvest all of its money for expansion and was not planning to pay any dividends.

Trace's guarantee of BNS's loan to CHF contained a prohibition against CHF paying any management fees until CHF had $20 million of earnings EBIT. Based on CHF's past poor performance, Trace could not reasonably expect CHF to reach that EBIT number within a three-year time horizon. Thus, Trace had no chance of receiving any money from CHF. In addition, Trace's own projections indicated that it planned to infuse additional monies into CHF going forward. Thus, CHF was a drain on Trace's cash flow.

Having no cash flows of its own, Trace's only means of covering its annual $13 million in general and administrative expenses was from additional borrowings, thereby increasing its debt. Trace's internal financial statements show that Trace's expenses consumed, over a four-year period of 1995 through 1998, $103 million of cash, which needed to be funded through the additional debt.

In constructing his cash flow and capital adequacy model, Blake determined the amount of additional cash Trace required to meet its obligations and assumed, favorably to Trace, that Trace could borrow up to 100% of the low-point value of Trace's holdings in Foamex, UAG and CHF. This Court has already rejected Blake's use of the low-point value of Trace's holdings in valuing the stocks, and similarly finds here that to use Blake's low-point analysis would inject impermissible inconsistency into the analysis. Unfortunately, unlike in his valuations, Blake did not perform a cash flow and capital adequacy test using the quarter-end values of the stocks as opposed to the low-point value of the stocks.

As a result, a means must be devised by which the error is corrected and the prejudice to the defendants is minimized. Blake has provided as part of his report a summary of shareholders' equity for each quarter, both according to his "low-point" analysis and at the quarter end point. The difference between these two amounts would appear to represent the amount of potential capital that Blake's figures left

out.[59] Thus, the difference between the shareholders' equity at the end of the quarter and the shareholders' equity at the quarterly low should be added to the figures provided by Blake.

Blake found the following amounts as a result of his cash flow and capital adequacy model based on the erroneous use of low-point values of stock:

| Date | One Year | Three Years |
|---|---|---|
| First Q 1995 | $ 41.5 million | ($ 8 million) |
| Second Q 1995 | $ 16.4 million | ($ 33.1 million) |
| Third Q 1995 | ($ 1.3 million) | ($ 50.8 million) |
| Fourth Q 1995 | ($ 4.3 million) | ($ 53.8 million) |
| First Q 1996 | ($ 17.4 million) | ($ 65.6 million) |
| Second Q 1996 | $ 3.7 million | ($ 42.3 million) |
| Third Q 1996 | ($ 7.8 million) | ($ 63.3 million) |
| Fourth Q 1996 | $ 48.3 million | ($ 7.2 million) |
| First Q 1997 | $ 35.1 million | ($ 21 million) |
| Second Q 1997 | ($ 16.9 million) | ($ 82.6 million) |
| Third Q 1997 | ($ 34.3 million) | ($104.4 million) |
| Fourth Q 1997 | ($ 81.8 million) | ($161.7 million) |
| First Q 1998 [60] | ($ 76.7 million) | |
| Second Q 1998 | ($ 47.8 million) | |
| Third Q 1998 | ($ 91.9 million) | |
| Fourth Q 1998 | ($160.2 million) | |

The difference between the quarter end point and the quarter low point for each of the quarters is as follows:

| First Q 1995 | $ 3.6 million |
|---|---|
| Second Q 1995 | $ 7.8 million |
| Third Q 1995 | $14.1 million |
| Fourth Q 1995 | $ 7.2 million |
| First Q 1996 | $26.2 million |
| Second Q 1996 | $22.5 million |
| Third Q 1996 | $35.1 million |
| Fourth Q 1996 | $24.6 million |
| First Q 1997 | 0 |
| Second Q 1997 | $14.8 million |
| Third Q 1997 | $51.4 million |
| Fourth Q 1997 | $22 million |
| First Q 1998 | $42.9 million |
| Second Q 1998 | $25.8 million |
| Third Q 1998 | $14.1 million |
| Fourth Q 1998 | $18 million |

Adding the two figures together results in the following amounts:

| Date | One Year | Three Year |
|---|---|---|
| First Q 1995 | $ 45.1 million | ($ 4.4 million) |
| Second Q 1995 | $ 24.2 million | ($ 25.3 million) |
| Third Q 1995 | $ 12.8 million | ($ 36.7 million) |
| Fourth Q 1995 | $ 2.9 million | ($ 46.6 million) |
| First Q 1996 | $ 8.8 million | ($ 39.4 million) |
| Second Q 1996 | $ 26.2 million | ($ 19.8 million) |
| Third Q 1996 | $ 27.3 million | ($ 28.2 million) |
| Fourth Q 1996 | $ 72.9 million | $ 17.4 million |
| First Q 1997 | $ 35.1 million | ($ 21 million) |
| Second Q 1997 | ($ 2.1 million) | ($ 67.8 million) |
| Third Q 1997 | $ 17.1 million | ($ 53 million) |
| Fourth Q 1997 | ($ 59.8 million) | ($139.7 million) |
| First Q 1998 | ($ 33.8 million) | |
| Second Q 1998 | ($ 22 million) | |
| Third Q 1998 | ($ 77.8 million) | |
| Fourth Q 1998 | ($142.2 million) | |

On a three-year basis under Blake's cash flow and capital adequacy model, because Trace's expenses and interest exceeded its income, Trace was insolvent during the entire relevant time period except for the fourth quarter of 1996. Under that prong of the two-part solvency test, therefore, Trace was insolvent or at the very least in the zone or vicinity of insolvency from 1995 to 1998, except for the fourth quarter of 1996.

### D. *Lenhart's Second Test*

Lenhart's second test focused on Trace's ability to meet its current obligations, looking to the facts that, during the relevant period, (1) Trace met its current obligations in the ordinary course of business and (2) no "going concern" opinions [61] were issued.

For the reasons discussed *infra*, Lenhart's second test is insufficient to establish Trace's solvency. Lenhart's failure to perform any such analysis renders his re-

---

59. The simple addition of the difference does not take into consideration any asset appreciation liability. Therefore, the numbers will be more favorable for the defendants. Given the Trustee's expert's failure to compute the cash flow and capital adequacy figures using the quarter end points, however, the resulting slight increase in the amount is acceptable.

60. Blake did not calculate cash flow and capital adequacy beyond one year in 1998 due to the large cash flow deficits within that year.

61. A "going concern" opinion is issued by an auditor to reflect substantial doubt about the ability of the company to continue as a going concern.

port incomplete.[62]

### E. *Summary*

It is concluded based on all the reasons and factual findings set forth herein that Trace was either insolvent or in the zone or vicinity of insolvency for the entire period of 1995 through Trace's filing of bankruptcy in 1999, except for the fourth quarter of 1996.

### V. *Count V: Illegal Dividends and Share Redemption*

Count V seeks to impose liability on the Trace Directors for providing dividends and redeeming shares when Trace was insolvent. The dividends and Dow repurchase were discussed above. Also, as concluded above, Trace was insolvent from 1995 through the filing of Trace's bankruptcy in 1999 except for the fourth quarter of 1996.

Moreover, Cogan, Marcus, Farace, Nelson and Winters should have been aware of precarious Trace's financial condition because they received copies of Trace's cash flow sheets and non-GAAP balance sheets on a regular basis. The Defendants also received copies of Trace's financial statements. Trace's shareholders' equity, as per its audited financial statements, fell consistently from $27 million in 1994 to negative $29 million in 1995, to negative $103 million in 1996, to negative $205 mil-

lion in 1997 to negative $425 million in 1998. Trace's net income fell from negative $11 million in 1994 to negative $52 million in 1995 to negative $72 million in 1996, to negative $97 million in 1997 to negative $189 million in 1998.

### VI. *Collateral Offsets*

### A. *Marcus*

Marcus is attempting once again to interpose a Thirteenth Affirmative Defense, which has already been twice stricken by this Court. The defense involves two deferred compensation and salary continuation agreements from 1985 and 1986 and a voided life insurance policy.

### B. *Smith*

Smith entered into a deferred compensation agreement with Trace in 1989. The contract required Trace to pay Smith, upon his reaching age 65, $50,000 per year for ten years. If Smith were to die before the payout was completed, his beneficiary would be entitled to receive the remaining payments. Trace never paid Smith his deferred compensation.

On December 15, 1993, Smith was awarded 10,000 shares, with 5,000 shares vesting on December 15, 1995 and the other 5,000 shares on December 15, 1998. Trace never distributed the shares. Foamex stock was worth $7.52 a share on

---

**62.** Lenhart readily admits that a company that does not have any outstanding matured debts can still be insolvent. For instance, Trace was essentially engaged in financing akin to "borrowing on your credit card to pay another credit card and the credit card interest," according to Blake. From 1995 to 1998, Trace consistently borrowed money to fund its general and administrative expenses yet never (1) reduced its loan obligations, (2) paid down the principal, or (3) make interest payments in the ordinary course, other than through refinancing and payment in kind ("PIK") interest.

Furthermore, the loans from BNS to Trace had a higher element of equity risk and reward than a traditional loan because BNS believed they carried more risk. The "price" at which Trace had to borrow these additional funds was as high as 23.5% interest coupled with an asset appreciation provision that gave BNS up to 28% of any increase in the value of Trace's assets. By November 1997, BNS was demanding a minimum return on their investment of 40% to compensate BNS for the risk associated with the loans to Trace. Internally, BNS rated its loan to Trace as "junk."

December 15, 1995 and $11.75 a share on December 15, 1998.

On April 28, 2000, Smith entered into a Severance Agreement that terminated his employment with Foamex. The severance agreement's general release provision released Smith's claims related to his employment by Foamex. Smith and Foamex also purportedly entered into a new agreement on January 21, 2002 that abrogated the release provisions of the Foamex Severance Agreement.

## VII. *Mitigation by the Trustee*

The Trustee has mitigated or is seeking to mitigate some of the damages he alleges Trace's estate has suffered as a result of the defendants' actions or inactions through settlements and other recoveries from third parties. The Trustee has stated that the damages he seeks shall be modified by the settlements that he has already received.

BNS and the Trustee entered an agreement under which BNS waived its prepetition claims aggregating approximately $167 million and its claims under Chapter 11 debtor-in-possession credit facility. BNS also paid the Trace estate $174,685 in full and final settlement of any claims against BNS. The funds that Trace used to pay compensation to Cogan, make loans to Cogan and make other payments to Cogan were borrowed by Trace from BNS.

Prior to the appointment of the Trustee, the Official Committee of Unsecured Creditors (the Trustee's predecessor in interest with respect to this action), entered into a stipulation, so-ordered by Chief Bankruptcy Judge Bernstein on November 19, 1999, under which SGB and Rus, Inc. agreed to waive their total deficiency claims under a December 14, 1993 promissory note in the amount of $21,718,236 issued by Trace to SGB, and under a December 14, 1993 promissory note in the amount of

$36,612,310 to Recticel (which transferred its rights under the note to Rus) of between $9 million to $21 million in exchange for Trace's relinquishment of its interest in shares of Foamex common stock pledged as collateral.

During trial, Sherman settled by agreeing to pay the Trustee $2 million.

The Trustee has also received the following settlements, some of which were discussed above:

- $30,000 from Lowrance
- $85,000 from Sinkfeld
- UAG reduced its claim against Trace by $500,000, and Glantz settled for $160,000 $726,913 from Geoffrey Symonds and related parties
- GLS Corp. Partnership and GLC Capital Management in settlement of the Trustee's proposed action to recover a loan made to Symonds by Trace.

The Trustee has also commenced the following adversary proceedings:

- against Maureen Cogan, seeking $167,914.99 on account of alleged Trace loans and other transfers;
- against Golfinos, seeking $440,583.29 relating to alleged improper compensation paid by Trace;
- against BMA Limited Partnership, seeking $134,392 on account of Trace's alleged unlawful payment of dividends;
- against Dow, seeking $3,575,150 on account of Trace's alleged unlawful payment of dividends;
- against Equitable Life Insurance, seeking $1,065,609 on account of Trace's alleged unlawful payment of dividends;
- against TIHI Family Partnership, seeking $89,500 on account of Trace's alleged unlawful payment of dividends; and
- against Lambert Brussels Financial Group ("Lambert"), seeking $600,000 on

account of Trace's alleged unlawful payment of dividends.

Cogan also alleges that the Trustee has failed to mitigate some damages as he has not sued recipients of the dividends declared (or paid) when Trace was insolvent[63] and has not sued Dow for the $3 million paid to it by Cogan to redeem the stocks. Any such actions would now be time-barred.

## CONCLUSIONS OF LAW

### I. *Jurisdiction and Venue*

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b). Venue is proper pursuant to 28 U.S.C. § 1409(a).

### II. *Powers of the Trustee*

■ The Trustee stands in the shoes of Trace and is empowered to enforce Trace's rights. *Kalb, Voorhis and Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir.1993); *Pereira II*, 267 B.R. at 511. The Trustee also represents the interests of Trace's creditors. *Kalb*, 8 F.3d at 132–33.

### III. *Count I: The Cogan Notes*

Under Count I of the Complaint, the Trustee seeks recovery against Cogan on his eight promissory notes. Cogan has been previously held liable on the notes, and a Rule 54(b) judgment has been entered against Cogan for approximately $19.5 million, representing principal and interest through May 1, 2002. *Pereira II*, 267 B.R. at 504; *Pereira III*, 275 B.R. at

476; Second Amended Judgment and Order.

### A. *Additional Interest, Fees and Charges*

■ Since it is undisputed that Cogan has failed to pay any of his Rule 54(b) judgment, the Trustee is entitled to an updated judgment adding post-May 1, 2002 interest. The Trustee is also entitled to recover his enforcement costs, including reasonable attorney's fees, under the terms of the notes. Since the Court has already found that Cogan breached his obligations under the notes, no further finding need be made on the entitlement issue. *New Shows, S.A. de C.V. v. Don King Prods., Inc.*, 1999 WL 553780 at *11, 1999 U.S. Dist. LEXIS 11522 at *35–36 (S.D.N.Y. July 29, 1999), *aff'd* 210 F.3d 355 (2d Cir.2000). The amount shall be determined by post-judgment motion pursuant to Fed.R.Civ.P. 54(d)(2). *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1312–16 (2d Cir.1993).

The Trustee has asserted that he is additionally entitled to recover a 2% late charge, in the approximate amount of $356,000, under the terms of the Cogan notes. Cogan contests this assertion, arguing first that the Trustee has at the minimum sought an interest fee greater than he should be entitled to and second that the late charge is an unenforceable penalty.[64]

---

**63.** Cogan states that the following entities received such dividends: (1) Atwell & Company ($600,000); (2) DLJ ($300,300); and (3) CIBC ($226,300).

**64.** The Trustee contends that Cogan is not entitled to make such arguments because Cogan did not include them as an affirmative defense in his answer and did not raise them until fact discovery was completed. The terms of the Second Amended Judgment

signed in May 2002 recognized that the late charges were in dispute. Further, the joint pretrial order in this action provides that the parties' pleadings are deemed amended in accordance with the framing of the issues in the pretrial order. Cogan's right to challenge the legality of the late charges therefore has not been waived by not specifically amending his answer in accordance with Fed.R.Civ.P. 8.

■ The Trustee is only entitled to a late charge up until the time that the notes at issue were accelerated, however. *Centerbank v. D'Assaro*, 158 Misc.2d 92, 600 N.Y.S.2d 1015,1017 (N.Y.Sup.Ct.1993) (it would be "inconsistent to allow a lending institution to accelerate a note, thereby denying the debtor the right ... to make monthly installments and to continue to insist on its own right under the note to impose monthly late charges"). The Trustee accelerated payment on some notes in June 2000. For those notes, he is therefore only entitled to late charges on the annual payments up until that time.

■ Cogan argues that the late charges as a whole should not be applied because they are an illegal penalty under section 1–106(1) of the Uniform Commercial Code. *E.g., Jacobs v. Citibank, N.A.,* 61 N.Y.2d 869, 872, 474 N.Y.S.2d 464, 465, 462 N.E.2d 1182 (1984) (a penalty is found where "a fixed sum, which bears no reasonable relation to the nonbreacher's actual loss, has been designated as the compensation which must be paid"). Such argument is hardly persuasive given the fact that Cogan obtained loans at extremely attractive interest rates from the company of which he was the controlling shareholder and that the notes memorializing the loans were drafted by his own attorney. Therefore, the late charges provisions will not be voided as an illegal penalty.

### B. *Cogan's Claimed Offsets*

Cogan alleges that he is entitled to severance pay of $3.6 million, deferred compensation of $1.1 million, and un-reimbursed expenses of approximately $41,000.

#### 1. *Severance Pay*

■ In order to sustain his claimed offset of $3.6 million pursuant to an alleged informal severance policy, Cogan was required to prove two essential elements: (1) that Cogan reasonably relied upon such a policy in accepting or continuing his employment with Trace, and (2) that Trace had a regular practice of granting severance to senior executives pursuant to the alleged policy. *Pereira IV,* 200 F.Supp.2d at 378.

■ To prove the first element, Cogan must "establish reliance 'unequivocally referable' to the severance pay policy." *Id.* at 379. The "unequivocally referable" standard requires proof akin to the "but for" causation standard applied in negligence actions, and has been limited to proof of extraordinary conduct explainable only by reference to the allegedly relied upon promise. *Id.* As discussed, *supra,* Cogan has failed to meet this exacting standard. At the summary judgment stage, the Court drew the following inference in Cogan's favor given the above provisions: "Presumably, Cogan relied on the unwritten policy in that he was assured that even if his written contract was voided for some reason, he might still receive the usual severance package of one year's salary." *Pereira IV,* 200 F.Supp.2d at 379. At trial, when Cogan was asked whether the alleged informal policy was "sort of a backstop in case your contract was declared void," Cogan answered, "No." It makes no sense for Cogan otherwise to have relied on an unwritten severance policy when he was entering into a written contract that provided for five years' severance, and the written contract in any case expressly superseded any informal understanding about the alleged one-year benefit.

■ Nor has Cogan demonstrated that Trace had a "regular practice" of granting severance to senior executives. Cogan testified to only one example, involving Farace. Farace denied such a policy and, in any case, one example does not a regu-

lar practice make. The remaining evidence is that Cogan's codefendants, all former Trace senior executives, either make no severance claim or do so pursuant to individual written contracts. The use of individual formal contract indicates the absence of an informal regular practice. *E.g., In re Lyntex Corp.,* 403 F.Supp. 284, 287 (S.D.N.Y.1975). Therefore the offset is denied.

### 2. Deferred Compensation

Cogan has asserted a $1.1 million *quantum meruit* claim for allegedly unpaid 1999 compensation. Normally, recovery in *quantum meruit* would require that Cogan establish that the services were performed with an expectation that Trace would pay for them, and that the services were performed under circumstances that should have put Trace on notice that Cogan expected to be paid by Trace. *Construction Systems Group, Inc. v. The Council of Sea Colony,* 670 A.2d 1337, 1995 WL 622421 (Del. Sept. 28, 1995) (*citing Bellanca Corp. v. Bellanca,* 169 A.2d 620, 623 (Del.1961)).[65]

■ The case presents an additional wrinkle that requires a more nuanced analysis of Cogan's right to quantum meruit. Here, it has been determined that Cogan set his own salary. Thus, the Trustee is correct in relying on case law that deals with the recovery of such compensation regardless of the self-dealing on the theory of *quantum meruit.* Under traditional Delaware law, officers and directors were not entitled to recover any compensation whatsoever for their services to the company if such compensation was not authorized by a group of disinterested directors or officers, as here. *Delta Star v. Patton,* 76 F.Supp.2d 617, 634 (W.D.Pa.1999) (applying Delaware law). Delaware courts now recognize a right to recover under a theory of *quantum meruit* where an officer or director has fixed his own compensation. *Id.* (*citing Technicorp Int'l II, Inc. v. Johnston,* No. 5084, 1997 WL 538671, at *14–15 (Del.Ch. Aug. 25, 1997) (*citing Lofland v. Cahall,* 118 A. 1 (Del.1922))).

■ Cogan bears the burden of demonstrating (1) that he provided services as an officer of Trace with the understanding that he would be compensated; (2) that Trace benefitted from those services and would be unjustly enriched if he was not compensated; and (3) that he did not grant himself excessive compensation to enrich himself unjustly. *Delta Star,* 76 F.Supp.2d at 634 (*citing Technicorp,* 1997 WL 538671, at *15); *see also Telxon Corp. v. Meyerson,* 802 A.2d 257, 265 (Del.2002) (in self-dealing transaction, director must prove the claimed amount was reasonable and "fair to the corporation"); *Wilderman v. Wilderman,* 315 A.2d 610, 615 (Del.Ch. 1974) (in self-dealing transaction, "whether the salary bears a reasonable relation to the success of the corporation" is at issue).

---

**65.** Cogan relies on New York law. It has already been determined that Delaware law shall apply, however. *Pereira II,* 267 B.R. at 510 n. 3 ("The 1987 Agreement provides that it shall be governed by New York law. But since the present issue involves the governance of a Delaware corporation, and not contract law, Delaware law applies."). In any case, New York provides a more stringent standard than Delaware, in that it requires that (1) Cogan performed valuable services on behalf of Trace in good faith; (2) Trace accepted Cogan's continuing services; (3) Cogan expected to be compensation for such services; and (4) payment of the $1.1 million in deferred compensation constituted the reasonable value of such services. *LeBoeuf, Lamb, Greene & MacRae LLP v. Worsham,* 185 F.3d 61, 66 (2d Cir.1999). The Delaware statement leaves out the need that the compensation be reasonable and the services be performed in good faith. Such requirements are necessary in this situation under Delaware law, however, given the self-dealing nature of Cogan's compensation.

 First, Cogan did not operate with the understanding that he would necessarily be compensated. He was entitled to no compensation in 1999 because of Trace's inability to keep faith with its Series U Preferred Shareholders. Next, given Trace's precipitous fall into bankruptcy, it is not clear exactly how Trace was benefitted from Cogan's services.[66] Trace filed for Chapter 11 bankruptcy in 1999, where it failed again and was forced into Chapter 7 liquidation. In 1999, Cogan also injured Trace by refusing to repay his substantial debts to the company. Cogan offered no evidence about the appropriate level of compensation for defaulting CEOs of ruined corporations. Finally, Cogan cannot shoulder the burden to prove that he was not unjustly enriched under the third prong.

For these reasons, Cogan's $1.1 million deferred compensation claim is denied.

### 3. Reimbursement

Because Cogan did not establish credibly that he had advanced funds or paid such expenses on which the alleged offset is based, this claim for an offset is denied.

### C. Summary

The Court has already entered a judgment for principal and interest on the Cogan notes through May 1, 2002. The Trustee is entitled to an updated judgment adding additional interest and late fees for each note through the time that such note was accelerated, without offset. The Trustee should be afforded additional judgment for his attorney's fees and other enforcement costs, following a motion under rule 54(d).

### IV. Count II: Cogan's Excess Compensation

Under Count II of the Complaint, the Trustee asserts that Cogan, in breach of his fiduciary duty, obtained excess compensation via self-dealing. The Trustee seeks to recover from Cogan his excess compensation for the period from July 21, 1993 [67] until the end of 1999.

 When a plaintiff establishes a *prima facie* case of self-dealing by a corporate insider, the burden shifts to the proponent of the transaction to establish that it is justified under the Delaware "entire fairness" test. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del.1983). Self-dealing occurs, and the entire fairness burden applies, when an insider "stands on both sides of a transaction." *Id.; Kahn v. Lynch Commun. Sys., Inc.*, 638 A.2d 1110, 1115, 1117 (Del.1994) (hereinafter "*Lynch*"). Here Cogan determined his own compensation and so the entire fairness standard applies.

### A. The Burden Will Remain With Cogan in the Absence of Any Independent Board Action

 When a controlling shareholder engages in self-dealing, he assumes the

---

**66.** Interestingly, Cogan focuses his argument on this prong of the test, and notes several successes and the fact that he "worked tirelessly to add value to Trace." He points out that in 1999, Cogan negotiated the infusion of $83 million into UAG by companies controlled by Roger Penske, worked to restructure the BNS debt and attempted to merge Foamex with a Canadian company called Woodbridge Foam. Even if such efforts were sufficient to meet the second prong, he still has failed to prove the other prongs for the reasons stated above.

**67.** Cogan argues that the Trustee is time-barred from challenging any transactions that occurred prior to July 21, 1996, the date three years prior to Trace's bankruptcy filing. This argument for a three-year statute of limitations has already been rejected. *Pereira I*, 2001 WL 243537, at *12, 2001 U.S. Dist. LEXIS 2461, at *53–57.

initial entire fairness burden. *Levco Alternative Fund, Inc. v. Reader's Digest Ass'n,* 2002 WL 31835461, at *1, 2002 Del. LEXIS 488, at *5 (Del. Aug. 14, 2002); *Kahn v. Tremont Corp.,* 694 A.2d 422, 428–29 (Del. 1997) (hereinafter *"Tremont"*); *Lynch,* 638 A.2d at 1115–17. A controlling shareholder may shift the fairness burden to the plaintiff if the shareholder carries his burden of proving approval of the transaction by a well-functioning committee of independent directors. *Levco,* 2002 WL 31835461 at *1, 2002 Del. LEXIS at *5; *Tremont,* 694 A.2d at 428–29; *Lynch,* 638 A.2d at 1117. Regardless of where the burden lies, the controlling shareholder's actions will be measured according to the entire fairness standard. *Tremont,* 694 A.2d at 428.

■ Under the actual independent board test, the proponents of the transaction must prove that the board was "truly independent [and] fully informed, and that it acted in a careful and independent manner including arm's length" negotiations with the dominant shareholder. *Lynch,* 638 A.2d at 1120–22; *Tremont,* 694 A.2d at 430.

■ Cogan first argues that his salary increase was ratified implicitly in 1992[68] and explicitly in 1996. No defendant offered any evidence supporting any of the requirements of the actual independent board test. There is little information at all regarding the 1992 vote. In 1996, the Board, consisting of Cogan, three subordinates and a close friend of Cogan's, was not independent; the Board engaged in no arm's length negotiations with Cogan; the Board acted without any information gathering and in ignorance of the facts recited in their resolutions. In addition, both the 1992 and the 1996 resolutions do not evi-

dence, and the non-Cogan defendants did not know, what amount of compensation was being ratified. Finally, the fact that Trace was solvent prior to 1995 does not affect the conclusion that Cogan's compensation was excessive. *Pereira II,* 267 B.R. at 511 ("Self-dealing transactions are improper regardless of whether or not the corporation is solvent. Delaware cases commonly invalidate such transactions without reference to solvency."). Given the lack of any credible evidence that the Board acted in a fully informed, careful and independent manner in either 1992 or 1996, as discussed *supra*—or that a hypothetical independent board would have done so—no burden-shifting shall occur.

### B. *Cogan Is Liable for Excess Compensation*

■ The entire fairness standard requires a "two-pronged inquiry into the fair price and the fair process of the transaction." *Solomon v. Armstrong,* 747 A.2d 1098, 1112 (Del.Ch.1999). As described by the Delaware Supreme Court:

[Fair dealing] embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. [Fair price] relates to the economic and financial considerations of the proposed [transaction], including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock .... However, the test for fairness is not a bifurcated one as between fair dealing and fair price. All aspects of the issue must be examined

---

**68.** As a result, he claims that the Trustee is time-barred from attacking the legitimacy thereof. The Trustee's concern is the compensation Cogan received within the six-year time period, not the purported means by which the increase was ratified.

as a whole since the question is one of entire fairness.

*Cinerama,* 663 A.2d at 1162–63 (*quoting Weinberger,* 457 A.2d at 711). The "burden of proving entire fairness is often a daunting task." *Id.* at 1113 n. 39. Proponents of a self-dealing transaction must "demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain." *Weinberger,* 457 A.2d at 710; *Pereira II,* 267 B.R. at 508.

Cogan relies on Mines' testimony to support the first prong of fair price. Mines' testimony and report were rejected, however, in favor of a compromise between the parties' two experts. The factual findings above establish that Cogan did not receive a fair price when compared to similarly situated executives; in fact he was overcompensated by approximately $7 million. With regard to fair process, the Board was entirely bypassed except for the attempted ratification of Cogan's past compensation, which ratification was insufficient in any case, given the reasons discussed above.

■ The appropriate remedy is the restitution of the excess compensation, amounting to $6,948,994. This remedy is essentially the same as that ordered in *Delta Star,* 76 F.Supp.2d at 635, under like circumstances.

### C. *Summary*

The Trustee is entitled to restitution of excess compensation from Cogan in the amount of $6,948,994.

## V. *Count IV: Breach of Fiduciary Duty*

### A. *A Fiduciary Duty to Creditors Exists For the Period from 1995 to 1999 When Trace Was Insolvent*

■ Under Delaware law, directors and officers [69] owe a fiduciary duty to the corporation's creditors "at a point short of actual insolvency, that is, when the corporation is 'in the vicinity of insolvency.'" *Pereira I,* 2001 WL 243537, at *8, 2001 U.S. Dist. LEXIS 2461, at *26. *See also Credit Lyonnais Bank Nederland, N.V. v. Pathe Communs. Corp.,* 1991 WL 277613, at *34, 1991 Del Ch. LEXIS 215, at *108 (Del. Ch. Dec. 30, 1991) (*quoted in Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Cap. Group (In re Buckhead Am. Corp.),* 178 B.R. 956, 968 (D.Del.1994)); *Brandt v. Hicks, Muse & Co. (In re Healthco Int'l Inc.),* 208 B.R. 288, 301 (Bankr.D.Mass.1997) (applying Delaware law). In determining when this duty attaches, Delaware law is concerned with "insolvency in fact," rather than insol-

**69.** Citing *In re Ben Franklin Retail Stores, Inc.,* 225 B.R. 646 (Bankr.N.D.Ill.1998), *aff'd,* 2000 WL 28266, 2000 U.S. Dist. LEXIS 276 (N.D.Ill. Jan. 12, 2000), Nelson, Smith and Winters argue that officers do not owe a duty to creditors. *Ben Franklin,* as explained by the district court, stands for the proposition that an officer who was not a director could not be held liable for "oversight responsibilities" where those responsibilities had not been explicitly assigned to him by the Board under Section 141 of the Delaware General Corporations Law. 2000 WL 28266, at *6, 2000 U.S. Dist. LEXIS 276, at *17–21. Here, the Trustee claims that Smith and Winters breached their duties as officers, rather than any broad "oversight responsibilities."

*Bank of America v. Musselman,* 222 F.Supp.2d 792, 799–800 (E.D.Va.2002) (applying Virginia law but referring to Delaware law) is also distinguishable, as it held that an individual creditor could not recover its own debt from officers and directors of an insolvent corporation absent self-dealing or other illegal conduct. This case involves self-dealing and illegal conduct.

In any case, the officers owe fiduciary duties to Trace, as discussed below, and may be held liable to the extent that they have discretionary authority over, and the power to prevent, the complained of transactions.

vency as defined by a statutory filing. *Geyer v. Ingersoll Pubs. Co.*, 621 A.2d 784, 787–88 (Del.Ch.1992).

At least one court, in applying Delaware law, has limited the duty to situations where directors of an insolvent corporation diverted corporate assets for the benefit of insiders or preferred creditors. *E.g., In re Ben Franklin Retail Stores*, 225 B.R. 646, 655–56 (Bankr.N.D.Ill.1998) ("[C]reditors have a right to expect that directors will not divert, dissipate or unduly risk assets necessary to satisfy their claims. That is the appropriate scope of duty that exists only to protect the contractual and priority rights of creditors.").

 Although the parties agree that a duty to creditors may be triggered when a corporation is in the vicinity of insolvency, they differ greatly in how they believe a fact-finder should determine that a corporation is within the vicinity of insolvency for these purposes.

The Defendants' expert, Lenhart, utilized two tests to determine the solvency of Trace: (1) the balance sheet test (a comparison of a company's debts to the "fair value" of its assets) and (2) the inability to pay debts as they become due approach (a determination whether the company is unable to meet its current maturing obligations in the ordinary course of business). The Trustee's expert, Blake, also utilized two tests: (1) the balance sheet test, as used by Lenhart, and (2) the cash flow and capital adequacy method (a company is insolvent if it cannot generate and/or obtain enough cash to pay for its projected obligations and fund its business requirements for working capital and capital expenditures with a reasonable cushion to cover the variability of its business needs over time).

While the experts agree as to the first test, they completely disagree with regard to the appropriate second test. As a re-sult, the appropriate test to apply must be determined as a conclusion of law. The experts' choices of second tests primarily differ with regard to the scope of the focus of the tests: Lenhart concentrates on Trace's immediate ability to pay debts, while Blake looks to Trace's future ability to pay its debts.

The Defendants rely on the insolvency standard set forth in Delaware case law regarding the appointment of a receiver to support Lenhart's choice of second test. Under that case law, insolvency exists when (1) the corporation's liabilities exceed its assets (*i.e.*, both experts' first test) or (2) the corporation is unable to meet its current maturing obligations in the ordinary course of business (Lenhart's second test). *See generally Gibralt Capital Corp. v. Smith*, 2001 WL 647837, at *7, 2001 Del. Ch. LEXIS 68, at *25 (Del. Ch. May 9, 2001) (receiver should be appointed where the corporation (1) is unable to pay current expenses as they mature in the ordinary course of business, or (2) has a negative net worth); *Banks v. Cristina Copper Mines, Inc.*, 99 A.2d 504, 506 (Del.Ch.1953) (receiver should not be appointed if corporation can pay obligations as they mature, even if by relying on credit resources); *McKee v. Standard Minerals Corp.*, 156 A. 193, 198 (Del.Ch.1931) (receiver should not be appointed where corporation could "tide itself over whatever difficulties now beset it" by using credit resources).

In response, the Trustee argues that Lenhart's second test sets the bar too low. Lenhart's second test makes sense in the context in which it is used in the Defendants' cases: in determining whether a receiver should be appointed. The appointment of a receiver is an "extraordinary" event since management is being removed and replaced with an independent third party either to operate or to liquidate

a company. R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law on Corporations & Business Organizations*, § 11.4; *Freeman*, 142 A. at 795–96. *See generally Gibralt*, 2001 WL 647837 at *7, 2001 Del. Ch. LEXIS at *25–27; *Banks*, 99 A.2d at 506; *McKee*, 156 A. at 198. As a result, this test purposefully permits a corporation to avoid "insolvency" until it essentially can no longer pay its debts by any means, including borrowing money on its assets. By the time a corporation cannot pay its current maturing debts—or is in the vicinity of not being able to pay its current maturing debts—it would be too late to protect a creditor's interest in such a way as to give the fiduciary duty any meaning.

In support of Blake's second and more far-reaching test, the Trustee relies on *In re Healthco Int'l Inc.*, 208 B.R. 288, 302, in which the court applied Delaware law and found that a fiduciary duty could attach if a showing was made similar to that required under fraudulent conveyance statutes, *i.e.*, that there was an "unreasonably small capital." A corporation with "unreasonably small capital" is one that is "technically solvent but doomed to fail." *Geron v. Schulman (In re Manshul Const. Corp.)*, 2000 WL 1228866, at *54, 2000 U.S. Dist. LEXIS 12576, at *154–55 (S.D.N.Y. Aug. 30, 2000) (factors include debt-to-equity ratio, historical capital cushion and need for working capital). Moreover, a company will be considered inadequately capitalized if it does not have sufficient cash flow to "account for difficulties that are likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin for error." *Peltz v. Hatten*, 279 B.R. 710, 745 (D.Del.2002).

In light of the finding in *Healthco* and in light of the policy reasons underlying the creation of a fiduciary duty when a corporation enters the "vicinity of insolvency," it is held that Blake's second test is the more appropriate one, as it looks to a corporation's ability to obtain enough cash to pay for its projected obligations and fund its business requirements for working capital and capital expenditures with a reasonable cushion to cover the variability of its business needs over time.

It should be noted that Lenhart's second test is not without its uses. For instance, if a corporation failed that test, it would provide strong evidence that the corporation was insolvent. Unlike the farther-reaching cash flow and capital adequacy test, however, it cannot be used to bolster a finding that a corporation is solvent such that the fiduciary duty to creditors does not attach.

In light of the conclusion that Blake's second test is more credible and reliable, and in light of the factual findings that Blake's determinations were correct, Trace was in the vicinity of insolvency from 1995 until its bankruptcy filing in 1999, except for the fourth quarter of 1996. As a result, a fiduciary duty to creditors attached during the period from 1995 until Trace's bankruptcy filing in 1999, except for the fourth quarter of 1996.

### B. *Fiduciary Duties Owed to Trace*

 The officers and directors of Trace also owed fiduciary duties of due care, loyalty and good faith to Trace. *In re Reliance Sec. Litig.*, 135 F.Supp.2d 480, 520 (D.Del.2001); *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del.2001); *Malone v. Brincat*, 722 A.2d 5, 10 (Del.1998); 1 *Delaware Corp. Law and Practices* § 14.02 (2002) (officers share duties). The Trustee is empowered to enforce Trace's rights in this regard. *Kalb*, 8 F.3d at 132; *Pereira II*, 267 B.R. at 511.

## 522

### C. *Whether the Officer–Defendants May Be Held Liable for the Alleged Breaches*

Before addressing whether the business judgment rule has been rebutted and whether the challenged transactions constitute a breach of fiduciary duty, it is necessary to determine whether the Officer–Defendants may be held liable for the alleged breaches.

▇▇▇ A defendant may be classified as a corporate officer for liability purposes if he had discretionary authority in the relevant functional area and the ability to cause or prevent the complained-of action. 3 Wm. Meade Fletcher, et al., *Fletcher Cyclopedia of the Law of Private Corporations,* § 846 (2002) (The Revised Model Business Corporation Act provides that a non-director officer with discretionary authority is governed by the same standards of conduct as a director); *Gold v. Sloan,* 486 F.2d 340, 351 (4th Cir.1973) (officers who lack "the slightest connection" with events in question or ability to meaningfully participate should not be considered officers for liability purposes); *see Colby v. Klune,* 178 F.2d 872, 873 (2d Cir.1949) ("It is immaterial how [an officer's] functions are labeled or how defined in the by-laws or that he does or does not act under the supervision of some other corporate representative."); *Schimmel v. Goldman,* 57 F.R.D. 481, 485–86 (S.D.N.Y.1973) (acknowledging that defendant might argue that "although given the title of an officer, he did not perform the policy making functions or have access to inside information which characterize an 'officer' ").

Smith and Winters are the only Defendants who solely were Trace officers and not directors.[70] Therefore, it will have to

be concluded for each of the alleged breaches that they had discretionary authority in the relevant functional area and the ability to cause or prevent the complained-of action. As they note, the mere fact that they held the "impressive title" of Vice President is insufficient in the absence of such showing.

#### 1. *Dow Re–Purchase*

##### a. *Smith*

▇▇▇ Smith was heavily involved in setting the stage for the Dow re-purchase and in concocting the eventual subterfuge to cover the redemption. First, he wrote the letter with Cogan by which Trace obligated that the $3 million worth of Trace stock would be purchased. Then he worked with Cogan, Nelson and Winters to figure out a way in which the stock could be bought back without the need of paying $2 million in *pari passu* dividends. Smith's active involvement in this situation suggests that it was within his discretionary authority and that he had the ability to prevent the redemption, either at the time he and Cogan created the need for the redemption in October 1997 or later when he came up with the subterfuge.

##### b. *Winters*

Winters also was involved in plotting the best means of avoiding the *pari passu* payment. As with Smith, although he played a smaller role, the role suggests that he both had the discretionary authority to take action with regard to the redemption, and that he had the power to prevent the redemption by not agreeing with the plan or by presenting the issue to the Board.

---

**70.** The Director–Defendants who were also officers claim that they had no liability as officers. The issue is not addressed, however, given the fact that they are found liable as

directors. Such a finding would be necessary, however, if the Court were to accept any of their arguments that they, as directors, were shielded from liability.

## 2. *Dividends*

### a. *Smith*

The evidence showed that Smith explained the Delaware dividend declaration standards to Nelson. While he thus appears to have had the general authority to advise the Board regarding this issue, it is not clear that, after having acquitted himself of this duty, he could have had the ability to affect the Board's eventual declaration of, or payment of undeclared, dividends. As a result, he will not be liable as an officer for payment of the dividends.

### b. *Winters*

There is no evidence that Winters partook in any way in the discussions regarding whether, when and how dividends should be paid, nor was there any evidence that such discussions were within the scope of his duties. He cannot be held liable as an officer, therefore, for any breach related to the declaration of, and payment of undeclared, dividends.

## 3. *Cogan compensation*

### a. *Smith*

As General Counsel, Smith had a number of obligations, as outlined above. He failed to meet them, however, as he never discussed with the Board the need to establish compliance and monitoring programs or an audit committee and the obligation to supervise and evaluate Cogan as CEO. Thus, it was within his discretionary authority to advise the Board that they should ensure that Cogan was appropriately recompensed. As with the dividends above, however, there is no evidence that any advice would have resulted in the Board's taking proper action. The evidence revealed that the complacent Board felt that Cogan was properly compensated. Smith could not have presented any legal precedent requiring the Board to take any further action. Therefore, he shall not be liable.

### b. *Winters*

Winters joined Trace in September 1993, after Cogan had unilaterally increased his salary to $3.6 million. Moreover, although he took over some of Nelson's CFO duties in 1995, he continued to report to Nelson. His limited involvement in personnel issues did not include any means by which he would know the extent of Cogan's compensation, or have any means of effecting it. Therefore, Winters did not have the discretionary authority or ability to cause or prevent the excess compensation received by Cogan prior to the 1997 renewal of the 1987 Agreement.

The issue as to whether he may be liable for Cogan's excess compensation after August 4, 1997 presents a closer question. Winters was, or reasonably should have been, aware that Cogan's employment contract was up for renewal in 1997 as a result of the inclusion of this fact in Trace's 1995 Financial Statement. Moreover, Winters admittedly did play some role in the personnel system, as he did input the salaries and bonuses received by Trace personnel other than Cogan (and, as it turns out, Golfinos). Thus, Winters would have the most intimate knowledge of any of the Defendants (other than, perhaps, Cogan), as to how Cogan's salary stacked up to those of his employees. Nonetheless, the Trustee has not shown that it was Winters' duty to make sure that the Board discussed the issue of the renewal of Cogan's employment contract. As a result, Winters will not be liable for Cogan's post-August 4, 1997 compensation either.

## 4. *Cogan loans*

### a. *Smith*

Smith was not aware of the loans to Cogan until the 1997 Financial Reports were released in mid–1998. At that time,

he should have taken steps to advise the Board that any such loans had to be approved by them, in keeping with his obligation to discuss with the Board its duty to establish compliance and monitoring programs or an audit committee, the obligation to supervise and evaluate Cogan as CEO and to inform themselves as to transactions between Cogan and Trace. Smith did not believe that the directors had the legal duty to determine if loans should or should not be made to Cogan or other insiders, and he admittedly never read the Delaware statute that made such duty a Board responsibility. Yet as General Counsel, it was his responsibility to take steps to so inform himself. Moreover, unlike with the Cogan compensation and dividends discussed above, Smith's advice as general counsel could have prevented the loans by his revelation that such loans were not permitted under Delaware law. Therefore, he could be liable for the loans that took place after mid–1998, when he is charged with the knowledge that Cogan was impermissibly receiving loans from Trace.

#### b. Winters

Winters is charged with the knowledge that Cogan was receiving all the loans because of his perusal of the Trace daily cash reports and because he discussed such loans with Trace's auditors in the mid–1990's. As the CFO in all but name, such loans should have raised a red flag. Moreover, this situation differs from that of Cogan's compensation given his particular knowledge of the situation. Cogan's compensation was put before the Board (albeit in a dilatory manner), and the Directors had a general idea of Cogan's salary. They did not know, however, without recourse to the daily cash report, that Cogan was obtaining millions of dollars at extremely generous interest rates from Trace's coffers. As a result, given Winters' special knowledge and the fact that

he discussed the loans with the outside auditors, it is found that Winters had the discretionary authority over the loans (as much as anyone at Trace, that is) and that had he acted, by even informing the Board about the loans, it is possible that the loans could have been prevented.

#### 5. Other loans

The only loans to insiders of which both Smith and Winters were aware were to Lento and King. Smith also knew about the loans to Glantz and Sinkfeld.

Based on the same logic as discussed above, Smith and Winters are considered to have had the discretionary authority and ability to prevent the loans to the four persons listed above.

#### 6. MOMA Party

As discussed above, Smith, as General Counsel, had the obligation to direct the Board to supervise Cogan and to ensure the financial integrity of Trace. There is no evidence that such advice would have resulted in the prevention of the Birthday Party, particularly given the fact that it appeared, to all intents and purposes, to be a business expense, albeit an extravagant one.

There is no evidence that Winters had any discretionary authority over who paid for the Birthday Party, nor that he could have prevented the expenditure.

In any case, neither Smith nor Winters were aware that Trace paid for the Birthday Party, nor was any evidence presented that they should have investigated whether it was.

#### 7. Golfinos

Other than Smith's general duty to advise the Board of its responsibilities, he did not have any discretionary authority over the issue of compensation to Golfinos, nor is there any evidence that his exercise of that authority could have resulted in the

prevention of the payment. Winters, while in charge of inputting information regarding the payroll, did not have information regarding Golfinos on the spreadsheet from which he worked. Therefore, he did not have the discretionary authority first to notice that Golfinos was on the payroll, nor the authority to raise the issue with Nelson or the other directors in the absence of any evidence that he knew that Golfinos was not supposed to be on the payroll.

In any case, neither Officer–Defendant was aware, nor reasonably should have been aware, of Golfinos' compensation.

As a result, Smith and Winters may only be held liable as officers for the Dow redemption and the loans to Cogan and outsiders.

### D. *"Abstention" Not a Defense Where No Actions Taken*

■ The Director–Defendants argue that they cannot be held liable on the expenditures in Count IV on which the Board did not vote. They point to case law where directors have been exonerated where they abstained from voting on challenged transactions. *E.g., In re Tri–Star Pictures, Inc. Litig.*, Civ. A. No. 9477, 1995 WL 106520, at *2 (Del.Ch. March 9, 1995) ("a director who plays no role in the process of deciding whether to approve a challenged transaction cannot be held liable on a claim that the board's decision to approve the transaction was wrongful") (*citing Citron v. E.I. Du Pont de Nemours & Co.*, 584 A.2d 490, 499 (Del.Ch.1990); *In re Wheelabrator Techs. Inc. S'holders Litig.*, C.A. No. 11495, 1992 WL 212595, at *19–20 (Del.Ch. Sept. 1, 1992); *Propp v. Sadacca*, 175 A.2d 33, 39 (Del.Ch.1961), *modified on other grounds*, 187 A.2d 405 (Del.1962)). Thus, they argue, because there was no

vote, none of the directors voted and they should not, as a general rule be held liable.

The point does not quite capture the situation. First, as the *Tri–Star* Court explained, "no *per se* rule unqualifiedly and categorically relieves a director from liability *solely* because that director refrains from voting on a challenged transaction." *Id.* at *3 (emphasis in original). The Court imagines a situation where directors with sinister intentions purposefully structure and propose an illegal transaction, yet absent themselves from the deciding vote "specifically to shield themselves from any exposure to liability." *Id.* In these circumstances, the Court concluded that the "nonvote" would not shield the plotters. *Id.* To gauge whether such situation had occurred in the case before it, the Court looked to whether the defendant directors "played any role, open or surreptitious, in formulating, negotiating, or facilitating the transaction complained of." *Id.* (holding that because directors played no overt or covert role in the board's decisionmaking process, their abstention on the vote on the challenged transaction shielded them from liability).

The Director–Defendants thus extrapolate that where there is no Board vote, no directors may be held liable unless they played some part in the challenged expenditure. Such a rule would insulate from liability directors who purposefully prevented a vote yet did not take part in formulating the challenged transactions, as well as directors who purposefully remained ignorant of issues of which they, as directors, should have been aware in order to fulfill their fiduciary duties to the corporation. Indeed, under this rule, the safest position would be for a director to hold his or her nose, close his or her eyes, and avoid attending Board meetings at all

cost.[71] Such actions surely do not satisfy that director's fiduciary duties to the corporation. As discussed above, directors will not be excused from liability if they either (1) knew about the challenged expenditure yet unreasonably failed to take action; or (2) if they did not know, should have taken steps by which they would have been informed of the challenged expenditure.

### E. Standard of Review

The parties disagree as to whether the officers and directors are protected by the business judgment rule or whether a higher standard should apply. Different analyses are required in situations where a board of directors takes action and where a board of directors does not. Because two situations involved Board action, and the rest did not, it is necessary to explore the appropriate standards for each group separately according to the appropriate case law.

### 1. Board Actions

#### a. Standard of Review

 The business judgment rule,[72] if not rebutted, may apply to actions taken by the Board.[73] The only two challenged transactions in which the Board took action are (1) the retroactive ratification of Cogan's compensation, and (2) the declared dividends.

 The business judgment rule; which is designed to ensure that courts do not in hindsight reverse the managerial decisions of corporate officers and directors, presumes directors and officers have acted in good faith and in the best interests of the company. *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984), *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244, 253 (Del.2000); *Havens v. Attar,* 1997 WL 55957; at *11 (Del.Ch. Jan. 30, 1997) (*quoting Aronson,* 473 A.2d at 812).

 At the outset, therefore, plaintiffs challenging a board decision have the burden of rebutting the rule's presumption, which they may do in one of two ways, as discussed below. If a plaintiff fails to meet this evidentiary burden, the business judgment rule attaches to protect corporate officers and directors and the decisions they make. *Cede & Co. v. Technicolor Inc.,* 634 A.2d 345, 361 (Del.1993). If the rule is rebutted, the burden shifts to the defendant directors and officers, the proponents of the challenged transaction, to prove to the trier of fact the "entire fairness" of the transaction. *Id.* at 361. Burden-shifting does not create *per se* liability on the part of the directors. *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1162 (Del.1995). As discussed in Part III, *supra,* under the "entire fairness" doctrine, a transaction must be justified under both elements of "a two-

---

**71.** The Director–Defendants admit that, even under the case law they raise and even under the gross negligence standard that a director or board may be held liable for a "complete lack of monitoring by the board," *Cantor v. Perelman,* 235 F.Supp.2d 377, 389 (D.Del. 2002), or "an utter failure to attempt to assure [that] a reasonable information and reporting system exists." *McCall v. Scott,* 250 F.3d 997, 999 (6th Cir.2001).

**72.** The business judgment rule "operates as both a procedural guide for litigants and a

substantive rule of law." *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1162 (Del. 1995). As a procedural guide, the business judgment presumption is a rule of evidence that places the initial burden of proof on the plaintiff. *Id.*

**73.** Decisions of officers also may be protected by the business judgment rule. *E.g., Ella M. Kelly & Wyndham, Inc. v. Bell,* 266 A.2d 878, 879 (Del.1970); *Pogostin v. Rice,* Civ. A. No. 6235, 1983 WL 17985, at *3 (Del.Ch. Aug. 12, 1983).

pronged inquiry into the fair process and the fair price of the transaction." *Solomon*, 747 A.2d at 1112.

The business judgment rule may be rebutted in two ways. First, plaintiffs may show that the directors, in reaching their challenged decision, breached any one of the triads of their fiduciary duty—good faith, loyalty or due care. *Cede*, 634 A.2d at 361. Second, and in what logically appears to be a subset of the above rule, the burden shifts to a defendant to prove the entire fairness of the transaction where the transaction is self-dealing, as discussed in Count II. *Tremont*, 694 A.2d at 428; *Lynch*, 638 A.2d at 1117. This second standard appears to overlap with the first rule, as a self-dealing transaction is in essence also a breach of the duty of loyalty.

■■■ The parties have argued at great length with regard to the second test as to whether non-conflicted directors are also subject to the requirement of proving the entire fairness of the transaction, and cannot rely on the business judgment rule, where a controlling shareholder is the director who engaged in self-dealing. While a self-dealing director has lost the presumption of the business judgment rule in manifold situations, *e.g.*, *Nixon v. Blackwell*, 626 A.2d 1366, 1375–76 (Del.1993) (executive compensation and key man life insurance policies); *Marciano v. Nakash*, 535 A.2d 400, 407–07 (Del.1987) (loans); *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 721 (Del.1971) (dictum that if dividend payment was self-dealing by controlling shareholder "the intrinsic fairness standard is the proper standard"); *Technicorp Int'l II, Inc. v. Johnston*, 2000 WL 713750, at *25, 2000 Del. Ch. LEXIS 81 at *74 (Del. Ch. May 31, 2000) (executive compensation); *In re MAXXAM, Inc.*, 659 A.2d 760, 771 (Del.Ch.1995) (loans), the only cases cited by the Trustee in which non-conflicted di-

rectors have also lost that presumption as a result of another's self-dealing have involved mergers. *E.g.*, *Emerald Partners*, 787 A.2d at 88, 94–97; *Tremont*, 694 A.3d at 424, 426.

In the absence of any explicit authority to support the Trustee's position, and in light of the findings that because all of the Defendants have breached at least one of their duties, thus rebutting the business judgment rule presumption in any case, this Court will not expand the rule to include the instant situation. Therefore, the mere fact that the controlling shareholder, Cogan, was self-dealing, will not result in a finding that the other Defendants must prove the entire fairness of the transactions in the absence of any more particularized inquiry into the other Defendants' (in)actions. However, Cogan will be liable under this rule to prove the entire fairness of the ratification of his pre–1994 compensation in 1996, as well as the other challenged transactions, discussed below, in which no Board action occurred and which involved self-dealing by Cogan.

Thus, in order to determine whether the business judgment rule has been rebutted, it is necessary to look to the first means of rebuttal, *i.e.*, whether the Defendants have violated their fiduciary duties.

### b. *The Director–Defendants Are Obliged to Prove the Entire Fairness of the Transactions as They Breached Fiduciary Duties*

The Trustee claims that the Director–Defendants have violated their duties of loyalty and due care.

#### i. *Duty of Loyalty*

■■■ The Supreme Court of Delaware has "traditionally and consistently" defined the duty of loyalty of officers and directors in "broad and unyielding" terms. *Cede*, 634 A.2d at 361. "Essentially, the

duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Id.* (*citing Pogostin v. Rice,* 480 A.2d 619, 624 (Del. Supr.1984); *Aronson,* 473 A.2d at 812). Pertinent to this case, the Delaware Supreme Court has deemed that directors shirk their duty of loyalty where there exists an "abdication of directorial duty." *Id.* at 363 (*citing Lutz v. Boas,* 171 A.2d 381, 395–96 (1961)).

■ A breach of the duty of loyalty may also be established where it is shown that an interested director "controls or dominates the board as a whole or that the interested director failed to disclose his interest in the transaction to the board and a reasonable board members would have regarded the existence of the material interest as a significant fact in the evaluation of the proposed transaction." *Cinerama,* 663 A.2d at 1168 (internal quotation marks and brackets omitted). *See also Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Investcorp,* 1999 WL 754015, at *4, 1999 U.S. Dist. LEXIS 14826, at *14 (S.D.N.Y. Sept. 24, 1999) (business judgment rule rebutted where "one could infer that the director-defendants, through their dominance over the other board members, 'so infected or affected the deliberative process of the board as to disarm the board of its presumption of regularity and respect.'") (*citing Cinerama,* 663 A.2d at 1153); *In re The Walt Disney Co. Deriv. Litig.,* 731 A.2d 342, 355 n. 18 (Del.Ch. 1998), *rev'd in part on other grounds,* 746 A.2d 244 (Del.2000) (holding that mere allegations of personal or business relationships do not overcome the presumption of independence afforded to all directors); *Nebenzahl v. Miller,* Civ. A. No. 13206, 1996 WL 494913, at *3 (Del.Ch. Aug. 29, 1996) (dismissing fiduciary duty claim against directors; fact that 50% of the directors who voted on proposed merger were interested and held substantial corporate positions and shareholdings was not sufficient to rebut the presumption that the disinterested directors who voted to approve the merger did so independently and in good faith).

■ The evidence reveals that the directors clearly abdicated their duties with regard to these two transactions. With regard to the declared dividends, the Defendants point to the Dividend Memorandum from Richards Layton and purported calculations by Nelson determining that a surplus existed. However, there is no evidence that Nelson performed the calculations, nor that he showed them to the other Directors. Further, there were no practices in place to determine whether Nelson correctly calculated the surplus. In addition, the Defendants were well aware of Trace's precarious financial situation, and such knowledge should have caused them to question any calculations purporting to find a surplus. In the absence of such evidence that the Defendants were fulfilling their duties and in light of Cogan's domination over the Board, the actions of the defendants in approving the declarations was an abdication of their duties and thus a breach of the duty of loyalty.

With regard to the ratification of Cogan's compensation from 1988 to 1994, there is no evidence that the Board met to discuss the ratification or that the Board actually knew what level of compensation they were ratifying. While Nelson delivered a report on Cogan's 1991–1994 compensation approximately two years prior to the ratification, on June 24, 1994, there is no evidence that the directors who ratified the compensation remembered that colloquy, nor that they relied on their two-year-

old memories of it in deciding the ratify Cogan's compensation. The mere fact that Cogan had successfully spearheaded extremely lucrative deals for Trace in the relevant years and up to the ratification vote is insufficient to justify a blind vote in favor of compensation that may or may not be commensurate with those given to similarly situated executives. Any blind vote is suspect in any case given the fact that Cogan dominated the Board.

The most that the Board did, or even could do, based on the evidence presented, was to rely on the recommendation of the Compensation Committee. They have not established reasonable reliance on the advice of the Compensation Committee, then composed of Nelson and Sherman (two of the four non-interested Board members who ratified the compensation). The Compensation Committee had never met. It did not seek the advice of outside consultants.[74] The "report" to the Board consisted of several conclusory statements regarding Cogan's performance, without reference to any attachments listing how much the compensation was or any schedule pitting that level of compensation against that received by executives the Compensation Committee believed to be similarly situated. The "report" was little more than an *ipse dixit* and it should have been treated accordingly by the Board. As a result, the director-defendants cannot elude liability on the basis of reliance on the Compensation Committee's report.

In sum, Cogan's self-interest, the close relationships of the Board members to Cogan, and the complete lack of any exercise of diligence in the performance of the Board's duties further suggest that a breach of the duty of loyalty exists.

As a result, it is the Defendants' burden to prove that both disputed transactions were entirely fair to Trace.

### ii. Duty of Due Care

A determination of director due care "is highly particularized and generalizations are of little help in that task." *Citron v. Steego Corp.*, Civ. A. No. 10171, 1988 WL 94738, at *10 (Del.Ch. Sept. 9, 1988). A trial court will not find a board to have breached its duty of care unless the directors individually and the board collectively have failed to inform themselves fully and in a deliberate manner before voting. *Cede*, 634 A.2d at 368; *Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del.1985); *Aronson*, 473 A.2d at 812.

One means of breaching this duty is a failure to monitor. The leading case on this issue is *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del.Ch. 1996) (Allen, Ch.). In that case, shareholders brought a derivative actions against the board of directors of Caremark International ("Caremark") for breach of the fiduciary duty of care.[75] In their com-

---

**74.** The Defendants correctly point out that there is no legal requirement that a Board obtain expert advice. *E.g., Citron v. Steego Corp.*, No. Civ. A. 10171, 1988 WL 94738, at *9 (Del.Ch. Sept.9, 1988) ("[F]or example, whether the advice of an investment banker would be helpful or not in making a business decision of importance is itself a question demanding business judgment."); *Chesapeake Corp. v. Shore*, 771 A.2d 293, 331 (Del.Ch. 2000) (no legal requirement that a board consult advisors as long as the board has adequate information to make an informed judg-

ment). For the reasons noted above, there is no evidence that the Committee was sufficiently informed such that it did not have to obtain expert advice.

**75.** Caremark provided consulting services and gave research grants to physicians. Some of those physicians referred patients to Caremark. Such contracts were permissible under the law. However, the Anti–Referral Payments Law ("ARPL") prohibited payments from health care providers to physicians or other parties for securing referrals.

plaint, the plaintiffs alleged that the directors of Caremark "allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in doing so they violated a duty to be active monitors of corporate performance." The *Caremark* court explained that a director may violate his duty of care in two contexts: (1) rendering a negligent decision or (2) an "unconsidered failure" to act in situations in which due attention would, arguably, have prevented the loss. *Id.* at 967. The second violation, which is at issue here, was dubbed a "failure to monitor." *Id.* at 968. The Court recognized a number of policy concerns surrounding this cause of action:

> Most of the decisions that a corporation, acting through its human agents, makes are, of course, not the subject of director attention. Legally, the board itself will be required only to authorize the most significant corporate acts or transactions: mergers, changes in capital structure, fundamental changes in business, appointment and compensation of the CEO, etc. As the facts of this case graphically demonstrate, ordinary business decisions that are made by officers and employees deeper in the interior of the organization can, however, vitally affect the welfare of the corporation and its ability to achieve its various strategic and financial goals....

*Id.* at 968. In light of the above policy considerations, it was held that "a di-

rector's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists, and that failure to do so under some circumstances may, in theory at least, render a director liable for losses caused by non-compliance with applicable legal standards." *Id.* at 970. The court cautioned, however, that any action seeking recovery for losses must entail a judicial determination of proximate cause, *i.e.*, that the absence of the adequate information system caused the losses. *Id.* at 970 n. 27; *see also Grimes v. Donald*, No. Civ. A. 13358, 1995 WL 54441, at *8–9 & n. 6 (Del.Ch. Jan. 11, 1995) (the law "expressly permits a board of directors to delegate managerial duties to officers of the corporation," but "while a board may delegate powers subject to possible review, it may not abdicate them."); *Canal Capital Corp. v. French*, Civ. A. No. 11,764, 1992 WL 159008, at *4 (Del.Ch. July 2, 1992) ("[A] director breaches his fiduciary duty of due care if he abdicates his managerial duties.").

 For the same reasons as discussed above, the actions (and inactions) of the Defendants result in a finding that they breached their duty of due care and that the entire fairness standard applies to the two actions in which the Board took action.

### 2. *Board Inaction*

The Board took no action with regard to (1) the Dow repurchase, (2) the undeclared

---

Since any payments from Caremark to a referring physician would raise suspicion, even if those payments were for consulting services, Caremark developed guidelines for contractual relationships, which included a directive prohibiting payments for patient referrals. Caremark, which had operated under a decentralized management, began to centralize its management after the Health and Human Services and the Department of Justice launched investigations into Caremark's practices. Additionally, the board of

directors implemented other procedures to ensure that Caremark was in compliance with state and federal laws. Despite management's efforts, Caremark was indicted for violating the ARPL. After settling the criminal claims, Caremark entered into a settlement agreement with the shareholder plaintiffs. In *Caremark*, the Court of Chancery addressed the fairness of the settlement agreement which necessarily required a review of the merits of the case.

dividends, (3) the renewal of Cogan's 1987 Agreement, (4) the loans to Cogan, (5) the insider loans, (6) the MOMA Birthday Party, and (7) Golfinos' compensation. Of these, as discussed above, the Officer–Defendants Smith and Winters may be held liable only for the Dow redemption, the Cogan loans, and the loans to insiders of which they were aware.

 It is the law of the case that the Defendants are not entitled to the business judgment rule for the claims based on alleged director inaction, *i.e.*, all of the breach of fiduciary claims but those grounded on the attempted retroactive ratification of Cogan's 1988–94 compensation and the declared dividends.[76] *Pereira I,* 2001 WL 243537, at *14, 2001 U.S. Dist. LEXIS 2461, at *41–43 ("[T]he business judgment rule operates only in the context of director action. Technically speaking, it has no role where directors have either abdicated their functions or, absent a conscious decision, failed to act.") (*quoting Rabkin v. Philip A. Hunt Chem. Corp.,* 1987 WL 28436, at *1, 1987 Del. Ch. LEXIS 522, at *3 (Del. Ch. Dec. 17, 1987) (*quoting Aronson v. Lewis,* 473 A.2d at 813)). The Delaware Supreme Court has held that the business judgment rule,

> has no role where directors have either abdicated their functions or, absent a conscious decision, failed to act. But it also follows that under applicable principles, a conscious decision to refrain from acting may nonetheless be a valid exercise of business judgment and enjoy protections of the rule.

*Aronson,* 473 A.2d at 813. Dictum in *Pereira I* suggested that the director-defendants should at the very least face an ordinary negligence standard for such inaction. *Id.* at 2001 WL 243537, *14 n. 17, 2001 U.S. Dist. LEXIS 2461, *43 n. 17; *see also .Graham v. Allis–Chalmers Mfg. Co.,* 188 A.2d 125, 130 (Del.1963).[77]

---

76. The Defendants contend that in a few instances a "business judgment" was made by one of them, typically Cogan, and that therefore the Defendants should be protected by the business judgment rule. Delaware corporative governance law dictates that individual directors, constituting less than a quorum, cannot act for the corporation. *E.g., Colish v. Brandywine Raceway Ass'n,* 119 A.2d 887, 891–92 (Del.Super.1955); Del.Code. Ann., tit. 8, § 141(b). In addition, the Trace by-laws explicitly define an "act of the Board" to be "the vote of the majority of the directors present at a meeting at which a quorum is present," or a unanimous written consent. Trace By–Laws, §§ 2.6, 2.8.

 In any case, the business judgment rule would not protect the illegal acts complained of, such as the redemption, dividends and loans made without board approval. *Kahn v. Roberts,* 679 A.2d 460, 465 (Del.1996) ("the business judgment rule normally protects all lawful actions of a board"); *Miller v. American Tel. & Tel. Co.,* 507 F.2d 759, 762 (3d Cir.1974) (applying New York law) ("The business judgment rule cannot insulate the Director–Defendants from liability if they did in fact breach [a criminal statute].").

77. In *Graham,* the Delaware Supreme Court addressed the question of potential liability of board members for losses experienced by the corporation as a result of the corporation's having violated the anti-trust laws of the United States. Plaintiffs claimed that the directors ought to have known of the violations, and if they had known of it they would have been under a duty to bring the corporation into compliance with the law and thus save the corporation from the loss. The Delaware Supreme Court concluded that, under the facts as they appeared and applying what it claimed was a reasonable person standard, there was no basis to find that the directors had breached a duty to be informed of the ongoing operations of the firm. *Graham* has since been interpreted to stand for the proposition that, "absent grounds to suspect deception, neither corporate boards nor senior officers can be charged with wrongdoing simply for assuming the integrity of employees and the honesty of their dealings on the company's behalf." *In re Caremark Int'l Inc. Deriv. Litig.,* 698 A.2d 959, 969 (Del.Ch.1996).

█ In light of the discussion above, however, the Defendants also may be held to the higher entire fairness standard if their inaction was a result of a breach of any of the fiduciary duties discussed above. Otherwise, a Board could avoid the higher judicial scrutiny of the entire fairness standard merely by ignoring or not addressing any potentially harmful transactions. Such is not good corporate governance and should not be encouraged by the law. Thus, the actions in which the Board took no action will be individually discussed.

█ First, Cogan, as a self-interested director, faces the entire fairness standard for (1) his post-August 4, 1997 compensation; (2) the Cogan loans; (3) the loans to his wife, Maureen Cogan; (4) the MOMA birthday party; and (5) Golfinos' compensation. Cogan shall be subjected to the same standards as the other defendants for the other challenged transactions. Although it has been argued that the Dow re-purchase was an interested transaction, Cogan will not be subject to the entire fairness standard for it, although he received a $3 million loan to effectuate the transaction, because the loan was intended to purchase stocks for Trace, Cogan did use the loan to purchase stocks for Trace, and Cogan pledged the stocks to Trace.

█ All of the Defendants were aware of the challenged Dow repurchase. At no time did any of them suggest that the Board should discuss, investigate or approve the deal, even though it was apparent that such transaction could be considered an illegal redemption and would involve the transfer of $3 million from Trace's rapidly declining coffers. As a result, this is at the very least a violation of the duty of due care. In addition, given Cogan's domination of the Board and the fact that he and Smith concocted this plan in secret, a violation of the duty of loyalty

is also present. Thus the burden shifts to the Defendants to prove that it was entirely fair. The above analysis does not include Farace, who appropriately recused himself as the head of Foamex from all consideration of the matter. His actions will be subject to ordinary negligence standards as described above.

█ With regard to the undeclared dividends, the directors were aware or should reasonably have been aware of the dividends, yet took no action to ensure that the Board approved of the Dividends. There is no evidence that any calculations were completed to determine whether there was a surplus, and such failure is a violation of the duty of loyalty and due care. These dividends were, in any case, illegal as discussed *infra*.

█ All of the Director–Defendants were, or should have been, aware that Cogan's 1987 Agreement was up for renewal on August 4, 1997. Farace, Marcus, and Nelson, as Board members, permitted the contract to be renewed by their inaction. There is no evidence that any such investigation or discussion took place. As discussed above, the mere fact that Cogan had earned significant returns-on-investments for Trace was insufficient without any discussion or investigation into how Cogan's compensation compared to similarly situated executives. There is no allegation that the directors relied on any written report, and there is no credible evidence that any oral report was given on which the directors could have reasonably relied. Such failure to do anything but let the contract of the controlling shareholder (and one's superior) renew is a violation of the duty of loyalty and due care.

█ With regard to Cogan's loans, at no time did any of the Defendants attempt to (1) set up a procedure by which loans would be approved; (2) seek to insure that

Cogan had put up collateral or was otherwise able to pay back the loans; (3) investigate the loans to insure that they were fair to the company; or (4) even discuss whether such measures should be put into place. This grave inattention violates the duties of loyalty and due care.[78] In addition, the Officer–Defendants argue that they had no duty to report to the Board about the loans because the directors eventually found out. The directors' individual discoveries of the loans were serendipitous at best, and cannot acquit the officers of their duty to ensure that the Board was aware of the loans as soon as the officers were aware.

The same is true for the loans to insiders, except that, given the lack of a self-interested director's involvement in all the loans but the one to Nelson, the inattention primarily is in contravention of the duty of due care.

■ Nelson and Marcus were aware before the fact that Cogan's Birthday Party potentially might be paid for by Trace. Given this knowledge, and after witnessing the tenor of the party, they should have checked up to see how much the party had cost and what portion Trace had paid, or informed the Board about these facts.

Their failure to do so was a violation of their duties of loyalty and due care.

■ Finally, in light of the fact that none of the Defendants but Cogan were aware of Cogan's unilateral actions in putting his daughter, Golfinos, on the payroll, their failure to investigate at great lengths to be sure that she was not is not a violation of the duty of due care and/or loyalty. As a result, the reasonable person standard will apply for the Director–Defendants other than Cogan.

In light of the above findings, the Defendants have the burden to show that all of the transactions were entirely fair to Trace, except that the non-Cogan Defendants face the lower, reasonable person standard with regard to the Golfinos compensation, and Farace faces the same standard with regard to the Dow redemption from which he properly recused himself.

### 3. The Defendants Are Not Protected by Section 102(b)(7)

The Defendants ask that the Court reconsider its ruling in *Pereira I*, 2001 WL 243537, at *9–11, 2001 U.S. Dist. LEXIS 2461, at *29–38, that the Trustee is not bound by Section 102(b)(7) of Delaware's General Corporation Law and Article IX of Trace's Articles of Incorporation,[79]

---

78. Farace and Marcus appear to argue that they essentially took no action because they believed that Cogan was good for the loans. Their belief in his wealth was insufficient. As the old adage goes, appearances can be deceiving. If Farace and Marcus were only gambling with their own money, their belief would be a simple mistake. Because it was Trace's money, however, their duty to Trace required them to go beyond such simplistic assumptions.

79. Article IX, "Elimination of Certain Liability of Directors," states:

To the fullest extent permitted by the General Corporation Law, as the same presently exists or may hereafter be amended, a director of the Corporation shall not be

liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit. Any repeal of modification of this Article IX shall not adversely affect any right or protection of a director of the Corporation with respect to any act or omission occurring prior to such repeal or modification.

Trace Certificate of Incorporation, art. IX.

which shield directors from liability for the breach of a duty of care. The Defendants cannot evade this holding by contending that (a) the Exculpatory Clause is inapplicable only to claims by individual creditors, which the Trustee lacks standing to assert; [80] or (b) this Court should not rely upon the *Ben Franklin* opinion, because the Trustee in that case had a specific assignment of individual creditors' claims. Both arguments were heard and rejected in *Pereira I*, 2001 WL 243537, *11 & n. 14, 2001 U.S. Dist. LEXIS 2461 at *31–36 & n. 14. The Exculpatory Clause in any case would not provide protection for officers for any breach of fiduciary duty, and for any directors who breached the duty of loyalty. In any case, given the finding that the duty of loyalty has been breached by all of the defendants, the argument is further vitiated.

## F. *The Challenged Transactions*

As discussed above, the Defendants who were, or reasonably should have been, aware of the particular challenged transactions are required to demonstrate either that the transactions below were "entirely fair" to Trace as that term was defined above, or, in a few instances, that their (in) actions were those that ordinary prudent persons would take.

### 1. *The Dow/Series A Preferred Transaction*

■ Given the conclusion, *infra*, that the Dow re-purchase was an illegal redemption given Trace's insolvent state, the only real liability at issue here is that of the officers, Smith and Winters, as the other defendants who were involved are subject to liability under Count V.

All of the Defendants were aware of the challenged transaction, and all but Farace are subject to the entire fairness standard of review.

There is a scarcity of evidence of fair process. The initial obligation to Dow was concocted by Smith and Cogan without recourse to the Board. There was no discussion as to whether Dow could be placated in some other way. Later, other officers and directors were brought in when the duo realized that the obligation would require Trace to pay an additional $2 million in dividends. The larger group's actions then resulted in the illegal redemption of the stock, given Trace's insolvent state and the fact that such actions were likely not permitted by the articles of incorporation. Had the Defendants exposed the issues to the sunlight of the corporate board room and corporate minutes, they might not have carried through on the plan, as they might have been stopped from doing so by the *pari passu* shareholders.

The fair price element presents a closer question, however. It is true that the maneuver potentially saved Trace $2 million (although opening it up for a potential shareholder derivative suit challenging the redemption). In light of the fact that the $3 million was not a required cost, however, and only came about because of an earlier, unapproved deal that occurred outside the accountability of the board room, such is not sufficient to meet the defendant's entire fairness burden.

Farace, who was not a member of the Board at the time of the Dow repurchase, properly recused himself at the time Cogan effectuated the agreement with Dow to purchase the stocks. *Weinberger*, 457

---

**80.** Given the alternative means by which the protection of § 102(b)(7) and Article IX of the articles of incorporation are not applicable to the Defendants, there is no need in any case to address their lengthy reargument of the issue. *E.g.,* Nelson, Smith and Winters Mem. at 46–50.

A.2d at 711 (directors who have a conflict of interest should "totally abstain from participating in the board's consideration of that transaction"); *Tri–Star*, 1995 WL 106520, at *3 (granting summary judgment to directors who abstained from a decision on transaction based on potential conflict). Therefore, Farace acted with the amount of care that ordinarily careful and prudent persons would use in similar circumstances, and he is subject to no liability for breach of fiduciary duty for the Dow repurchase.

In sum, all the Defendants but Farace are liable for damages resulting from the Dow re-purchase.

### 2. *Dividends*

■ Because of the conclusion, *infra*, that almost all of the dividends were illegal under Count V, and because Smith and Winters have been found not to have officer liability for the dividends, the only real question at issue is whether the Director–Defendants may be held liable for the issuance of dividends during the fourth quarter of 1996 when Trace was solvent.

All of the Director–Defendants were aware, or should have been aware, of the issuance of dividends, both declared and undeclared. These transactions also will be judged by the entire fairness standard.

There was clearly a lack of fair process with regard to the undeclared dividends. The Board did not have the opportunity to take any action to ensure that the dividends were appropriately declared (not that there is any evidence that it did take appropriately investigate the existence of a surplus when the issue was presented). Further, the lack of evidence regarding any such investigations with regard to the declared dividends also suggest a lack of fair process. The Defendants' uncorroborated claims of Nelson's calculations are insufficient.

With regard to fair price, given the wild fluctuations in Trace's net worth and the fact that Trace consistently operated with approximately $13 million in the red each year and relied on loans taken out on its assets, the Defendants have failed to present any evidence that the issuance of dividends was at a fair price to Trace.

All of the Director–Defendants are therefore liable for the dividends.

### 3. *Cogan Compensation and Employment Agreement Renewal*

Cogan has already been held liable for breach of fiduciary duty under the entire fairness standard for his receipt of excess compensation.

■ The Director–Defendants also are subject to the entire fairness standard. As noted above, it has not been shown that either the ratification of Cogan's salary nor the renewal of his 1987 Agreement was entirely fair to Trace. Therefore, the Director–Defendants are liable for the excess compensation received by Cogan about which they were aware.

■ It should be noted that the Director–Defendants have attempted to establish reasonable reliance with regard to the ratification of Cogan's past compensation, pursuant to Section 141(e) of the Delaware General Corporations Law, which states, in pertinent part:

A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of his duties, be fully protected in relying in good faith ... upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matter the member reasonably believes are within such other person's profes-

sional or expert competence and who has been selected with reasonable care on behalf of the corporation.

Tit. 8, § 141(e) (2002). Reliance is established where a preponderance of the evidence proves that a director reasonably relied in good faith upon the corporation's records or upon information, opinions, reports or statements presented to him by an officer or legal counsel or an expert or professional. *Van Gorkom,* 488 A.2d at 875; *Cheff v. Mathes,* 199 A.2d 548, 556 (Del.1964); *Grubb v. Bagley,* Civ. A. No. 13882, 1998 WL 92224, at *2 (Del. Ch. Feb. 25, 1998) (finding genuine issue of material fact as to whether the board acted reasonably and in good faith reliance on fairness opinion by investment banking firm).

█ The term "report" is liberally construed to allowed a director's reliance upon reports, presentations and written, oral and informal personal investigations. *Van Gorkom,* 488 A.2d at 875; *Cheff,* 199 A.2d at 556. A report must, however, be "pertinent to the subject matter upon which a board is called to act" and "otherwise be entitled to good faith, not blind, reliance." *Van Gorkom,* 488 A.2d at 875 ("Considering all of the surrounding circumstances— hastily calling the meeting without prior notice of its subject matter, the proposed sale of the Company without any prior consideration of the issue or necessity therefor, the urgent time constraints imposed by Pritzker, and the total absence of any documentation whatsoever—the directors were duty bound to make reasonable inquiry of Van Gorkom and Romans, and if they had done so, the inadequacy of that upon which they now claim to have relied would have been apparent.").

█ The most that the Board did, or even could do, based on the evidence presented, was to rely on the recommendation of the Compensation Committee. They have not established reasonable reliance on the advice of the Compensation Committee, then composed of Nelson and Sherman (two of the four non-interested Board members who ratified the compensation). The Compensation Committee had never met. It did not seek the advice of outside consultants. The "report" to the Board consisted of several conclusory statements regarding Cogan's performance, without reference to any attachments listing how much the compensation was or any schedule pitting that level of compensation against that received by executives the Compensation Committee believed to be similarly situated. The "report" was little more than an *ipse dixit,* and it should have been treated accordingly by the Board. As a result, the director-defendants cannot elude liability on the basis of reliance on the Compensation Committee's report. They are therefore liable for the $4,207,303 in excess compensation Cogan received from Trace.

### 4. *Loans to Cogan and Insiders*

█ Delaware law authorizes corporations to make loans to any officers, directors or other employees. Delaware General Corporations Law § 143 states:

> Any corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the corporation or of its subsidiary, including any officer or employee who is a director of the corporation or its subsidiary, whenever, in the judgment of the directors, such loan, guaranty or assistance may reasonably be expected to benefit the corporation.

GCL § 143.[81] The plain language of this statute requires that the Board approve

---

**81.** Prior to 1963, the statute held directors and officers personally liable for any loans

any of the loans below. *Pereira I,* 2001 WL 243537, at *15, 2001 U.S. Dist. LEXIS 2461, at *47 (directors' failure to evaluate loan to Cogan under § 143 "is itself a basis for liability"); *Williams v. Don Yerkes Fine Cars, Inc.,* No. 4777, 1977 WL 2582, at *3, 1977 Del. Ch. LEXIS 160, at *15–16 (Del. Ch. June 1, 1977). *See also Folk on the Delaware General Corporation Law,* § 143.1 (loan "must be approved by the board of directors, who must make a judgment that it is expected to benefit the corporation"); 18B *Am.Jur.2d Corporations* § 2104 ("express authority given to a corporation to loan money in certain ways would seem to be a restriction on its power to loan money in other ways").[82]

### a. *Cogan loans*

All the Defendants were aware or reasonably should have been aware of the loans. They are liable for them, therefore, if the loans were not entirely fair to Trace. There is no question that they were not.

There was no process in place for the loans to be approved and, in fact, the officers and directors for the most part could only determine the existence of the

loans by reading the daily cash reports. At no time did any officer or director attempt to (1) set up a procedure by which loans would be approved; (2) seek to insure that Cogan had put up collateral or was otherwise able to pay back the loans; (3) investigate the loans to insure that they were fair to the company; or (4) even discuss whether such measures should be put into place. As a result, there was not fair process.

The Defendants have also failed to establish fair price. The terms of the loans were set by Cogan, rather than Trace, at extremely favorable rates to him. Thus, all the Defendants are liable for the Cogan loans.[83]

### b. *Loans to Insiders*

The Trustee has challenged seven loans. One of the purported loans, to Tambra King, should not have been considered a loan and therefore the Defendants shall not be liable. Of the remaining six, five involve very similar factual patterns, except that different Defendants were, or should have been, aware of them. One of

they made to insiders. The superseded code provided:

> No loans shall be made by a corporation to its officers or directors, and no loans shall be made by a corporation secured by its shares, and if any such loan be made, the officer or officers who make it or assent thereto shall be jointly and severally liable until the repayment of the sum so loaned with interest.

Del.Code Ann. tit. 8, 143 (1953). The Defendants argue that the repeal of the former strict liability § 143 means that they cannot now be held liable for the loans at issue. The elimination of strict liability, and its replacement with a statute more in line with the business judgment rule, does not prove the fairness of the loans. Moreover, the officers and directors remain liable for breaching their fiduciary duties, whether in connection with a statutory violation or otherwise.

**82.** While the Defendants point to a Minnesota statute and its Reporter's notes, Minn. Ann. Code § 302A.501 (2001), in support of their proposition that no board approval is required, such commentary is not persuasive given the contrary authority above.

**83.** Even if the non-Cogan defendants are correct that their lack of oversight was not a breach of their fiduciary duties, there is an alternative ground on which they all would be liable for the loans. The Defendants' compensation expert, Mines, concluded that the loans received by Cogan were part of his compensation. Thus, as it has been concluded that Cogan received excess compensation merely from his salary, without consideration of the loans, all Defendants liable for permitting Cogan to receive excess compensation would also be liable for permitting Cogan to receive the loans, in excess of what has already been deemed excess compensation.

the loans, that to Glantz, is different and will be treated separately.

### i. *Glantz*

Cogan was the only defendant aware, or who should have been aware, of the "loan" to Glantz.

It is more accurate to describe the loan as one to UAG, rather than to Glantz. Trace lent its subsidiary money to pay one of its top performers an annual bonus. While such loan makes good business sense, the standard of review is higher. Cogan has failed in his burden to present evidence that the loan was entirely fair to Trace. The lack of process alone dooms this loan. If Trace was lending its subsidiary money, someone other than Cogan should have assisted with the decision, and—given the close ties between the two corporations and their employees—the Board likely should have been notified, if not asked to approve, the loan.

Although Cogan is liable, it does not appear as though there are any damages left to assess him. The Trustee has collected $660,000 associated with this claim—$500,000 in debt relief from UAG and $160,000 from Glantz.

Cogan is therefore liable for any damages resulting from this loan, but there do not appear to be any. The other defendants, as they were not aware of the loan and had no reasonable cause to be, are not liable.

### ii. *The Other Loans*

The following chart summarizes the remaining five loans to insiders and which defendants were aware of them:

| Loanee | Amount At Issue | Defendants Who May Be Liable |
|---|---|---|
| Maureen Cogan | $161,000 | Cogan and Nelson |
| Lowrance | $ 13,000 | Cogan and Nelson |
| Lento | $558,000 | Cogan, Nelson, Smith, Winters |
| Nelson | $600,000 | Cogan, Farace, Marcus, Nelson |
| Sinkfeld | $ 15,000 | Cogan and Smith |

The Defendants have failed to prove that these loans were entirely fair to Trace. There were no efforts to (1) set up a procedure by which the loans would be approved; (2) seek to insure that collateral was provided or that the loans would be repaid; (3) investigate the loans to insure that they were fair to the company; or (4) even discuss whether such measures should be put into place when approving insider loans. None of the Defendants who knew of the loans bothered to tell the rest of the Board. Moreover, there is no evidence that the loans were at a fair price to Trace.

As a result, the Defendants listed above are responsible for the loans to insiders. Some of the amounts listed above may be affected by collateral proceedings, however. In such situations, the defendants may be entitled to a pro-rata credit in the amount of the funds recovered by the Trustee.

### 5. *Cogan's Birthday Party at MOMA*

Cogan was aware that Trace paid for his extravagant Birthday Party, and Marcus and Nelson were aware or should have been aware that Trace paid for part or all of the party. They will be judged by an entire fairness standard.

There is no evidence that the Board approved the extravagant party Cogan and his family planned. Nor was there any evidence that other such extravagant parties as were held by subsidiaries of Trace and other businesses were similarly charged to the corporations without any prior (or even subsequent) board approval. The issue of fair price presents a closer question, however. Testimony was persuasive that the party was, at least in part, a legitimate business expense, even if not properly approved. While other corporate entertainments referred to cost less than Cogan's party, they were not so much cheaper as to suggest that the Birthday

Party was excessively extravagant. The only sour note presented is the excessive $108,000 spent on the filming and showing of the movie played at the party, a seemingly purely personal expense and extravagantly priced. As a result, while the bulk of the party appears to have been at a fair price to Trace, liability should attach for the cost of "The Life of Marshall Cogan."

Cogan, Marcus and Nelson shall be required to pay damages in the amount of the cost of the film, $108,000.

The other defendants were not aware, and had no reason to be aware, that the Birthday Party was being paid for by Trace. Therefore, they shall not be held liable.

### 6. *Golfinos*

■ Only Cogan was aware of Golfinos' compensation, and he is required to show that it was entirely fair to Trace. Cogan certainly should have sought permission from the Board to hire his daughter—particularly given the fact that Marcus had previously refused to put her on the '21' Club payroll. Golfinos had no reviews, and there was no evaluation of how much here services were worth. Moreover, Golfinos clearly received compensation well in excess of her worth to Trace. Golfinos did little or nothing for Trace, yet received a handsome salary and the use of a company car.

Cogan is therefore liable for the losses associated with putting Golfinos on the payroll and loaning her a car leased or owned by Trace.

Because the non-Cogan defendants were not, and could not reasonably have been, aware of the transaction, they are not liable for the losses to Trace related to Golfinos' position.

### G. *Summary*

The liability in Count IV is attributed as follows:

| | |
|---|---|
| Dow Re-purchase: | Cogan, Marcus, Nelson, Smith, Winters |
| Dividends: | All Director–Defendants |
| Cogan Compensation: | |
| pre–1997: | All Director–Defendants |
| post–8/4/97: | All Director–Defendants |
| Cogan's Loans: | All Defendants |
| Insider Loans: | |
| King: | No Defendants |
| M. Cogan: | Cogan and Nelson |
| Glantz: | Cogan |
| Lowrance: | Cogan and Nelson |
| Lento: | Cogan, Nelson, Smith and Winters |
| Nelson: | Cogan, Farace, Marcus and Nelson |
| Sinkfeld: | Cogan and Smith |
| MOMA Party: | Cogan, Marcus and Nelson are liable for the cost of the Cogan film |
| Golfinos: | Cogan |

## VI. *Count V: Dividends and Dow Re-purchase*

In Count V, the Trustee seeks to hold responsible Cogan and the Director–Defendants [84] for the dividends paid by Trace and the Dow Re-purchase because he claims that Trace was insolvent or had impaired capital when such actions were taken.

### A. *The Dividends*
### 1. *Most of the Dividends Were Illegal*

■ The payment of a stock dividend while a corporation is insolvent, or one that renders a company insolvent, is illegal under Delaware law. *EBS Litig., LLC v. Barclays Global Investors, N.A.*, 304 F.3d 302, 305–06 (3d Cir.2002). It is also illegal for a company to pay dividends that are not declared by the Board in accordance with Section 170 of the Delaware General Corporation Law. Del.Code Ann., tit. 8, § 173.

---

84. Smith and Winters, as solely officers, can- not be liable under § 174.

■ Dividends in the amount of $1,983,491 were not declared or approved by the Board and therefore are illegal.[85] They were also declared at a time when Trace was insolvent and therefore are also illegal. Because there was no Board action, the directors cannot claim to have "relied" on any report.

■ Of the remaining dividends that were declared and approved by the Board, all but those declared in November and December 1996 were illegal as they were declared when Trace was insolvent. Those dividends amount to a sum of $2,326,332.

With regard to those declared dividends, the director-defendants argue that they are protected under § 172 [86] because they reasonably relied on Nelson's "report" that Trace was not insolvent in declaring the $2.3 million in dividends. To succeed, they must prove (1) Nelson actually determined a surplus existed, and (2) it was reasonable for them to rely on that determination. 8 Del. C. § 172; *Van Gorkom*, 488 A.2d at 877. All that is present here is the "blind reliance" that *Van Gorkom* held could not insulate a Board from liability. There is no evidence to support Nelson's assertion that he performed a surplus calculation, nor was any balance sheet or other written analysis attached to the unanimous consents to evidence the calculation Nelson claims to have made. Absent such documentation, the Director–Defendants have failed in their fiduciary duty of accountability and "every presumption will be made against the fiduciaries." *Technicorp Int'l II, Inc.*, 1997 WL 538671, at *1, 2000 Del. Ch. LEXIS 81, at *4–5 (court not required to accept "fiduciaries' uncorroborated or self-serving testimony" of legitimate business purposes for expenditures where there is no documentation thereof).

Moreover, each unanimous consent contains the assertion that Trace had at least $150 million in surplus. There is no assertion of the actual or approximate amount of surplus. These "boilerplate" unanimous consents also belie the testimony that Nelson performed calculations on which the Board relied.

### 2. *Defendants' Collateral Estoppel Argument Fails*

Collateral estoppel is an affirmative defense pursuant to Fed.R.Civ.P. 8(c), on which Defendants bear the burden of proof.

The Defendants have alleged that the Trustee is collaterally estopped from claiming the dividends were illegal by pointing to an order by the Delaware

---

**85.** To the extent the Director–Defendants contend that the absence of an approving resolution in the corporate minute book does not prove that the dividend was unauthorized, their argument fails. The evidence has shown that King was conscientious and thorough in recording and maintaining the minute book for all formal board actions. Any informal board action, that would not be recorded in the corporate minute books, is, for the reasons discussed *supra*, a breach of the directors' obligations to manage the corporation's affairs in an accountable way.

**86.** Section 172 provides:
A member of the board of directors ... shall be fully protected in relying in good faith ... upon such information, opinion, reports or statements presented to the corporation by any of its officers or employees ... or by any other person as to matters the director reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation, as to the value and amount of the assets, liabilities and/or net profits of the corporation or any other facts pertinent to the existence and amount of surplus or other funds from which dividends might properly be declared and paid, or with which the corporation's stock might properly be purchased or redeemed.
Del.Code Ann. tit. 8 § 172.

Chancery Court in *Barbuto v. Trace Int'l Holdings, Inc.,* No. 15175 (Del. Ch. May 21, 1999). Anthony G. Barbuto, as trustee for Lambert Brussels Financial Corporation, had moved for partial summary judgment against Trace International and its directors seeking the payment of dividends accrued, but not yet paid, on June 30, 1995, December 31, 1995, and June 30, 1996, at the rate of $839.94 per share. Those dividends were never paid. Moreover, a final judgment was never entered in the case.

In determining whether a state court action precludes a party from asserting a fact in a subsequent litigation, federal courts look to the law of the state in which the first decision was rendered. *Fuchsberg & Fuchsberg v. Galizia,* 300 F.3d 105, 109 (2d Cir.2002). Under Delaware law, as well as New York law, a party to the first action and its privies are estopped from relitigating "issues necessarily decided in the prior action" where there is a final judgment. *Nationwide Mut. Ins. Co. v. Flagg,* 789 A.2d 586, 593 (Del.Sup. Ct.2001); *Fuchsberg,* 300 F.3d at 109 (holding preclusive effect "if resolution of the issue was 'by necessary implication . . . contained in that which [was] explicitly decided'") (citation omitted).

The Defendants, by way of proof, include the short-form *Barbuto* order, which makes no reference to surplus. Smith, the Defendants' lone witness on the order's alleged meaning, thought the surplus issue had been withdrawn. He also contradicted the claim that the order was even "final" for collateral estoppel purposes. The only remaining (non-with-drawn) issue addressed in the *Barbuto* order was whether Trace had improperly paid dividends to one class of preferred stock that was entitled to equal treatment. All that the court necessarily decided was that one class had been paid and one had not. The court had no need to consider whether the dividends that were in fact paid were paid out of surplus, and there is no evidence, nor is it likely, that Trace defended the *Barbuto* litigation by arguing that the dividends it had paid were unlawful. As a result, the Defendants' collateral estoppel argument is rejected.

### 3. *The Dow Re-purchase*

Section 160 of the Delaware Gen. Corp. Law provides the authority for, and limitations on, stock redemption. Section 160 provides:

> Every corporation . . . may redeem . . . its own shares; provided, however, that no corporation shall: . . . redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such . . . redemption would cause any impairment of the capital of the corporation
> . . . .

The $3 million Dow re-purchase was made when Trace was insolvent.[87] In addition, *Pereira I* already rejected the Defendants' argument that the "subterfuge" of Cogan's purchase of the stocks on Trace's behalf, using Trace's funds, and which were pledged to Trace was not a redemption. *Pereira I,* 2001 WL 243537, at *15, 2001 U.S. Dist. LEXIS 2461, at *46 ("[The Director–Defendants] have cited no authority for the proposition that the Delaware

---

**87.** The Trustee also argues that the redemption was illegal because it was in contravention of Trace's certificate of incorporation. Presumably, he means that the shares could not be redeemed unless dividends were paid on *pari passu* stock. In making this assertion, the Trustee failed to point to any particular provision in the certificate of incorporation (although the Defendants agree that Trace could not redeem the shares). In the absence of any provision of the certificate of incorporation to support this assertion, it cannot be determined if Cogan's purchase of the stock violated the certification of incorporation.

Court of Chancery, a court of equity, would permit the statute to be evaded by the subterfuge of the nominal purchase by Cogan, using funds provided by Trace.").

In the intervening time, the Defendants have found a Delaware case they claim supports their argument, *In re Sunstates Corp. S'holder Litig.*, 788 A.2d 530 (Del. Ch.2001), and thus raise the argument once again. In *Sunstates,* as with Trace, Sunstates' corporate documents provided that it could not purchase shares of any stock ranking *pari passu* or junior to a preferred stock unless dividends on that preferred stock were current. Sunstates was in arrears in the payment of dividends on its preferred stock. To circumvent this restriction, Sunstates' wholly owned subsidiaries purchased shares of both its common and preferred stocks. The owners of preferred shares then filed suit, claiming that the subsidiaries' purchase of the shares violated Sunstates' certification of incorporation, which prohibited the "Corporation" from making any purchase of any stock ranking as to dividends junior or *pari passu* to the preferred stock in question. *Id.* at 532. Noting that stock preferences are to be strictly construed, with any ambiguities resolved against granting the challenged preferences, the Court held as a matter of contract interpretation that the certificate of incorporation did not prohibit Sunstates' subsidiaries from purchasing stock because it restricted only the corporation itself and not its subsidiaries. *Id.* at 533–34.[88]

The Trustee argues both that the Dow re-purchase was illegal due to Trace's insolvency and that it violated Trace's certificate of incorporation. If the certificate of incorporation had included similar language as in *Sunstates,* which it does not,[89] the case might have been helpful to the Director–Defendants. Instead, it is inapplicable because the certificate of incorporation uses other language and because the Trustee's primary argument is that the Dow repurchase was illegal because of Trace's insolvency. The definition of "redemption" therefore, need not be as narrowly defined as was contractually agreed to in *Sunstates.*

Redemption is defined as "[t]he reacquisition of a security by the issuer." *Black's Law Dictionary* 1282 (7th ed.1999). Courts uniformly employ the same definition. *E.g., Krassen v. Climaco, Climaco, Lefkowitz & Garofoli Co.,* No. 80305, 2002 WL 1454066, at *4 (Ohio Ct.App. July 3, 2002) (defining redemption as "repurchase of stock by the corporation"); *Frontier Chevrolet Co. v. Comm'r of Internal Revenue,* 116 T.C. 289, 294, 2001 WL 505196 (T.C.2001) ("Redemption, in the context of

---

**88.** The Defendants also point to *Sunstates'* conclusion that the argument that the subsidiaries were acting as agents of Sunstates was "legally flawed." *Id.* at 534. It looked to the doctrine of alter-ego liability and concluded that the subsidiaries could not be deemed to be agents of Sunstates unless "the corporation was a sham and existed for no other purpose than as a vehicle for fraud." *Id.* (citation omitted). That finding does not impair the Trustee's claim, as here the purchaser of the stock was an individual (a controlling shareholder), rather than subsidiaries. There is nothing in the corporate veil doctrine that prohibits a corporate from acting through an individual.

**89.** The relevant provision in the articles of incorporation, Section 4.04(g)(ii), provides that "The Corporation shall not and shall not permit any of its subsidiaries or affiliates to redeem or purchase or otherwise acquire for value any shares of any class of Common Stock, if at the time of making such redemption, purchase or other acquisition, the Corporation shall be in default with respect to any dividends payable on, or any obligation to redeem or retire, shares of Convertible Preferred Stock." The term "otherwise acquire" likely encompasses Cogan's re-purchase of the stock.

securities, is defined as '[t]he reacquisition of a security by the issuer.'") (citation omitted); *Pabst Brewing Co. v. CIR,* No. 18466–92, 1995 WL 325875 (T.C. June 1, 1995) (Internal Revenue Code treats stock "as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property").

Here, Trace reacquired the stock, albeit in a roundabout way, in exchange for property. Trace's funds, rather than Cogan's funds, were used to purchase the stocks. It does not matter that the fiction was created that Cogan received a "loan," the collateral of which were the stocks. The purpose of the transaction was for Trace to buy back its shares. It is undisputed that Trace orchestrated the purchase in this manner in order to avoid liability to preferred shareholders. These facts do not detract from the finding that the ultimate goal was for Trace to redeem its shares.

The Defendants also argue that § 160 by its plain language is applicable only when the corporate issuer redeems the stock. The "court must give effect to a statute's plain meaning in order to implement the General Assembly's intent." *Nelson v. Frank E. Best, Inc.,* 768 A.2d 473, 478 (Del.Ch.2000); *Speiser v. Baker,* 525 A.2d 1001, 1008 (Del.Ch.1987) (when construing "reasonably precise words" in the General Corporation Law, the court "accord[ ]s them their usual and customary meaning"); *RFE Capital Partners, L.P. v. Weskar, Inc.,* 652 A.2d 1093, 1095 (Del.Super.Ct.1994) (where statutory language "conveys a clear and definite meaning" court "must give full effect to that meaning").

Presumably, the Defendants argue that the statute's focus is on actions by the "corporation." They are correct that the plain language of the statute means that only the corporation's actions are at issue. Thus, if Cogan used his own money to

purchase the stock, even though he is a controlling shareholder, his actions would not be prohibited under § 160. The key word in § 160 for this discussion, however, is "redeem." As discussed above, the meaning of redemption is broad enough to include situations where, as here, the corporation directs another entity to purchase the shares, loans that entity money to purchase the shares, and accepts the shares as collateral for the loan.

██ Because the Defendants have opened the can of statutory interpretation worms, it is only fair to point out another concept of such interpretation: looking to the intent of the legislative body in passing § 160. Section 160 is intended to buffer creditors against corporate expenditures that impair the integrity of the corporation's capital because capital constitutes a fund for the payment of indebtedness. *Johnston v. Wolf,* 487 A.2d 1132, 1134–35 (Del.1985) (construing Section 174); *PHP Liquidating LLC v. Robbins,* 291 B.R. 592, 598–99 (D.Del.2003) ("The purpose of Section 160 is to protect a corporation's creditors") (collecting cases). Here, Trace paid $3 million when its capital was severely impaired and, in fact, when Trace was insolvent. It does not matter that it paid the $3 million to Cogan for the purposes of doing what Trace otherwise could not do. Thus, while a clever way for Trace to avoid paying an additional $2 million in *pari passu* dividends, it was not sufficiently clever to avoid liability as a redemption under § 160.

More interesting is the Defendants' argument the $3 million transaction does not cause injury. As they note, absent the 1998 transaction, Trace would have had a $3 million contractual liability to Dow, but instead Trace exchanged a $3 million liability for a $3 million Note from Cogan, which has been held to be with recourse. Such a logical point, however, defies the reason for the prohibition on redeeming

shares when a corporation is insolvent or has impaired capital, as discussed above: the need to protect assets for creditors. Therefore, the damage done by the redemption of the stock was in shunting $3 million from other potential creditors than Dow. This argument is therefore rejected.

### B. *Summary*

Under Section 174(a) of the Delaware General Corporation Law, the directors of a corporation are jointly and severally liable to the corporation's creditors for any illegal dividends or illegal redemptions they allow. 8 Del. C. § 174(a); *see also* *EBS Litig.*, 304 F.3d at 307. Therefore, the Director–Defendants are liable for the illegal dividends in the amount of $4,309,823 and the illegal redemption in the amount of $3 million, or a total of $7,3090,823.

### VII. *Damages Are Available Even Though the non-Cogan Defendants Do not Possess Any Particular Funds Belonging to Trace*

██ The non-Cogan Defendants argue first that the Trustee limited his grounds of relief to restitution, and that such relief is limited to situations where defendants have received particular funds or property that they must restore.[90] Second, the non-Cogan Defendants argue that a second form of equitable relief that they apparently concede does not require that the defendants possess particular funds, rescissory damages, is not available in this situation because the Trustee limited his damages to equitable restitution and because rescissory damages is in any case a troublesome remedy that is not often awarded.

In *Pereira v. Cogan,* 2002 WL 989460, at *2–4 (S.D.N.Y. May 10, 2002), it was held that a right to jury trial did not attach in this case because breach of fiduciary duty was historically treated as an equitable cause of action and because the Trustee had limited his relief to restitution. In making the determination that the damages sought were equitable in nature, the primary case on which the non-Cogan defendants now rely, *Great–West Life*, 534 U.S. 204, 212, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002),[91] was specifically discussed. *Id.* at *4. Further, it was held that the fact that "the officers and directors never per-

---

**90.** *E.g., Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 205, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002); ("For restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession."); *Geller v. County Line Auto Sales, Inc.,* 86 F.3d 18, 22 (2d Cir.1996) (equitable restitution could not be awarded where defendant caused wrongful payment to be made to his girlfriend and therefore he was not in possession of the funds); *Neidich v. Estate of Neidich,* 222 F.Supp.2d 357, 375 (S.D.N.Y.2002) (dismissing ERISA claim for equitable restitution because the defendants themselves never received the vast majority of funds that the plaintiff sought and any proceeds they did receive could not be recovered in equity because they could not longer be traced to a particular fund).

**91.** In *Great–West,* an insurance company brought suit to compel a health plan beneficiary, who had recovered from a third-party tortfeasor, to make restitution to the plan for benefits it had paid. The issue was whether reimbursement to the health plan for payments made to a beneficiary by a third party constitutes "equitable relief" authorized by section 502(a)(3) of ERISA. *Id.* at 206, 122 S.Ct. 708. The Court held that because the insurance company was seeking to impose personal liability on the plan beneficiary for a contractual obligation to pay money, the relief it sought was "legal," as opposed to "equitable," and was therefore not available under section 502(a)(3), which authorizes plan participants and fiduciaries to bring civil actions to obtain "appropriate equitable relief." *Id.* at 214, 122 S.Ct. 708.

sonally possessed any of the disputed funds" did not militate that the relief was not equitable in nature.[92] *Id.* Although not expressly stated, the assumption underlying this finding was that the Trustee was able to obtain an award from the officers and directors of funds that the officers and directors never themselves possessed.

The Trustee's argument for the application of the equitable remedy of rescissory damages, as opposed to restitution, will be adopted. First, the fact that the Trustee did not expressly claim that he would seek rescissory damages does not bar such relief. Pursuant to Fed.R.Civ.P. 54(c), a party shall receive the relief to which he is "entitled, even if the party has not demanded such relief in the party's pleadings." Nor does Fed.R.Civ.P. 16 present any bar.[93] Further, an award of rescissory damages is the "equivalent money judgment" of restitution. *Lynch v. Vickers Energy Corp.,* 429 A.2d 497, 503 (Del.1981) (hereinafter *"Vickers"*). Thus, the distinction between restitution and rescissory damages has no practical significance when, as here, the wrongfully taken property is in the form of cash, on which the Trustee is entitled to appreciation in the form of an award of prejudgment interest.

The Defendants have pointed out that the Delaware courts have attempted to confine rescissory damages to cases involving more than breaches of the defendants' duty of due care. The rationale for the discretionary denial of rescissory damages for breach of the duty of care was set forth in *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1134 (Del.Ch.1994); *Strassburger v. Earley,* 752 A.2d 557 (Del.Ch.2000). *Cinerama* addressed the issue of liability for a disinterested board which tried in good faith to perform its responsibilities, but was inadequately informed. *Id.* at 1148–49. Chancellor Allen was concerned with inhibiting the ability of such a board to "function as prudent risk-takers ...." *Id.* at 1148.[94] This rationale does not apply to this situation where the Board did not take any actions, and its very lack of action may be seen as bad faith.

Moreover, reliance on *Cinerama* must be based on the conclusion that this Court earlier rejected, that the Defendants had not engaged in a breach of their duty of loyalty. The Defendants' gross inattention to the governance of Trace, the dereliction of their duties and their willingness to permit Cogan to rule without restraint has resulted in a finding of a breach of their duties of loyalty.

**92.** The non-Cogan defendants argue that the opinion "never stated that equitable restitution could be awarded against a defendant who did not possess particular Trace funds." Nelson, Smith and Winters Mem. at 7. That is true. The opinion found that the relief sought was equitable, and that it did not matter that the officers and directors never personally possessed any of the disputed funds.

**93.** Rule 16 does not require "an abstract, perfect equivalence between the pretrial papers and the course of litigation ..." and is instead "intended to insure the efficient resolution of cases and, most importantly, minimize prejudicial surprise." *Lamborn v. Dittmer,* 873 F.2d 522, 527 (2d Cir.1989). The Defendants cannot claim to be prejudiced

here as it was evident from the opinion striking their jury trial demand that the Court and the parties fully expected that the Trustee was seeking to obtain damages from the officers and directors even though they had not received particular funds from Trace.

**94.** Chancellor Allen was also concerned with subjecting a disinterested, functioning board to exposure for the "appreciation value" element of rescissory damages, but recognized that a plaintiff could still recover for its pre-appreciation "out-of-pocket loss." 663 A.2d at 1149, 1150. Here, the Trustee seeks only the "out-of-pocket" recovery of cash (as opposed to shares of stock, as in *Cinerama*) in addition to prejudgment interest to which he is concededly entitled.

Finally, the Delaware courts have held corporate fiduciaries jointly and severally liable for damages in circumstances similar to this case. In *Lutz*, 171 A.2d at 395–96, for instance, damages were awarded against non-insider directors who had given "scant attention" to their duties and thereby permitted improper transfers of corporate fund, including to an entity controlled by the corporation's "dominant" CEO.[95] The same remedy is appropriate here. As a result, the damages sought by the Trustee are not barred, and the award thereof does not infringe upon the Defendants' rights to a jury trial.

## VIII. *Judgment Reduction Arguments*

### A. *The Properly Asserted Offsets*

Cogan, Nelson and Smith have properly asserted offsets allegedly owed to them in their individual capacities as former Trace employees.

Cogan has asserted three employment-related offsets that have already been held to be without merit. Nelson and Smith make employment-related claims involving stock grants and deferred compensation agreements.

None of these offsets may be asserted against claims for breach of fiduciary duty, including Counts II, IV and V. Under Section 553 of the Bankruptcy Code, 11 U.S.C. § 553(a), a defendant may set off only a "mutual" claim against the Trustee. The requirement of mutuality means that the Defendant and the Trustee must assert claims against each other in the same "capacity." 5 *Collier on Bankruptcy* ¶ 553.03[3][c] (15th ed.2002).

Under § 553, individual claims may not be offset against claims for breach of fiduciary duty because the mutuality/same capacity element is lacking. *Id.* Accordingly, corporate officers and directors may not assert individual-based offsets as defenses to breach of fiduciary duty. *Klein v. Tabatchnick*, 610 F.2d 1043, 1050–51 (2d Cir.1979); *Ritter v. Mountain Camp Holding Corp.*, 252 A.D. 602, 604–05, 299 N.Y.S. 876 (N.Y.App.Div. 1st Dep't 1937) (cited with approval in *Klein;* precludes employee compensation offsets against fiduciary duty claim when corporation is insolvent).

Cogan has admitted that his employment-based offsets have been asserted in his individual [non-fiduciary] capacity and thus are "mutual ... in the bankruptcy sense," vis-a-vis the Trustee's individual claims against Cogan on his notes. As admittedly "individual" offsets, they are not "mutual" vis-a-vis claims against Cogan in his fiduciary capacity.

Nelson is in the same position as Cogan. Nelson is using his individual-based offsets as a defense to the Trustee's individual claims against him, in a separate Bankruptcy Court proceeding. *In re Trace Int'l Holdings, Inc.*, 284 B.R. 32 (Bankr. S.D.N.Y.2002). There is also no practical reason to entertain Nelson's alleged offsets unless they are denied for failure of proof as to amount. Nelson offered no such

---

95. The non-Cogan Defendants note that the *Lutz* opinion does not use the term "restitution," and they claim that the case is one dealing with corporate waste rather than breach of fiduciary duty. There is no need for the damage to be explicitly labeled restitution; the court awarded in equity damages as a result of a breach of fiduciary duty in a case similar to the one presented here in that the directors neglected to exercise the degree of oversight they should have. The non-Cogan Defendants' attempt to distinguish the case as one solely regarding corporate waste is also unsuccessful, as the particular portion of *Lutz* at issue here is uniformly cited to in breach of fiduciary cases to outline the scope of such duties. *E.g., Cede*, 634 A.2d at 363; *Van Gorkom*, 488 A.2d at 872.

proof here, and instead represented that the amount of his offsets will be decided by Judge Bernstein. Judge Bernstein has recently held that this issue must await trial in Bankruptcy Court. *Id.* at 38–40. Judge Bernstein also rejected the argument Nelson is attempting here, that his offset is the face value of his deferred compensation agreement, holding instead that Nelson was limited to its deeply discounted present value. *Id.* Nelson offered no present value evidence here.

Smith's alleged offsets also are indistinguishable from the individual, employment-based claims of Cogan and Nelson. Thus they too are not a defense to Count IV. Smith's claims have also been released. On April 28, 2000, Smith and Foamex executed a Severance Agreement and Release, under which Smith released "any claims of any nature whatsoever" against Foamex and its shareholders. Trace was the principal shareholder in Foamex, a fact that Smith knew or reasonably should have known as general counsel of Trace and Foamex. Smith received a two-year payout of $430,000 in return for his release. After Smith was confronted with his release at his deposition on November 2, 2001, he purported to rescind it via another agreement with Foamex (chaired by Cogan) on January 21, 2002, near the end of the two-year severance period. Rather than promptly updating his production of documents, Smith did not disclose the January 21 agreement until he testified late in the trial on November 26, 2002.

In any event, Smith did not obtain the Trustee's consent to his attempted rescission. Absent such consent, Smith could not terminate the Trustee's rights. Under Pennsylvania law under which the release is governed, the rights of even a donee third-party beneficiary become "indefeasible" upon execution of the relevant agreement, and those rights cannot be abrogated without the beneficiary's consent. *Biggins v. Shore*, 523 Pa. 148, 565 A.2d 737, 739–42 (1989) ("A donee beneficiary's contractual rights vest immediately, [and] they may not be modified by the contracting parties unless the power to modify has been expressly reserved in the contract and ... the donee beneficiary has a right of action to enforce the benefit conferred by the contract."); *Crane Co. v. Nat'l Cas. Co.*, 40 Pa. D. & C. 649, 1941 WL 2883 at *1, 1941 Pa. D. & C. LEXIS 35 at *4 (Common Pleas 1941) (donee beneficiary's right under executed contract could not thereafter be eliminated without its consent).

### B. Marcus's Proposed Thirteenth Affirmative Defense

Marcus has also moved this Court to reconsider its earlier ruling striking a new Thirteenth Affirmative Defense, in which Marcus claimed a damages offset of less than $2 million (present discounted value) based on separate 1985 and 1986 deferred compensation/severance agreements with a predecessor to Trace International Holdings, Inc.

The defense was asserted on April 22, 2002, and was timely filed purportedly as of right in response to the Trustee's Third Amended Complaint, which was filed on April 15, 2002.[96] By opinion dated August 7, 2002, the Thirteenth Affirmative De-

---

96. The Complaint was amended to add an alternative theory concerning an already pleaded 1998 corporate governance issue. The pre-existing complaint had alleged that, in violation of defendant's fiduciary duties and a Delaware statute, Trace was caused to redeem certain preferred shares in 1998 while its capital was impaired. The Complaint added an allegation that this same redemption also violated Trace's certificate of incorporation and another Delaware statute.

fense was stricken as one that could not be added as of right. *Pereira v. Cogan*, 2002 WL 1822928 (S.D.N.Y. Aug. 7, 2002). Subsequently Marcus sought to amend his answer to include the Thirteenth Affirmative Defense, which the Court, by opinion dated November 8, 2002, also denied. *Pereira v. Cogan*, 2002 WL 31496224, at *3 (S.D.N.Y. Nov. 8, 2002).

Marcus now points to dictum in *Lucente v. IBM*, 310 F.3d 243 (2d Cir.2002) in an effort to revive the twice-denied Affirmative Defense. In *Lucente*, the district court granted leave to plaintiff to amend his complaint while refusing to allow the defendant to submit an amended answer or assert affirmative defenses. *Id.* at 252. The Court of Appeals reversed and remanded, observing that "a court may not deprive an affected party of the right to file a response to an amended pleading if the party so desires." *Id.* at 260 (*quoting* 3 James Wm. Moore et al., *Moore's Federal Practice* § 15.17[5] (3d ed.2002)).

 Such argument would be unavailing even if timely made. Here, Marcus was permitted to interpose a responsive pleading to the Trustee's Amended Complaint. What he was not permitted to do, however, was to add a new affirmative defense about which he had had prior knowledge and which was not responsive to the amended complaint. In exercising its discretion to deny the amendment under Fed.R.Civ.P. 15(a), the Court denied the motion based on the unexplained delay in raising the defense, the inference of bad faith that such delay evidenced, and the resulting prejudice to the Trustee. *Pereira*, 2002 WL 31496224, at *3–4. *Lucente*

in no way affects this holding, and Marcus's untimely motion for reconsideration is therefore denied.

Even if his affirmative defense were to be permitted, he would encounter the same mutuality problem discussed above, and the claimed offsets would in any case be denied.

### C. Sherman Settlement

The Defendants argue that they are entitled to a "pro rata" credit in excess of the $2 million that Sherman actually paid in settlement, relying on Del.Code Ann., tit. 10, § 6304(b).[97] That provision authorizes a pro rata reduction only if "the release ... provides for [such] a reduction ...." The Defendants did not introduce the Sherman Settlement Agreement and thus this argument is denied in the first part for a failure of proof.

 In addition, the Trustee has provided a copy of the Sherman Settlement, which provides for a pro rata reduction only "[i]n the event that Sherman has been adjudicated to be a joint tortfeasor ...." Settlement, ¶ 5. It was the Defendants' burden to introduce evidence such that Sherman would be adjudicated a joint tortfeasor. No such evidence has been presented, and therefore his settlement will not result in a pro rata reduction.

### D. Mitigation

The Trustee has already agreed to credit the Defendants for all funds previously received in settlements. What remains of the so-called mitigation issues are two arguments made by Cogan.

---

97. Section 6304(b) provides:

A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tortfeasor unless the release so provides; but reduces the claim against the other tortfeasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

Del.Code Ann. tit. 10, § 6304(b).

Cogan first contends that there was no injury because BNS, which had lent Trace the funds that Cogan later took from Trace, settled its claims as a lender against the Trace estate. This argument is akin to saying that a release by a corporate lender would absolve company officers from civil claims for theft or embezzlement of their employer's funds. BNS's settlement as lender does not release or eliminate the injury to Trace when funds were wrongfully diverted from the company. Nor does it eliminate all the other creditors who remain unpaid.

 Cogan next contends that the Trustee should have sued more parties. The applicable rule is that a plaintiff's recovery may be reduced by the measure of injury "that he could have avoided by the use of reasonable effort or expenditure after the commission of the tort." *Restatement (Second) of Torts*, § 918(a). In assessing reasonableness, "[t]here must also be considered the personal situation of the plaintiff." *Id.* at cmt. e. Failure to mitigate is an affirmative defense on which Cogan has the burden. *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1580–81 (2d Cir.1994); *Air et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir.1985).

 Here, the plaintiff is a fiduciary who represents a bankrupt estate, with accordingly limited assets, and who has considerable discretion as to how to employ the estate's resources. A bankruptcy trustee has no duty to sue. *In re Bean*, 251 B.R. 196, 203–05 (E.D.N.Y.2000) ("A trustee is under no mandatory duty to pursue and recover every transfer that may be avoidable ...."), *aff'd*, 252 F.3d 113 (2d Cir.2001). To the contrary, a Trustee's decision about whether to bring an action is a matter committed to his "informed discretion" as a fiduciary. *In re Mailman Steam Carpet Cleaning Corp.*, 212 F.3d 632, 635 (1st Cir.), *cert. denied*, 531 U.S. 960, 121 S.Ct. 385, 148 L.Ed.2d 297 (2000). The exercise of the Trustee's discretion "involves weighing a myriad of factors," including "the factual and legal merits of the prospective action; the probable value of the recovery to the estate; the probable cost of the action to the estate." *Bean*, 251 B.R. at 204 (*quoting In re Haugen Constr. Serv., Inc.*, 104 B.R. 233, 240 (Bankr.D.N.D.1989)). When the decision involves "potentially costly litigation, with no guarantee as to the outcome, the trustee must tread cautiously—and an inquiring court must accord him wide latitude should he conclude that the game is not worth the candle." *Mailman*, 212 F.3d at 635.

 Cogan has failed to meet his burden of showing that the Trustee has improperly exercised his discretion in choosing not to sue the numerous parties suggested by Cogan. As a result, the claim is denied.

### E. *Farace's 1998–99 Liability*

The Trustee does not appear to claim that Farace is liable for any of the disputed transactions in Counts IV and V that were effectuated in 1998 and 1999,[98] except that he argues that Farace should be liable for Cogan's excess compensation in those two years, as he was a member of the Board at the time its inaction resulted in the automatic renewal of another ten-year term of Cogan's 1987 Agreement. Because Farace was liable, in part, for such inaction as discussed above, he will be held

---

**98.** As noted above, the Trustee sought to find Farace liable for the Dow repurchase as well, but it was found that Farace did not breach any fiduciary duties in recusing himself from the issue due to his position at Foamex.

liable for Cogan's excess compensation in 1998 and 1999.

### IX. *Prejudgment Interest*

The Trustee seeks prejudgment interest on Counts II, IV and V under Delaware law.[99]

██ Under Delaware law, prejudgment interest is available "as a matter of right" in breach of fiduciary duty cases. *Trans World Airlines, Inc. v. Summa Corp.*, 1987 WL 5778, at *1, 1987 Del. Ch. LEXIS 373, at *2 (Del. Ch. Jan. 21, 1987) (citing cases); *see Smith v. Nu–West Indus.*, 2001 WL 50206, at *1, 2001 Del. Ch. LEXIS 8 at *1–2 (Del. Ch. Jan. 12, 2001). Prejudgment interest is awarded as compensation for "the inability to use money awarded during the time it was not available" due to the defendants' breach of fiduciary duties. *Trans World*, 1987 WL 5778 at *1, 1987 Del. CH. LEXIS 373 at *3; *Smith*, 2001 WL 50206, at *1, 2001 Del. Ch. LEXIS 8, at *2–5.

██ Prejudgment interest shall be calculated from the dates Trace was wrongfully deprived of its funds by the multiple wrong acts. *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 409 (Del.1988) (granting interest for twenty-seven years, including ten in which the case was dormant, in absence of undue delay on plaintiff's part). The rate of interest shall be the legal rate of five percent simple interest over the Federal Reserve discount rate as of each applicable date, except for Defendants' liability for the Cogan notes where the contractual rate of nine percent shall be awarded. *Smith*, 2001 WL 50206, at *1, 2001 Del. Ch. LEXIS 8, at *1–2; Del.Code Ann., tit. 6, § 2301(a)(2002) (setting legal rate of interest as above). *Cf. Summa*, 540 A.2d at 409

("the legal rate is a mere guide, not an inflexible rule").

### CONCLUSION

Based upon the findings of fact and conclusions of law set forth above, the Trustee is entitled to judgment on all of his claims, as follows. With regard to Count I, the Trustee is entitled to an updated judgment adding additional interest and late fees for each note through the time that such note was accelerated, without offset. The Trustee should be afforded additional judgment for his attorney's fees and other enforcement costs, following a motion under rule 54(d). Under Count II, the Trustee is entitled to restitution of excess compensation from Cogan in the amount of $6,948,994. The liability in Count IV has been described in greater detail above. Finally, under Count V, the Director–Defendants are liable for the illegal dividends in the amount of $4,309,823 and the illegal redemption in the amount of $3 million, or a total of $7,3090,823. Defendants are also liable for prejudgment interest.

Settle judgment in accordance with this opinion as of May 27, 2003, upon ten (10) days' notice.

It is so ordered.

### APPENDIX A

The following are notable transactions and financings of Trace during the relevant period.

In 1991 and 1992, Trace, through wholly owned subsidiaries, repurchased, from its joint venture partner, Recticel, an affiliate of Societé Génerale de Belgique, the stock of Foamex that Trace did not own.

Beginning in 1992, Trace, through investments from Trace, Harvard University, JP Morgan and the Apollo group, be-

---

**99.** The Defendants do not contest that Delaware law applies.

gan to create what would become UAG through the acquisition and consolidation of retail automobile distribution businesses. UAG had originally been incorporated in December 1990.

On October 13, 1992, Foamex issued $150 million of Senior Notes bearing an interest rate of 11.25%. On the same date, Foamex also issued approximately $125 million of Senior Subordinated Debentures bearing an interest rate of 11.875%.

In March 1993, Foamex L.P. acquired GFI (which had been sold by Trace in 1988) for aggregate consideration of $95.8 million.

In May 1993, Foamex L.P. acquired Great Western Foam Products Corporation and certain related entities and assets (collectively "Great Western") from John Rallis, the sole shareholder of Great Western, for an aggregate consideration of $38 million.

In November 1993, Foamex L.P. acquired Perfect Fit Industries, Inc. ("Perfect Fit") for an aggregate consideration of $69.1 million.

In December 1993, Trace issued an IPO of the common stock of its subsidiary Foamex at a value of close to $400 million. Trace itself earned approximately $104 million from the IPO.

On June 28, 1994, Foamex acquired the businesses and assets of the automotive products and industrial fabrics divisions of JPS for $287.3 million.

On or about November 25, 1994, Republic National Bank of New York ("Republic") provided a $2 million line of credit to Trace. There were no defaults under this line of credit at any time. The line of credit was secured by a personal guarantee of Cogan.

In or about February 1995, DLJ issued a $25 million margin loan to Trace Foam Sub, Inc., a wholly owned subsidiary of Trace. This loan was secured by approximately seven million shares of Foamex stock held by Trace. On February 25, 1995, Trace, through its wholly-owned subsidiary, CHF, acquired all the assets of CHF Industries, Inc., a home furnishing product business. The purchase price was approximately $109 million.

On or about July 5, 1995, Phemus, an investment/finance firm, issued Trace Auto Holdings, Inc. a loan in the principal amount of $12.3 million. The loan was guaranteed by a pledge of Trace Auto Holding, Inc.'s shares of the '21' Club and the personal guarantee of Cogan. This agreement also included an Asset Appreciation Agreement whereby Trace Auto Holdings would pay to Phemus 2% of any increase in value over specified amounts if Trace Auto Holdings or any of its Affiliates sold, transferred or otherwise disposed of its shares of Foamex, UAG, or CHF.

On or about July 28, 1995, BNS purchased $22 million of CHF's Senior Subordinated Notes, backed by a guarantee of Trace.

In September 1995, Trace sold the '21' Club to Sea Containers Ltd. for approximately $22.8 million, resulting in a profit to Trace of approximately $6.4 million after sales costs.

On or about February 5,1996, Republic, under the terms of an Installment Promissory Note, made a secured loan to Trace in the principal amount of $3 million. Repayment of this loan was to be made in three installments, which were due on May 31, 1996, August 31, 1996, and November 30, 1996. Trace repaid the loan in full.

On July 23, 1996, Trace entered into a Credit Agreement with BNS whereby

BNS committed to loan Trace up to $52.5 million.[100] The July 1996 BNS loan agreement included an Asset Appreciation and Extraordinary Distribution Agreement whereby Trace would pay to BNS 25% (less certain adjustments) of any increase in value over specified base amounts if Trace sold, transferred to a non-affiliate or otherwise disposed of its shares of Foamex, UAG or CHF (the "asset appreciation percentage").

In October 1996, Trace took UAG public. The lead underwriters were JP Morgan, Montgomery Securities and Smith Barney Inc. UAG's market capitalization immediately following the IPO was $465 million.

On December 11, 1996, Foamex completed the sale of its partnership interests in JPS Automotive for the sale price of approximately $220.1 million.

On or about January 27, 1997, Citibank issued Trace a $15 million revolving loan, at prime plus 1%, for 180 days, callable on demand and secured by all of the UAG stock owned by Trace. The loan was amended on July 27, 1997. There were no defaults under this revolving loan agreement.

On June 12, 1997, Foamex substantially completed a refinancing plan (the "Refinancing Plan") designed to reduce Foamex's interest expense and increase its financing flexibility. The Refinancing Plan included a tender offer to purchase $489.7 million of Foamex's public debt, the payment of $5.2 million of Foamex L.P.'s term loan borrowings under an existing credit facility and the payment of related fees and expenses. In addition, the tender offer included amending the existing indentures to remove substantially all of the restrictive covenants. Foamex purchased $459.0 million of public debt under the tender offer and incurred an extraordinary loss on the early extinguishment of debt of approximately $42.0 million (net of income tax benefit of $25.7 million). The Refinancing Plan was funded by $347.0 million of borrowings under a new credit facility (the "Credit Facility") and the net proceeds from the issuance of $150.0 million principal amount of senior subordinated notes. As a result of the Refinancing Plan, Foamex's total long-term debt increased by $63.9 million. The Refinancing Plan resulted in decreased interest expense of roughly $6 million a year as compared to the debt structure prior to the Refinancing Plan. In connection with the Refinancing Plan, Houlihan Lokey Howard & Zukin Financial Advisers, Inc. ("Houlihan Lokey"), financial advisers to Foamex L.P., issued a fairness opinion in which Houlihan Lokey opined that, as of June 12, 1997, and after giving effect to the Refinancing Plan, the fair value and present fair saleable value of the assets of Foamex L.P. would exceed the stated liabilities and

100. At this time, BNS was aware that Trace was cash flow poor when it and Trace entered into this initial credit agreements in 1996, but lent to Trace because BNS believed that Trace's interests in the portfolio companies had considerable value which could be realized. It did not believe, however, that Trace was insolvent. Prior to the acceptance of any lending proposal, BNS would routinely meet with the prospective client, review the client's financial statements, and consult outside sources of information on the client such as S & P reports and reports prepared by investment banks. BNS employed the same due diligence when it considered any of Trace's lending proposals from 1996 to 1999.

BNS also did not believe Trace was insolvent in 1997 when BNS increased its loan to Trace under the 1997 loans agreements, or in 1998 when it provided Trace with two commitment letters, each for $850 million, as discussed *infra*.

identified contingent liabilities of Foamex L.P. by at least $330 million.

On July 23, 1997, UAG, using JP Morgan as the lead underwriter, completed the sale of $150 million aggregate principal amount of 11% Senior Subordinated Notes. On September 16, 1997, UAG completed the sale of another $50 million aggregate principal amount of 11% Senior Subordinated Notes.

On July 28, 1997, Trace guaranteed a $2 million loan by Republic to the James Danziger Gallery, Inc., an art gallery in which Trace held a 49% equity interest.

On or about August 15, 1997, BNS loaned Trace an additional $10 million pursuant to an Amended and Restated Credit Agreement. In addition, pursuant to a Margin Loan Agreement of the same date, BNS issued to Trace two loans in the amounts of $7.5 million ("Tranche A Loan") and $8.75 million ("Tranche B Loan"), respectively. The August 1997 BNS loan agreement raised the asset appreciation percentage to 28%.

On December 23, 1997, Foamex acquired Crain Industries, Inc. ("Crain"), a competitor of Foamex, pursuant to a merger agreement with Crain Holdings Corp., for a purchase price of approximately $213.7 million, including the assumption of debt with a face value of approximately $98.6 million (and an estimated fair value of approximately $112.3 million) (the "Crain Acquisition").

On or about December 24, 1997, BNS loaned Trace an additional $3 million on the Term A Loan. BNS also issued Trace two additional term loans in the amounts of $15 million ("Term B Loan") and $21 million ("Term C Loan") each with an with an interest rate of 23.5%, but with only 6.5% payable per annum, until maturity. All other BNS obligations accrued interest at a rate of 10% per annum. Pursuant to the Pledge Agreement dated December 24, 1997, Trace granted a security interest in all the Pledged Shares, as defined therein.

On or about June 30, 1998, BNS loaned Trace $5 million pursuant to Amendment Number 4 to the Second Amended and Restated Credit Agreement and the Amended and Restated Pledge Agreement dated June 30, 1998, secured by Trace's pledge of 1000 shares of Trace Foam Sub, Inc. and all of Trace's remaining shares of UAG common stock.

On or about August 14, 1998, the Board approved by unanimous written consent the issuance of certain Series U Preferred shares to CIBC Wood Gundy ("CIBC") in exchange for $10 million. These shares were mandatorily redeemable on December 31, 1998.

On December 23, 1998, the Board determined that Trace had insufficient surplus to redeem the Series U Preferred shares pursuant to the mandatory redemption provision of the August 20, 1998 Series U Shares Purchase Agreement with CIBC.